1               UNITED STATES OF AMERICA
              SOUTHERN DISTRICT OF ILLINOIS

2

3  CHRISTOPHER NOVUS DAVIS,     )
                           )

4              Plaintiff,    )
  v.                    ) No. 3:13-cv-01260-SMY-RJD

5                          )
  DEPARTMENT OF HUMAN SERVICES, )

6  et al.,                )
                           )

7             Defendants.   )

8

9

10         TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                  DAY 1 OF 3

11
         BEFORE THE HONORABLE STACI M. YANDLE

12         UNITED STATES DISTRICT JUDGE

13             May 14, 2018

14

15

16

17

18

19

20

21  REPORTED BY:      Christine Dohack LaBuwi, RDR, RMR
                 Official Court Reporter

22                 301 West Main Street
                 Benton, Illinois  62812

23                 (618) 439-7725
                 Christine_Dohack@ilsd.uscourts.gov

24
  Proceedings recorded by mechanical stenography, produced

25  by computer-aided transcription.

```
 1    APPEARANCES:

 2    FOR PLAINTIFF:        Daniel A. Spira, Esq.
                           Elizabeth M. Chiarello, Esq.
 3                         Caitlyn Maly, Esq.
                           Julie Becker, Esq.
 4                         SIDLEY AUSTIN LLP
                           One South Dearborn Street
 5                         Chicago, IL  60603
                           (312) 853-9203
 6                         dspira@sidley.com
                           echiarello@sidley.com
 7                         cmaly@sidley.com
                           Julie.Becker@sidley.com
 8

 9
      FOR DEFENDANT:        Ashley M. Vincent, Esq.
10                         Samantha J. Costello, Esq.
                           Sean Edward Miller, Esq.
11                         OFFICE OF THE ATTORNEY GENERAL
                           500 South Second Street
12                         Springfield, IL  62706
                           (217) 782-1090
13                         avincent@atg.state.il.us
                           scostello@atg.state.il.us
14                         smiller@atg.state.il.us

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2
                                            PAGE:
 3
        Chambers Conference                 4:1
 4      Opening Statement by Ms. Chiarello  18:10
        Opening Statement by Ms. Costello   31:16
 5      Stipulated Facts by the Court       35:12
        Motions                             121:11
 6

 7                        WITNESSES

 8   ALL WITNESSES:                         PAGE:

 9    CHRISTOPHER NOVUS DAVIS for Plaintiff:
        Direct Examination by Mr. Spira     36:14
10      Cross-Examination by Ms. Vincent    83:12

11
      DR. AHMED TARIQ for Plaintiff:
12      Direct Examination by Ms. Maly      91:23
        Cross-Examination by Ms. Costello   99:22
13      Redirect Examination by Ms. Maly    104:23

14
      TERRY STEWART for Defense:
15      Direct Examination by Mr. Miller    114:11
        Cross-Examination by Mr. Spira      120:15
16

17    DR. LAWRENCE SOELLNER for Defense:
        Direct Examination by Ms. Vincent   126:20
18      Cross-Examination by Ms. Maly       138:21
        Cross-Examination by Ms. Maly       138:21
19

20

21

22

23

24

25
```

```
 1            (Proceedings began in chambers at 9:00 a.m.)
 2            THE COURT:  All right.  So, I wanted to take up
 3   any outstanding pending matters before we start.  I guess
 4   the first pending matter is for me to figure out who's all
 5   in here.  So, who is here on behalf of the plaintiff?
 6            MR. SPIRA:  Dan Spira.
 7            MS. CHIARELLO:  Beth Chiarello.
 8            MS. MALY:  Caitlyn Maly.
 9            THE COURT:  Okay.  And on behalf of the
10   defendants?
11            MS. VINCENT:  Ashley Vincent.
12            MS. COSTELLO:  Samantha Costello.
13            MR. MILLER:  Sean Miller.
14            THE COURT:  Okay.
15            MR. SPIRA:  And, Judge, just so you know, we do
16   have Julie Becker listed as counsel, as well.
17            THE COURT:  Will she be at counsel table?
18            MR. SPIRA:  Yes.
19            THE COURT:  Will she be participating?
20            MR. SPIRA:  Yes.  I think she's on the next page.
21   There you go.
22            THE COURT:  I'm not sure this case needs all this
23   heat but, okay.
24            All right.  So, I know of one issue that we need
25   to take up has to do with Defendants' Exhibit 19.  I see
```

1    it on the exhibit list.  It's seclusion -- restraint

2    seclusion records.  And my understanding is, plaintiff has

3    an objection to those records.

4          What are these records, Miss Vincent?

5          MS. VINCENT:  Yes, Your Honor.  The records are

6    part of plaintiff's medical records.  They are -- it's

7    basically a flowsheet showing when the nurse and STA saw

8    plaintiff during the time he was restrained on the day of

9    the incident.  And the records were disclosed to plaintiff

10   in discovery and listed in our pretrial disclosures.

11         THE COURT:  What's the relevance of the records

12   and who is going to get them in, on what basis?

13         MS. VINCENT:  Yes, Your Honor.  We may not get

14   them in, but Nurse Donna Cole, she is one of the nurses

15   that was present that day and she will be able to --

16         THE COURT:  That day or at the time of -- because

17   this is an isolated incident.

18         MS. VINCENT:  Yes.

19         THE COURT:  This happened -- this didn't happen

20   over the course of a day.

21         MS. VINCENT:  Yes.

22         THE COURT:  This happened at one point in time, as

23   I understand it.  The incident was one isolated incident

24   at one point in the time of the day.  So, Miss Cole --

25   what is Miss Cole's knowledge?

```
 1            MS. VINCENT:  Miss Cole can testify as to whether
 2   or not she saw injuries on Mr. Davis on that day.
 3            THE COURT:  After the incident?
 4            MS. VINCENT:  Yes, immediately after the incident.
 5   And Miss Cole was also in the restraint room with
 6   plaintiff.  And plaintiff alleges that Lucas Nanney choked
 7   him in the restraint room, so she can testify as to
 8   whether or not she observed that.
 9            THE COURT:  Okay.  But what are the -- what's the
10   point of the records?
11            MS. VINCENT:  The records show that she saw him on
12   an hourly basis.  And she made a record as to what her
13   interaction was with plaintiff during that time.
14            THE COURT:  I don't think there's an issue of her
15   interaction with him.  I don't -- I'm failing to -- well,
16   I'll let plaintiff jump in here, but I'm thinking I'm
17   getting into what your -- what your objection is.  What's
18   plaintiff's objection?
19            MR. SPIRA:  Well, part of our objection is what
20   you said.  The other part is just that this -- it wasn't
21   disclosed to us until -- that it was going to be on their
22   exhibit list until 4:00 p.m. on Friday afternoon.  It
23   wasn't included on their JERS list.
24            She mentioned that it was on their pretrial
25   disclosures.  We don't -- we see it as a little different
```

than medical records, which is what was disclosed.  This

was a restraint chart as opposed to like a, you know,

progress notes or some sort of medical records.

THE COURT:  This doesn't seem like medical

records.

MS. VINCENT:  The nurse told me it was part of his

medical file, that's why I represented that to you.

THE COURT:  But this is not medical records.  This

is something totally different and I guess I'm struggling

to see the relevance of the records and what those would

be probative of, that's at issue.  Certainly, Miss Cole

can testify to her observations and what her knowledge is

based on those observations as to what's relevant, which

is only the incident, any injuries, you know, if she

observed the plaintiff immediately after and had an

opportunity to observe injuries or lack thereof.  That's

fair game.

But her observations of -- her interactions with

him in the restraint room prior to the incident are

totally irrelevant and immaterial, as I see it.  So, I'm

going to grant the objection to the records.  The

defendants, at the time Miss Cole testifies, if you want

to do an offer of proof, we can do an offer of proof.

But at this point the records appear to be

immaterial, irrelevant.  And even though I guess medical

1    records were disclosed in discovery, but in terms of what

2    the defendants listed in their 26(a)(3) disclosures and,

3    and anything up to 4:00 on Friday, it appears as plaintiff

4    indicates that these records were not disclosed.

5         So, the records would be excluded subject to an

6    offer of proof.  And even with the offer of proof, I think

7    we have an issue with disclosure.  I just don't see where

8    they are relevant.

9         Any other issues?

10        MR. SPIRA:  Your Honor, we have a joint

11   stipulation as to other exhibits that both parties listed

12   regarding their authenticity and admissibility just to --

13   for reference sake.

14        THE COURT:  You don't have to have a written one.

15   If you guys agree that they're authentic, that's fine.

16        MR. SPIRA:  Okay.

17        THE COURT:  In terms of admissibility, if nobody's

18   going to object to it, I think -- they still have to be

19   relevant and I'm not --

20        MR. SPIRA:  Sure.  It's just, they are pictures of

21   the plaintiff that were taken the day after.  And there

22   are a couple videos produced of the time of the incident

23   from, from the facility --

24        THE COURT:  Yeah, I have no problems --

25        MR. SPIRA:  -- of medical records.

```
 1              THE COURT:  You guys don't need to file anything
 2    in writing.
 3              MR. SPIRA:  Okay.
 4              THE COURT:  But if you stipulate, you just -- when
 5    it comes up, you just have no objection when it comes in.
 6              MR. SPIRA:  Okay.
 7              THE COURT:  Anything else?
 8              MR. SPIRA:  We have an agreement that we may call
 9    Russell Hecht to testify.  He was the one who took the
10    pictures of the plaintiff and is a supervisor of -- at
11    Chester.  He's available tomorrow.  And the parties have
12    an agreement that, depending on how far we get today, even
13    if, you know, even if we get through our witnesses, he can
14    still be called tomorrow if that's okay with the Court.
15              THE COURT:  If we're still going, yep.
16              MR. SPIRA:  Okay.  There is one stipulated record
17    that has -- it's a medical record from the day after the
18    incident, and it has two references to OIG that we have
19    redacted pursuant to the Court's motion in limine order.
20    So, I just wanted to flag that.  That's why those would be
21    redacted.
22              We have a request to treat Dr. Tariq, who is a
23    physician, who has met with -- he saw the plaintiff the
24    day after the incident.  We have a request to treat him as
25    a hostile witness.
```

```
 1              THE COURT:  Why?
 2              MR. SPIRA:  I think Miss Maly will take that up.
 3              MS. MALY:  Yes.  So, we intend to call Dr. Tariq
 4    as a witness, but we are asking for permission to call him
 5    as hostile.  He works at Chester and has worked or
 6    currently works with all the defendants.  And --
 7              THE COURT:  Was he a treater?
 8              MR. SPIRA:  Yes.
 9              MS. MALY:  Yes.
10              THE COURT:  Then he's not a hostile witness.
11              MR. SPIRA:  We have the same request with regard
12    to Russell Hecht, an STA, who works with the defendants as
13    well.
14              THE COURT:  These are not parties, so they're not
15    hostile.  They may not like -- they may not like you guys,
16    but, you know, that might be the lay opinion -- the lay
17    definition of hostile but not legal, so he -- you have to
18    call him on direct.  Of course, they can do things on
19    direct testimony that can turn them to hostile; you just
20    have to deal with that at the time.
21              MR. SPIRA:  Okay.  Now we do have -- in our
22    opening, we plan to use a series of slides that includes
23    -- we have disclosed this to opposing counsel and shown
24    her the slides.  It includes only exhibits that are
25    stipulated to, as well as a couple paragraphs from the
```

1   defendants' answer to the complaint.

2        THE COURT:  As long as you guys agree to it, it's

3   fine with me.

4        MS. COSTELLO:  We would like to make an oral

5   motion in limine with regards to the answer that is in the

6   opening.  We object to it because the answer is overly

7   broad, at least the specific answers that are included in

8   your opening.

9        To the extent that plaintiffs are using it in

10  their case in chief, we also object because the defendants

11  are not doctors.  They cannot use the defendants to lay

12  the foundation for medical support for plaintiff's

13  injuries because the injuries relate to lawful actions not

14  unlawful actions.  In addition, we object because it

15  mentions inadmissible evidence and it mentions unprovable

16  evidence.

17        THE COURT:  These are your clients' answers?

18        MS. COSTELLO:  Yes.

19        THE COURT:  Okay.  I think those are judicial

20  admissions.  Okay.  Overruled.

21        MR. SPIRA:  And I think the last thing we have,

22  Judge, is just how you'd like us to proceed.  Like I said,

23  we do have two videos that are stipulated.  In terms of

24  presenting those to the witness to lay any foundation

25  before it's published to the jury because it's -- we have

```
 1    the still image from the witness book we have prepared,
 2    but as opposed to a document that they can look at --
 3              THE COURT:  You say, "Mr. Witness, I'm going to
 4    now show you Video Exhibit X, which the parties agree,"
 5    and you say, "We move this into evidence.  Any objection?"
 6    "No."
 7              MR. SPIRA:  And then it will be -- okay.
 8              THE COURT:  It will be published.
 9              MR. SPIRA:  Okay.
10              THE COURT:  I have a question.  I don't remember
11    the specifics of it, but I know we dealt with this Miss
12    Teresa Parks.
13              MR. SPIRA:  So, we are not intending to call her.
14    We put her on the list and, after that, we had a chance to
15    speak with our client.  We don't intend to call her as a
16    witness.
17              THE COURT:  Okay.  Anything else?  (Pause.)  On
18    the plaintiff's proposed voir dire questions?  I have
19    incorporated the first six into my voir dire.  The rest of
20    them, if you guys want to ask as followup when I get
21    through, you can.
22              MR. SPIRA:  Okay.  Thank you.
23              THE COURT:  I won't ask those.  Anything else?
24              MR. SPIRA:  Oh, we brought a tie for the plaintiff
25    to wear.
```

```
 1              THE COURT:  I think the marshal already told you
 2    no.
 3              MR. SPIRA:  Yeah, okay, I just wanted --
 4              THE COURT:  Are you going to ask me again, because
 5    the marshal told you no?
 6              MR. SPIRA:  I didn't know what conversation you
 7    had with him, so.
 8              THE COURT:  Okie-doke.  Anything else?  All right.
 9              (Recess at 9:15 a.m.)
10              (Subsequent to voir dire, the following
11    proceedings were held in open court, plaintiff and jury
12    present.)
13              THE CLERK:  All rise for the jury, please.
14              THE COURT:  Thank you.  I'm going to ask that the
15    jurors remain standing until you are sworn in, and
16    everyone else may be seated.
17              (Jury sworn by clerk.)
18              THE CLERK:  Be seated, please.
19              THE COURT:  So, ladies and gentlemen of the jury,
20    we are now about to begin the trial of the case that you
21    heard about during jury selection.  Before trial begins,
22    I'm going to give you some instructions that will help you
23    understand what will be presented to you and how you
24    should conduct yourselves during the course of trial.
25    Soon, you will hear the lawyers' opening statements in
```

1    which they will explain to you the issues in the case and
2    summarize the facts that they expect the evidence will
3    show.  Then, witnesses will be called to testify under
4    oath and the evidence will begin.  The witnesses will be
5    examined and cross-examined by the attorneys and, after
6    all the evidence is in, the lawyers will have the
7    opportunity to make final arguments.
8         The opening and final statements made by the
9    attorneys are not to be considered as evidence in the case
10   or as your instructions on the law.  Nevertheless, these
11   statements and arguments are intended to help you properly
12   understand the issues, the evidence, and the applicable
13   law, so you should give them your close attention.  Before
14   the final arguments by the attorneys, I will instruct you
15   on the law.
16        You should give careful attention to the testimony
17   and other evidence as it is received and presented for
18   your consideration, but you should not form or express any
19   opinion about the case until you have received all the
20   evidence, the arguments of the attorneys, and the
21   instruction on the law from me.  In other words, you
22   should not form or express any opinion about the case
23   until you retire to the jury room to consider your
24   verdict.
25        From time to time, the lawyers and I may have

1   conferences off to the side and out of your presence.  You

2   should not let those conferences bother you or annoy you

3   in any way.  And during these sidebars, court is in

4   session and so I would ask that you not talk amongst

5   yourselves during that time.

6         The lawyers are trained on the rules of evidence

7   and trial procedure and it is their duty to make all

8   objections that they feel are proper.  When a lawyer makes

9   an objection, I will either overrule or sustain the

10  objection.  If I overrule the objection to a question, the

11  witness will answer the question.  If I sustain an

12  objection, the witness will not answer, but you must not

13  speculate on what might have happened or what the witness

14  may have said had I permitted the witness to answer.  You

15  should not draw any inference from the question itself.

16        I also ask that you not have any contact with the

17  lawyers in this case or with any of the parties or the

18  witnesses.  That includes any kind of exchange of words.

19  I have asked the lawyers not to communicate with you, so

20  if you see them around the building and they do not speak

21  to you or they do not say anything, do not think them

22  rude.  They are simply following my instructions.

23        You, as the jurors, must decide this case based

24  solely on the evidence presented here within the four

25  walls of this courtroom.  This means that during the trial

1   you must not conduct any research about the case, the

2   matters in the case, the individuals involved in the case,

3   or the organization involved in the case.  In other words,

4   you should not consult dictionaries or reference

5   materials, search the internet, websites, blogs, or use

6   any type of electronic tools to obtain information about

7   this case or to help you decide the case.  Please do not

8   try to find out any information from any source outside of

9   the four walls of this courtroom.

10          Until you retire to deliberate, you may not

11  discuss this case with anyone, even your fellow jurors.

12  After you retire to deliberate, you may begin discussing

13  the case with your fellow jurors, but you cannot discuss

14  the case with anyone else until you have returned your

15  verdict and this case is at an end.

16          Now, everyone uses cell phones, Blackberries,

17  iPhones, the internet, all other tools of technology.  You

18  must not talk to anyone about this case or use these tools

19  to communicate electronically with anyone about this case.

20  This includes your family and friends.  You may not

21  communicate with anyone about the case on your cell phone,

22  through e-mail, text messaging, or on Twitter, through any

23  blog or website, through any internet chat room, or by way

24  of any other social networking websites, including

25  Facebook, LinkedIn, and YouTube.

1          You have the right to take notes during the course

2     of trial if you choose to do so.  We have provided

3     notepads for your convenience.  No one else will be

4     allowed to look at your notes.  You do not have to take

5     notes.  That is entirely up to you.  You may use your

6     notes to refresh your memory at the appropriate time.

7     Your notes are for your own use only, and not for any

8     other juror's.  Do not show them to anyone at any time;

9     and that includes other jurors, and it includes the time

10    when you are deliberating on your verdict.

11         You should rely on your own memory of the

12    evidence.  If your notes conflict with what you remember,

13    or if someone else's notes conflict with your memory, you

14    are free to use your own memory of the evidence.  Just

15    because a juror has taken notes does not mean his or her

16    memory of the evidence has any more weight or impact than

17    the memory of a juror who has not taken notes.

18         At the end of the trial, when you are discharged

19    from further service in this case, Miss Hurst will collect

20    the notes and will destroy them.  No one will be allowed

21    to look at the notes before they are destroyed.

22         And so with that, let me ask lead counsel to

23    approach.

24         (Off the record discussion at the bench.)

25         THE COURT:  Okay.  Ladies and gentlemen, I had

1    indicated we were going to break for lunch after you were

2    sworn in, but we have some time.  The opening statements

3    are not anticipated -- they are not going to take that

4    long, so I'm going ahead -- we're going to go ahead and

5    hear from the attorneys on opening statements and we will

6    then break for lunch.  And when you come back from lunch,

7    we'll be ready to start with the first witness.

8            Who's prepared to give the opening statement on

9    part of the plaintiff?

10           MS. CHIARELLO:  Your Honor, Beth Chiarello for the

11   plaintiff.  If I could just have a moment for my

12   assistant --

13           THE COURT:  Okay.  Are you going to give it from

14   there or are you going to do it from the podium or where

15   are you going to be?

16           MS. CHIARELLO:  Do you mind if I move around

17   freely?

18           THE COURT:  You may move around freely, as long as

19   you stay in the courtroom.  Okay.

20           MS. CHIARELLO:  May it please the Court?

21           THE COURT:  Yes.

22           MS. CHIARELLO:  Good morning, ladies and gentlemen

23   of the jury.  We met earlier, but I'll reintroduce myself.

24   My name is Beth Chiarello.  And I'd also like to introduce

25   you to the members of our team.  Sitting at the head of

1    the table is Dan Spira.  This is Caitlyn Maly, Julie

2    Becker, and running the PowerPoint is Meredith Dudley.

3    I'd also like to introduce our client.  Chris Davis is

4    sitting next to Mr. Spira.

5          The evidence in this case will show that, in 2011,

6    Chris stood up for a carton of milk in a dining hall.  And

7    in response, he was handcuffed, he was dragged out of the

8    dining hall, he was beaten, kicked, punched, choked, and

9    then he was taken to a room and tied down and left there

10   for hours.  All over a carton of milk.

11         So, let me back up and give you a few more

12   details.  Chris was 20 years old in 2011.  He is 26 today.

13   And he arrived as a new patient at the Chester Mental

14   Health Center on December 22nd, 2011.  And for the first

15   few days that Chris was at the Chester Mental Health

16   Center, he ate breakfast in his room, where he was living,

17   until December 26, the day after Christmas, 2011.

18         On that day, Chris will get up here and testify

19   that he was supposed to go down for breakfast at the

20   dining hall at Chester.  And because Chris was new, he

21   didn't know the rules and the regulations at Chester,

22   wasn't sure what to do, so he did what anyone would do,

23   which is, he got in line with the other patients, he went

24   up to the front, picked up his tray with food on it, took

25   the tray over to his table, put it down and sat down.  And

1    it was only then that Chris looked down and realized he

2    didn't have any milk for his cereal, so he stood up.  And

3    that's when things started to go south for Chris.

4           Chris will testify and he will tell you that, as

5    soon as he stood up, the staff started shouting at him to

6    sit down.  Apparently, it was against the rules to stand

7    up after you had gotten your breakfast, but Chris didn't

8    know that.  He had only been there a few days and it was

9    his first day in the dining hall.  So, he tried to explain

10   to the staff that he was only standing up to get a carton

11   of milk because he didn't have it for his cereal.

12          And I'm going to tell you what the staff said to

13   him in response but, before I do that, I'm just want to

14   apologize.  There's going to be some offensive language

15   used in this trial.  But it's my job to present the

16   evidence to you, so I have to tell you what was said.

17          And while Chris was trying to explain that he was

18   standing up to go get a carton of milk for his cereal, the

19   staff said to him, "I don't feel like dealing with you

20   retarded stupid motherfuckers today.  Do you want to be

21   tied down?"

22          That's what they said to him.  So, Chris is going

23   to get up here and testify.  And he's going to tell you

24   that he was shocked by this, he was taken aback, and so he

25   used a few choice words of his own in response.

1          But rather than have a conversation with him, the

2     staff made him immediately stand up, put his hands behind

3     his back.  They cuffed him and then they took him out of

4     the dining hall.  And who did this?  Defendants Nordmann

5     and Stewart are the ones who made him leave the dining

6     hall.  And as you have already heard, all of the

7     defendants are what's called STAs -- Security Therapy

8     Aides -- at Chester.  Defendants Nordmann and Stewart are

9     the ones who, remember, took Chris out of the dining hall.

10    And remember, he was handcuffed with his hands behind his

11    back.  So as they took him out, they were jerking him

12    around from left to right.  They were manhandling him,

13    they were holding him at the back of the neck like a dog

14    as they took him out of the dining hall.

15          And they took him to a place called the stem.

16    That's S-T-E-M, like the stem of a flower or a three-leaf

17    clover.  And the stem is essentially a hallway.  And

18    that's where the attack happened.  Now, I have some

19    pictures up here to help orient you and help you visualize

20    where this all occurred, so I'm going to put up a slide

21    here.  I hope.

22          Okay.  And so what you are looking at here is,

23    you'll see at the very top it says "stem door."  And then

24    it says -- oops -- and then it says underneath that

25    "December 26, 2011," the day after Christmas.  That's the

1    day I told you that Chris went down to the dining hall for

2    breakfast for the first time.  And then it says "Monday

3    07:49" in the morning, which Chris will tell you is

4    breakfast time in the morning at Chester.

5            And what you see is a -- well, what you saw was a

6    double doors -- a set of double doors looking into a

7    hallway.  And those doors look directly into the stem.

8    Okay?  So, as you saw, when those doors are open, you can

9    see a little ways into the stem.

10           And so a very interesting thing happens at 7:50

11   a.m., and 37 seconds, into the video.  I'm going to play a

12   bit for you, but I want to tell you what to watch for,

13   first.

14           So, what you are going to see is, Defendant

15   Rackley is going to come out of the double doors from the

16   stem.  He's going to -- it looks like -- talk to the

17   gentleman with the vacuum.  And the vacuum -- the

18   gentleman with the vacuum is going to take a few more

19   passes, and then he's going to go and close the door to

20   the stem on the right-hand side, blocking the view of this

21   camera into the stem.

22           So, I'm going to play it and I want to show you

23   that that happened.

24           (Video playing.)

25           So, as I said there's Defendant Rackley.  He comes

1    out of the doors.  It looks like he says something to the
2    gentleman with the vacuum cleaner.  And then the gentleman
3    with the vacuum cleaner is going to take a few more passes
4    with the vacuum cleaner, he goes over, he puts it over to
5    the side, looks like he looks back, and at 7:50:35, 36, 37
6    on the video, he closes the door to the stem, blocking
7    this camera's view into the stem.
8            And Chris is going to get up and testify that
9    right behind those closed doors at that time, that's when
10   the attack occurred.
11           Now, what happened.  Well, Chris is going to
12   testify and he's going to tell you that Defendants
13   Nordmann and Stewart were already with him in the stem
14   because they were the two that took him out of the dining
15   room.  And then Chris is going to tell you that the other
16   two defendants, Defendants Nanney and Rackley, came into
17   the stem separately.
18           Once they were in the stem, Defendant Stewart put
19   Chris in a choke hold and yanked him down to the ground.
20   Somebody else took Chris's feet out from underneath him,
21   so he was lying on his back on the floor with his hands
22   cuffed behind him.  Still had his hands cuffed at this
23   point.  And at that point, Defendant Nanney started
24   choking him, strangling with him two hands, saying, "I'm
25   going to kill you, motherfucker.  I'm going to kill you,

1    motherfucker," just strangling Chris while he's on the
2    ground.  And Chris couldn't do anything because his hands
3    were handcuffed behind him.  And Nanney had him around the
4    throat, so he couldn't even cry for help.
5        At this point, Defendant Nordmann joined the fray.
6    And he started punching Chris all over his body, in his
7    ribs and in his genitals, and he was saying to Chris,
8    "Yeah, you think you're a tough guy, don't you, you
9    motherfucker?  Yeah, you're a real tough guy, aren't you?
10   You're from the city, huh?"
11       The defendants at this point turn Chris over onto
12   his stomach, and Defendant Rackley joined the fight.  He
13   dropped down and started kneeing Chris right in the face.
14   He was punching Chris in the face right by the eyes,
15   closed fist right to the face.  They came at him, folks,
16   from every possible angle.  The choking was the worst, but
17   Chris will tell you it felt like raining blows.  And
18   although this happened quickly, Chris is going to testify
19   and he's going to tell you that to him it felt a lot
20   longer.  It felt like forever.
21       Eventually, Chris was yanked back up to his feet.
22   And you're going to see video of him being taken out of
23   the stem on the other side of a hallway door.  You'll see
24   that video during the trial.  And I want you to pay
25   particular attention to that video, because what you're

1    going to see is, Chris was not flailing about, he was not

2    acting unruly.  He's compliant.  Walking into another room

3    called the restraint room.

4         And once he's in the restraint room, he gets

5    thrown on the bed and he is put in what's called full

6    leather restraints.  Four-point restraints.  What that

7    means is, they took each arm and each leg and they tied

8    him down to the bed so he couldn't move.  And while he's

9    in the restraint room, Nanney starts choking him again,

10   choking him again.

11        So, Chris was tied down, couldn't move, and he

12   felt all alone.  So, he did the only thing that he could

13   do, ladies and gentlemen.  He cried.  He laid there and

14   cried.  For hours.

15        Now, the evidence is going to show that the next

16   day, December 27th, there were some photographs taken of

17   Chris.  And they're not the best quality photographs.

18   Chris is not the one who took these photographs.  But even

19   in their poor quality, they're very telling.  And I have a

20   couple of the photos here to show you.  And what you can

21   see from this is bleeding in Chris's eyes; it's called

22   conjunctival hemorrhaging.  And Chris is going to get up

23   here and tell you, he didn't look like that before the

24   beating.

25        So, the evidence that you are going to hear will

1    include Chris's testimony.  It will include videos both of

2    Chris walking compliant down the hallway and of the door

3    being shut and blocking the only camera that has a view

4    into the stem where Chris was beat.  The evidence is going

5    to include these photographs.  And I think the evidence is

6    also going to include testimony from a doctor.

7            You heard the judge mention earlier that there

8    will be somebody named Dr. Ahmed Tariq who is going to

9    testify in this trial.  And Dr. Tariq saw Chris the day

10   after the attack.  Dr. Tariq wrote his observations in a

11   medical record.  And, of course, doctor's handwriting can

12   be hard to read, so we have a copy of the medical record

13   for you, and I'm just going to walk you through it so you

14   know what to look for and you can understand his

15   handwriting.

16           So, this is a copy of the medical record.  It's an

17   excerpt from the medical record.  And what you see is, at

18   the very top where it's highlighted, Dr. Tariq wrote that

19   the patient reports he was hit by the staff.  The next

20   thing Dr. Tariq wrote was that he observed conjunctival

21   redness, and then he has a plus sign, which he'll testify

22   means present.  And then he says B-forward slash-L, which

23   means bilaterally.  And that just means in both eyes.

24           Underneath that, Dr. Tariq wrote periorbital

25   tenderness, which he will tell you means swelling around

1    the eyes or tenderness around the eyes.  And then

2    underneath that he wrote on the right-hand side, swelling

3    left wrist.  And then if you look to the left of the

4    exhibit, almost outside the box, he wrote slight swelling

5    behind left ear.

6          And then in the next highlighted line down, Dr.

7    Tariq wrote that he alleged that the patient -- that being

8    Chris -- alleged physical abuse by the staff.  And

9    directly underneath that the doctor wrote physical

10   evidence plus, as above.  And again, Dr. Tariq will say

11   that that plus sign means present.

12         Now, the last couple pieces of evidence that I

13   wanted to show you are admissions by the defendants.  So,

14   when Chris filed this lawsuit, he filed a written paper

15   with the court.  And the defendants had an opportunity to

16   file something in response, and I'm going to put up what

17   those responses were.

18         So, you see there it says No. 20, and to the right

19   of that is what Chris said when he filed his lawsuit.  And

20   underneath that, in the highlighted portion, you see the

21   word "response."  Well, what follows that is the

22   defendants' response.  So, the defendants admitted in

23   papers filed with this court that "plaintiff experienced

24   subconjunctival hemorrhaging following the alleged

25   incident."  Those are their own words that they put in a

1    pleading filed with this Court.

2         The second admission that I wanted to show you is

3    in paragraph 28.  So, next to the 28 is Chris's statement.

4    So, he said that his "injuries were a direct and proximate

5    result of the defendants' actions."  And in the response,

6    the defendants "admit those injuries were potentially a

7    direct and proximate result of defendants' actions."

8         So, what are the defendants going to say when they

9    get up and testify?  Well, we took their testimony in this

10   case and they were sworn and they provided statements

11   under oath, and they told us they don't really remember

12   this incident.  They barely remember Chris.  And some of

13   them claim they don't even remember him at all.

14        Now, maybe they're going to get up and maybe

15   they're going to recover their memory while they're on the

16   stand.  Maybe they're going to say that Chris was upset

17   and he was acting out, and that may be true because of

18   what they said to him in the dining hall.  But when and if

19   they tell you that, I want you to look for the testimony

20   of who said, "I don't want to deal with you today, you

21   stupid retarded motherfucker."  I want you to look for the

22   testimony of who said, "I'm going to kill you."  I want

23   you to look for the testimony of who said, "You're a tough

24   guy, aren't you, you black motherfucker.  You're a real

25   tough guy from the city, right?" I want you to look for

who said that.  And I want you to look for the testimony
of who is a 20-year-old scared kid, who is brand new to
Chester, who had only been there a few days, and who just
asked for a carton of milk.

Now, the defendants' lawyer may get up here and
tell you that Chris has a felony conviction on his
criminal record.  And that's true.  But as the judge told
you earlier, you should not treat him any differently
because of that.  And just because he has that does not
give these defendants a license to knee him, to beat him,
to punch him, and to tie him down for hours just because
he wanted a carton of milk.

So, unlike the defendants' memory, Chris remembers
this event all too vividly.  He experienced not only the
physical pain of the beating and being tied down so he
couldn't move after he experienced it, but more so than
the physical pain is the emotional injury that this has
left him with.  Chris has nightmares about this event.  He
has flashbacks.  He wakes up in the middle of the night,
his heart pounding, palms sweaty, scared.  Anytime an
authority figure approaches him, he's on edge.  And he's
on edge because these authority figures were the ones who
were supposed to protect him, not abuse him.

So, Chris has two legal claims in this case, and
the first is that the defendants used excessive force on

1   him.  That's the first legal claim.  The second legal

2   claim is that each defendant failed to intervene to stop

3   the other defendants from causing Chris harm.  And so at

4   the end of this trial, you are going to be faced with the

5   task of deciding two things:  Did the defendants use

6   excessive force on Chris?  And, No. 2, did they each fail

7   to intervene to stop the other from hurting him?

8        Now, we're not saying that the defendants are bad

9   people.  Things may have gotten out of hand that day.

10  Maybe they had a bad day.  But they were the STAs.  They

11  were the Security Therapy Aides.  They were there to

12  protect them.  There were four of them.  There was one of

13  Chris.  They were familiar with the procedures.  Chris had

14  never been told what the procedures were.  It was his

15  first day in the dining hall.  They had experience.  They

16  had been at Chester.  Chris is a 20-year-old scared kid

17  who is a new patient at a mental facility.  So, instead of

18  providing security, therapy, and aide to Chris?  These

19  defendants provided the opposite.

20        And if you find that the defendants' actions of

21  taking Chris to the stem where the only camera that has a

22  view into the stem was blocked by the door just after Mr.

23  Rackley came out from that area and spoke to the gentleman

24  who closed the door, if you find that choking Chris,

25  beating him, kneeing him, tying him down to the bed, if

1    you find that those actions were not reasonable, then the

2    form that you are going to sign at the end of this case is

3    one holding the defendants liable.

4         And as I conclude my statement, I want to thank

5    you, the jury, for taking the time here today. We

6    appreciate that you are taking this time away from your

7    regular lives to do your civic duty and we really

8    appreciate that.

9         And I just want to leave you with one thought as

10   you think about whether defendants' action were reasonable

11   and whether they failed to intervene to protect Chris, and

12   that's a reminder of what I have said at the beginning and

13   throughout my statement today, which is that all of this

14   happened because Chris stood up for a carton of milk.

15        Thank you.

16        MS. COSTELLO: Good morning, ladies and gentlemen

17   of the jury. Thank you for your time today in this case.

18   My name is Samantha Costello. Together with my

19   co-counsel, Ashley Vincent and Sean Miller, we represent

20   the defendants in this case. The defendants are Lucas

21   Nanney, Tom Nordmann, Terry Stewart, and Josh Rackley.

22        On December 26, 2011, over half a decade ago,

23   plaintiff broke the rules. He was removed from the dining

24   hall for standing up without permission. The evidence

25   will show that plaintiff became combative, that plaintiff

was aggressive.  He was threatening the individuals.  Due
to plaintiff's behavior, he was placed in restraints.

On December 26, 2011, these individuals, the
defendants, were Security Therapy Aide 1 at Chester Mental
Health.

Here, plaintiff alleges that these defendants used
excessive force on him in violation of his constitutional
rights and failed to protect him.  In this trial, we will
ask you to find that their actions were reasonable; that
their actions did not violate his constitutional rights.

In this case, you will hear from the defendants.
You will hear evidence that none of them recall this
incident; this incident that occurred seven years ago.
However, the defendants will testify that they would not
have done what plaintiff claims.  Specifically as
plaintiff's counsel has stated, plaintiff claims that the
defendants attacked him, brutally beat him.  They dropped
their knees on him multiple times.  They choked him
multiple times.  As plaintiff's counsel said, they came at
him from every angle.  However, the evidence will show
that the defendants used the only force -- used force on
plaintiff that was minimal, that was necessary to gain
control of the situation.  And defendants admit that there
was a struggle, that plaintiff was combative, that he was
threatening, and that he was aggressive.  The evidence

will show that in order to gain control, plaintiff did
have to go to the floor, that handcuffs were used, and
that plaintiff did have to be restrained.

The evidence will show that, at Chester Mental
Health, handcuffs are very rarely used.  You will hear
testimony that handcuffs are only used in extreme
situations, for the protection of the individual patients
and for the staff.

In this case, the evidence will show that
plaintiff -- that handcuffs had to be used on plaintiff.
Security Therapy Aide 1, the position that the defendants
held, they do not have the authority to make the decision
to place a patient in handcuffs or to place a patient in
restraints.

You will hear evidence that the Security Therapy
Aides 2 can make that decision, or higher superiors.
These individual defendants did not make the decision.
You will hear evidence that the defendants acted
professionally; that they had to secure plaintiff and
regain order.

Again, plaintiff's counsel told you that plaintiff
was brutally beaten.  He was attacked and punched, and
kneed in the face multiple times.  That he was choked
multiple times.  But in this case, the pictures taken of
plaintiff one day later do not demonstrate those injuries.

1    Here, the evidence will show that plaintiff had redness in

2    his eyes.  The evidence will show that there were no

3    markings on plaintiff's neck.  This evidence does not line

4    up with plaintiff's account of the events.  This evidence

5    is not consistent with plaintiff's account of the events.

6         Again, plaintiff claims that he was punched, kneed

7    in the face, and choked, for injuries plaintiff

8    complained.  And the doctor indicated that, yes, he did

9    have redness in his eyes.  There was some slight swelling

10   on his wrists.  For treatments, you will -- the evidence

11   will show that plaintiff was given Tylenol.  You will hear

12   that the redness in the eyes absolved itself within one to

13   two weeks.  The evidence will show that he suffered no

14   long term injuries.

15        Here, you will hear the defendants' testimony, you

16   will hear Dr. Soellner's testimony, and you will hear

17   Nurse Cole's testimony.  After you have heard all of the

18   evidence, we will ask you to return a verdict in favor of

19   the defendants.  Again, the evidence that plaintiff is

20   presenting does not show excessive force and does not show

21   a failure to protect.

22        Thank you.

23        THE COURT:  Thank you, counsel.

24        Ladies and gentlemen, now it's time to take a

25   break for lunch.  I -- let me remind you of my previous

admonitions about not discussing the case, not doing any
research.  We will reconvene at 1:00, so you get an hour
for lunch.  And again, do not discuss the case amongst
yourselves or with anyone else and I'll see you at 1:00.
Have a good lunch.

        (Court recessed for lunch from 12:00 p.m. to 1:10
p.m.)

        (Proceedings continued in open court, plaintiff
and jury present.)

        THE COURT:  Okay.  Ladies and gentlemen, before we
call the first witness, there -- the parties have
stipulated to certain facts.  In other words, these facts
are not disputed and you should take them as having been
proven.

        1.  On December 26, 2011, Plaintiff, Christopher
Davis, was a resident at Chester Mental Health Center,
operated by the Illinois Department of Human Services.

        2.  On December 26, 2011, defendants were employed
by the Illinois Department of Human Services and assigned
to Chester Mental Health Center.

        3.  On December 26, 2011, defendants were on duty
as Security Therapy Aides at Chester Mental Health Center.

        So again, those facts are not disputed.  They
should be taken as proven.  You don't have to remember
them verbatim.  At the end of the case, when I instruct

```
 1    you on the law, I will also provide you with these facts
 2    so you will remember what is not disputed.
 3            And with that, the plaintiff should call their
 4    first witness, which is the plaintiff.
 5            (Witness sworn by clerk.)
 6            THE WITNESS:  My name is Christopher Davis.  My
 7    last name is spelled D-A-V-I-S.
 8            THE COURT:  You may proceed.
 9            MR. SPIRA:  Thank you.
10                      CHRISTOPHER NOVUS DAVIS,
11    having been first duly sworn, was examined and testifies
12    as follows:
13                      DIRECT EXAMINATION
14    BY MR. SPIRA:
15    Q.      Good afternoon, Chris.
16    A.      Good afternoon.
17    Q.      Could you please tell the jury why you are here
18    today?
19    A.      I am here to explain and prove the attack I
20    suffered from when I was at Chester Mental Health Center.
21    Q.      And who are the defendants in this case?
22    A.      Tom Nordmann, Lucas Nanney, Josh Rackley, and
23    Terry Stewart.
24    Q.      And are the defendants sitting at this table over
25    here?
```

```
1    A.      Yes, they are present in the courtroom.
2    Q.      We'll turn back to the incident that led you to
3    bring this lawsuit in just a moment.  But first, can you
4    tell the jury where you are from?
5    A.      I'm from Waukegan, Illinois.  Born in Chicago,
6    Illinois.
7    Q.      How old are you?
8    A.      26 years old.
9    Q.      How old were you in December of 2011?
10   A.      I was 20 years old.
11   Q.      Did you graduate from high school?
12   A.      Yes, sir.
13   Q.      Where did you go to high school?
14   A.      I went to high school at Lake Shore Academy and
15   graduated from Waukegan High School.
16   Q.      Have you been convicted of a felony?
17   A.      Yes, sir.
18   Q.      Chris, was there a period of time beginning in
19   2011 when you were a resident at Chester Mental Health
20   Center?
21   A.      Yes, sir.
22   Q.      Do you remember about what month and date you
23   arrived at Chester?
24   A.      I went to Chester at -- on December 23rd of 2011.
25   Q.      When you first arrived at Chester, were you
```

1    examined by a doctor for any physical injuries?

2    A.      Yes.   I was arrived at the infirmary and I was

3    seen and assessed by a doctor, yes.

4    Q.      Did you have any physical injuries when you

5    arrived at Chester?

6    A.      No.

7    Q.      When you arrived at Chester in 2011, was there any

8    kind of orientation where you were given facility rules or

9    guidelines?

10   A.      No.   The only thing I was given was notification

11   that I had a trust fund account and that I can spend money

12   on commissary, and the right to sign my rights over to a

13   legal guardian.

14   Q.      Were you told about any dining hall rules?

15   A.      No.

16   Q.      Were you given any sort of rule handbook?

17   A.      No, sir.

18   Q.      Okay.   Now I'd like you to tell the jury about the

19   events on December 26, 2011.   Do you know where you were

20   the morning of December 26, 2011?

21   A.      I was on my living unit, which is Unit C.   Also

22   referred to as Charlie.

23   Q.      And did you go to eat breakfast that day?

24   A.      Yes, sir.

25   Q.      Where did you go to eat breakfast?

```
 1    A.       To the dining hall.

 2    Q.       Prior to --

 3             THE COURT:  Hold on for a second.  You can move

 4    the microphone closer to you so you -- I don't think you

 5    can get any closer to --

 6             THE WITNESS:  Okay.

 7             THE COURT:  Is that comfortable for you?

 8             THE WITNESS:  Yes.

 9    Q.       (BY MR. SPIRA)  Prior to December 26, 2011, had

10    you eaten any meals in the Chester dining hall?

11    A.       No.  That date, December 26, was my first day in

12    the dining room.

13    Q.       Where did you eat your meals between December 22nd

14    and Christmas?

15    A.       On the living unit, Charlie.

16    Q.       Was there any -- when you say Charlie, you mean

17    unit -- are you referring to Unit C?

18    A.       Yes, sir.

19    Q.       Was there any particular reason you ate in the

20    unit for those first couple days instead of the dining

21    hall?

22    A.       Yes.  When you first arrive to the facility,

23    there's a treatment team you must see before you are

24    allowed to move outside of the unit.  And being that I

25    arrived during the days of the holidays, December 23rd, I
```

1    didn't see the treatment team.  So, I was restricted to

2    the unit until I was able to be approved that there wasn't

3    any emergency needs that I needed or anything, to be able

4    to move along the outsides of the unit.

5    Q.      How did you get to the dining hall on -- in the

6    morning of December 26, 2011?

7    A.      I was escorted by staff along with all the other

8    patients that lived on the same living unit with me.

9    Q.      When you entered the dining hall on that, that

10   morning, where did you go?

11   A.      I just followed the rest of the patients.  It was

12   a regular line.  I followed the patients to go retrieve a

13   tray.

14   Q.      After you got your tray of food, where did you go?

15   A.      Well, there was a specified section.  I was

16   following the other guys, I guess, where we were sitting.

17   I went to go sit down to the -- at the table where the

18   other guys were from my living unit.

19   Q.      About how many patients were in the dining hall

20   that morning?

21   A.      Roughly 50, 60.

22   Q.      About how many staff from Chester were in the

23   dining hall that morning?

24   A.      On an estimate, eight to ten.  I don't know

25   exactly, I didn't count.

```
1    Q.      Were the defendants in this case on duty at

2    Chester during the morning of December 26, 2011?

3    A.      Yes, sir.

4    Q.      Were any of the defendants in the dining hall the

5    morning of December 26, 2011?

6    A.      Yes, sir.

7    Q.      Do you know which ones were in the dining hall?

8    A.      I know for a fact that Tom Nordmann was there.  If

9    I'm not mistaken, Terry Stewart was there.

10   Q.      What happened after you sat down with your food?

11   A.      When I sat down, I noticed that we had cereal on

12   the trays, dry cereal.  And me, I had forgot to get a

13   milk.  So, of course I want to eat my cereal with some

14   milk because I can't drink milk plain.  But I stood up to

15   try to go retrieve a milk and right away all the staff

16   started yelling, "Sit down, sit down, sit down."

17   Q.      What happened when they yelled, "Sit down, sit

18   down, sit down"?

19   A.      I froze.  And then I sat down right away.

20   Q.      What happened after that?

21   A.      Tom Nordmann and another staff member approached

22   me right away and started swearing at me.  Excuse my

23   French.  They -- he approached me and said, "You stupid

24   retarded motherfucker, we don't feel like dealing with you

25   retarded motherfuckers.  You know you're not supposed to
```

stand up.  Do you feel like being tied down?  You must not want to eat."

Q.     Is it your understanding sitting here today that standing up from the table in the Chester dining hall is a violation of the rules?

A.     Well, it's my understanding now.  Back then, no, I had no idea.

Q.     How did you react when you were yelled at that way?

A.     Well, I didn't react right away because another staff was trying to stop him, trying to tell him that that's the new guy. "Hey, he's new.  He's new."  And I reacted saying, "who do you think you are talking to?"  You know, I was upset, and I sweared at him.  I said, "who do you think you're talking to, bitch?"  You know, I was upset that he talked to me like that.  I was really shocked actually and reacted off impulse.

Q.     How did the staff react to you using that language back to them?

A.     In my opinion, they were shocked as well.  Because Chester is mostly lower-functioning patients and I guess, since I challenged them by the way they talked to me, it bothered them.  So they started saying, "Let's take him back, let's take him back, he don't want to eat."  And I said, "I don't care about this tray, but you're not going

1    to talk to me like that."  And that's when they said,

2    "Stand up and put your hands behind your back."

3    Q.      So, when they said to stand and put your hands

4    behind your back, what did you do?

5    A.      I stood up.

6    Q.      And what happened next?

7    A.      I was placed in handcuffs.  Another staff took the

8    tray.  And they started escorting me back to Unit C.

9    Q.      After you were placed in handcuffs, what happened?

10   A.      I was walking down the main hallway, the patient

11   hallway.  On my way down the hallway, I was being

12   manhandled and racial slurs were being thrown at me at the

13   same time.

14   Q.      You said you were being manhandled in the main

15   hallway?  What do you mean by that?

16   A.      Well, my hands were behind my back.  And I was

17   being held by the staff, specifically on one of my arms or

18   both of my arms, and I was being like jerked back and

19   forth from left to right where I couldn't control my own

20   movement.  The only thing I could do is walk.  And in the

21   midst of that, that's when they are making the comments,

22   "You're a tough guy.  We're going to show you how we do it

23   down here in Chester.  You think you're tough, you're from

24   the city, huh?  You black motherfucker, we're going to

25   show you."  Excuse my French.

1    Q.      Were you still in handcuffs at this point?

2    A.      Yes, sir.  I remained in handcuffs.

3    Q.      So -- I think you said you went from the dining

4    hall to the main hallway.  Where did you go from there?

5    A.      From the main hallway, we went to Unit C.  But in

6    order to access Unit C, you must go through a stem.  So we

7    went through the stem, first.

8            MR. SPIRA:  Your Honor, can I just confirm I have

9    permission to move about the courtroom?

10           THE COURT:  Yes.

11           MR. SPIRA:  Thank you.

12           THE COURT:  Are you miked up?

13           MR. SPIRA:  I'm not.

14           (Off the record.)

15           THE COURT:  And you can put that in your pocket.

16           MR. SPIRA:  Thank you.

17           THE COURT:  Okay.

18   Q.      (BY MR. SPIRA)  Chris, who was escorting you into

19   the main hallway?

20   A.      I know for a fact Tom Nordmann was present.  If

21   I'm not mistaken, Terry Stewart, too.

22   Q.      Okay.  Now I want to -- I want you to help the

23   jury orient to where all of these events are happening.

24   So, can I draw the dining hall over on the right side of

25   the page?

1    A.      Yes.

2    Q.      We'll call that dining hall.  (Drawing.)  Okay.

3    What happens -- what is at the Chester facility when you

4    leave the dining hall?

5    A.      When you leave the dining hall, it's one very long

6    hallway.

7    Q.      A vertical hallway?

8    A.      Yes, sir.

9    Q.      (Drawing.)  Like that?

10   A.      Yes.

11   Q.      Okay.  So, can you remind the jury what you said

12   happened in the main hallway?

13   A.      Well, exiting on down the hall is a double doors.

14   Exiting the hallway, we went to the right towards Unit C.

15   Q.      Okay.  So, what side of the hallway would Unit C

16   be on?

17   A.      As you go down -- as you turn right coming out of

18   the dining hall, Unit C door would be on the left, which

19   will be the stem.  But it would be Unit C, but you must

20   enter the stem to access Unit C.

21   Q.      So there's a door here that goes to C?

22   A.      Yes.  That's Unit C.

23   Q.      And what is Unit C?  Is that a living unit?

24   A.      Yes.  It's a living unit.

25   Q.      Are there other living units that you can enter

1    from this main hallway?

2    A.      Yes.  There's multiple doors, including the gym,

3    Unit B, Unit A, which would be back this way, the opposite

4    way of C.  A, being at the farther end of the hallway.

5    Q.      Okay.  And so where is the stem that you are

6    referring to?

7    A.      The stem is a part of the unit, but it's like a

8    foyer, I guess you can say.  As soon as you enter Unit C,

9    as soon as you walk in the door, that is the stem.

10   Q.      Inside Unit C.  Why do you call it a stem?

11   A.      I guess it -- it's a good comparison to an actual

12   flower.  There's a, a stem, a branch that's a straight

13   branch, narrow, it goes vertical.  And I guess this is

14   like a three-leaf clover, where you can go to the left

15   leaf, the straightaway, and then to the right.  Three

16   options.

17   Q.      Okay.  So kind of like a stem of a flower, like

18   that?  (Drawing.)

19   A.      Yes.  That's, that's an entryway, a walkway.  The

20   stem would be the walkway.

21   Q.      Okay.  And you mentioned there is petals like on a

22   flower or a clover.  What would those be, if this -- if

23   this is the stem, what are the petals?

24   A.      To the left, would be C-1, which is a module

25   within C -- Unit C.  Straight ahead would be C-2, an

1    entryway to C-2.  And to the right is C-3, an entryway to

2    C-3.

3    Q.     Can you describe the doorway to enter C-2 from the

4    stem?

5    A.     C-2 is a double door with a glass at the top of

6    the left, left door.

7    Q.     About how long is the walk from the dining hall to

8    the stem on Unit C?

9    A.     Forty-five seconds, a minute, I would assume.

10   Q.     Okay.  When you were being taken into the stem,

11   were you complying with all orders?

12   A.     Yes, sir.

13   Q.     Did you struggle at all during that time?

14   A.     No, sir.

15   Q.     Did you make any threats to any staff at that

16   time?

17   A.     No, sir.

18   Q.     Did you try to attack any staff?

19   A.     No, I didn't.

20   Q.     Were you still in handcuffs at this time?

21   A.     Yes.  I remained handcuffed.

22   Q.     What happened when you got to the stem?

23   A.     When I went to the stem, as soon as I entered the

24   stem, I was yanked to the ground and cuffed from under my

25   knees and slammed onto the ground on my back.  As soon as

1    I landed on my back, Lucas jumped on top of me and started

2    choking me, saying, "I'll kill you, motherfucker.  I'll

3    kill you.  Shut the fuck up."

4         I was eventually rolled over onto my side and

5    punched.  Eventually, again, I was turned over onto my

6    stomach and my chest, where I was still in handcuffs, and

7    punched and kneed within the face and hit more throughout

8    the body.

9    Q.    Okay.  So I want to -- there's a lot going on

10   there, so I want to try to break that down, if we can.

11   You said that you were pulled to the ground.  How were you

12   pulled to the ground?

13   A.    Someone took their arm around my neck in like a

14   choke position, and yanked me to the ground while someone

15   cuffed my legs to make sure that it wasn't a struggle.

16   Q.    And who put their arm around your neck and pulled

17   you to the ground?

18   A.    Terry Stewart.

19   Q.    Do you know who pulled your legs out from under

20   you?

21   A.    No, I don't know exactly who pulled my legs.

22   Q.    Okay.  So, when you were pulled to the ground, did

23   you land on your back or on your front?

24   A.    I landed on my back.

25   Q.    And what's the next thing you remember happening

1    when you are lying on your back?

2    A.      Luke jumping on top of me, choking me, telling me

3    he will kill me and "shut the fuck up."

4    Q.      When you say Luke, are you referring to the

5    defendant Lucas Nanney?

6    A.      Yes, sir.  Lucas Nanney is Luke.

7    Q.      How do you know it was Mr. Nanney that was choking

8    you?

9    A.      He was directly on top of me.  I was looking at

10   him right in his face.

11   Q.      Now, you mentioned what Mr. Nanney was saying to

12   you.  Were you saying anything back to Mr. Nanney at that

13   time?

14   A.      No.  I could barely breathe.

15   Q.      Did you try to knock his hands away with your

16   hands?

17   A.      There's nothing I could do.  My hands are

18   handcuffed and I was being held.

19   Q.      How long was Mr. Nanney choking you?

20   A.      Second-wise, I couldn't tell you.  But in my

21   opinion, it felt like a lifetime when you got your air

22   passage being cut off, you can barely breathe.  It's like

23   you're fighting for dear life.

24   Q.      So, at this point when you are on your back and

25   Mr. Nanney is over you, do you know where the other

1    defendants are?

2    A.      The only person I know exactly where they were is

3    Terry, because he's the one who initially pulled me down.

4    Q.      Okay.  And so do you know where -- where was he at

5    that point?

6    A.      He was under me.

7    Q.      Oh, I see.  So he pulled you back on top of him?

8    A.      Yes.

9    Q.      What was your reaction to Mr. Nanney's actions?

10   How did you react to that?

11   A.      There wasn't a reaction.  I was shocked.  I was

12   stuck.  I was clinging for my life.  I didn't know when he

13   was going to stop.  And I didn't know why they were doing

14   this.

15   Q.      Okay.  And then what do you happen remembering

16   after Mr. Nanney was choking you?

17   A.      Eventually, I was rolled over onto like my side

18   and then my chest.

19   Q.      How were you rolled over?

20   A.      They were manhandling me.  It's not like I could

21   move myself.  They were doing all the moving me and

22   pushing me.

23   Q.      Okay.  And once you get rolled over onto your

24   front, what do you recall happening after that?

25   A.      I saw feet run across my face like someone was

1    running in front of me.  And right away, whoever feet

2    that was -- which I later discovered was Josh, Josh

3    Rackley -- he dropped to the ground and started kneeing me

4    in my face real hard.

5    Q.      You said that you eventually figured out that was

6    Mr. Rackley.  How did you figure that out?

7    A.      Well, eventually I was able to look at him when I

8    was on the ground.  As I was trying to run from the blows,

9    I made eye contact with him or was able to see his face,

10   and also the shoes that he had on.

11   Q.      When you say he kneed you in the face, what do you

12   mean?  Can you explain that?

13   A.      Well, I was laying down on the ground.  My chest

14   was on the ground and my head was vertical just like this.

15   And when he dropped to the ground, he started kneeing me

16   right here in my face.

17   Q.      Do you know what side of your face Mr. Rackley

18   kneed you in?

19   A.      It was the left side of my face.

20   Q.      And where were your hands at this point?

21   A.      I was still in handcuffs.

22   Q.      What do you remember happening after that?

23   A.      I was just being beat the entire time.  Hit in my

24   face, as I was trying to run from the blows from Josh

25   Rackley, from his knees.  I tried to run with my face and

1    turn to the right, and I was being punched on the other

2    side.  My ankle were being twisted and I was being punched

3    in my genitals and throughout my body, my stomach, my

4    ribs, and in the back of my head.

5    Q.     Okay.  And I want to break that down a little bit.

6    I think you said you were trying to run with your face.

7    What do you mean by that?

8    A.     Well, since this face, this side of my face, my

9    left side was the most sensitive from receiving the knees,

10   the blows from his knees, I tried to run, meaning like

11   turn my face, reposition my face to get away from it, and

12   I was -- only to get hit on the other side.

13   Q.     Now, you mentioned that you got hit in the

14   genitals.  Do you know who hit you in the genitals?

15   A.     I couldn't see him, but it's my opinion it was Tom

16   Nordmann.

17   Q.     And how do you know it was Mr. Nordmann?

18   A.     Well, you know, everybody was positioned in the

19   area.  Josh in front of me, kneeing me.  Terry Stewart was

20   somewhere towards the back because he pulled me down.  Tom

21   Nordmann was making the racial slurs on the way down to

22   the Unit C.  And when he was -- when I was being punched

23   in the genitals, like, you could tell like whoever was

24   punching me was the same one making the comments.  "You

25   black motherfucker, we're going to show you."  Excuse my

1    French.  "We're going to show you, tough guy, tough guy,

2    this is how we do it at Chester.  You're going to learn."

3    Q.      You mentioned you got hit in the genitals.  Did

4    you get hit anywhere else?

5    A.      I mean, about my body, the head, my stomach, my

6    ribs.

7    Q.      Do you know who hit you about the body and the

8    ribs?

9    A.      Well, no, everybody hit me, in my opinion, but I

10   can't see who hit me when and where.

11   Q.      How long did the attack in the stem last?

12   A.      Minute-wise, I couldn't tell you.  Maybe four or

13   five minutes.  I couldn't tell you but I -- it felt like

14   it lasted forever.

15   Q.      Were you handcuffed the entire time during that

16   aspect of the incident?

17   A.      Yes, sir.

18   Q.      Could you fight back or protect yourself?

19   A.      No.  I couldn't cover my face, block my face.  I

20   couldn't pull the hands that were being -- when I was

21   being choked, I couldn't do anything.

22   Q.      What happened after the four defendants stopped

23   beating you?

24   A.      Eventually, I was pulled to my feet and escorted

25   to the restraint room.  And I was thrown on a bed, where I

1    was choked and assaulted some more.

2    Q.     At any point during the portion of the incident in

3    the stem, did any of the defendants attempt to intervene

4    or stop the others from attacking you?

5    A.     No.

6    Q.     When you were lifted up to your feet before you

7    were brought into the restraint room, did any other staff

8    come into the stem?

9    A.     Yeah, multiple staff had arrived at that time, and

10   was around when I was on my feet and being escorted back

11   into the restraint room.

12   Q.     Were you in any pain at this point?

13   A.     Unbearable pain.

14   Q.     What specifically was hurting you?

15   A.     My face was hot, you know, from receiving them

16   blows in a sensitive spot.  And my face was hot, it was

17   throbbing.  I can't even explain how it was hurt in words.

18   Q.     When you were a patient at Chester, did you pass

19   through the stem on Unit C frequently?

20   A.     Yes.  You must go through the stem to go anywhere

21   outside of the unit.

22   Q.     And when you are in the stem, can you see the

23   doors leading into C-2 at the end of the hallway?

24   A.     Yes.  You can see directly into C-2, all the way

25   to the pool table and the table that's inside of C-2.

1   Q.      In the morning when all these events are
2   happening, do you know if the doors to C-2, those double
3   doors would normally be open?
4   A.      Yes.  When we return from the dining room, each
5   unit door is open.  They leave them open because, while
6   we're gone, the housekeepers clean up.  And on the way
7   back, the doors are open so that we can enter our living
8   units.
9   Q.      Is there a camera from C-2 that looks into the
10  stem?
11  A.      Yes.
12  Q.      Are you familiar with what the view from C-2
13  looking into the stem looked like as of December 26, 2011?
14  A.      Yes, sir.
15          MR. SPIRA:  Your Honor, I'd like permission to
16  pull up Plaintiff's Exhibit 14, which is a video that the
17  parties have stipulated to in this case.
18          THE COURT:  Are you moving to admit the exhibit?
19          MR. SPIRA:  I was going to pull it up first but,
20  if you prefer, I can proceed with requesting that it --
21          THE COURT:  If you guys have already agreed to it,
22  why don't you just -- so we can keep the record --
23          MR. SPIRA:  Okay.  Thank you.  Judge, I'd like to
24  move to admit Plaintiff's Exhibit 14 and publish it to the
25  jury, please.

```
 1              THE COURT:  Okay.  It's my understanding there are
 2   no objections.  Is that correct, Miss Vincent?
 3              MS. VINCENT:  That's correct, Your Honor.
 4              THE COURT:  Plaintiff's Exhibit 14 is admitted and
 5   you may publish it.
 6   Q.      (BY MR. SPIRA)  Chris, do you recognize this
 7   image?
 8   A.      Yes.
 9   Q.      What is this showing?
10   A.      That's the entryway of C-2.
11   Q.      And what's through those -- what's through that
12   entryway that you see there?
13   A.      Straight ahead would be the exit of Unit C.  So,
14   to the left would be C-3, to the right is C-1, and this is
15   C-2.
16              THE COURT:  Counsel, just so you know, Mr. Davis,
17   the witness, can actually place marks on the screen.
18              MR. SPIRA:  Okay.  Thank you.
19              THE COURT:  He can do it right there on the
20   screen.
21              THE WITNESS:  This screen is activated?
22              THE COURT:  Yes.
23   Q.      (BY MR. SPIRA)  Okay.  And through the doorway
24   there that's opened, what area is that?
25   A.      That's the stem.
```

```
1    Q.      So, if we are just keeping track of where we are
2    on our diagram, is the camera looking from C-2 pointing
3    that way?
4    A.      Yes, sir.
5    Q.      Okay.  Now I'd like to play a short clip of this
6    video.
7            MR. SPIRA:  Miss Dudley, if you could start the
8    video, Clip 1.
9            (Video playing.)
10   Q.      (BY MR. SPIRA)  Chris, do you recognize that
11   individual who came up through the stem into C-2?
12   A.      Yes, sir.
13   Q.      Who is that?
14   A.      That's Josh Rackley.
15   Q.      Is that one of the defendants in this case?
16   A.      Yes, sir.
17   Q.      Do you know who Mr. Rackley appears to be speaking
18   to?
19   A.      I would assume that's a housekeeper because he has
20   a vacuum.
21   Q.      Now, I'd like to show another clip from a few
22   seconds later in this same video.
23           MR. SPIRA:  Miss Dudley, if you could pull up Clip
24   2, please.
25           (Video playing.)
```

1   Q.      (BY MR. SPIRA)  Can you describe for the jury what

2   you just saw in that video?

3   A.      I saw the housekeeper go and close the right door

4   to C-2.

5   Q.      Now, once that right door to C-2 or from --

6   between C-2 and the stem is closed, can you see into the

7   stem anymore?

8   A.      No, you can't.

9   Q.      So, is this the door that was closed?

10  A.      Yes.

11          THE COURT:  For the record, counsel has marked on

12  the diagram that he has drawn the door.

13          MR. SPIRA:  Thank you.

14          THE COURT:  All right.

15  Q.      (BY MR. SPIRA)  Now, that same area that's blocked

16  by that door, is that the area where the attack in the

17  stem happened?

18  A.      Yes, directly outside of that door and in the

19  stem.

20  Q.      Do you see the time stamp on that video at the

21  top?

22  A.      Yes, sir.

23  Q.      What does that say?

24  A.      07:50:46.

25  Q.      Is that around the time that you would have been

1    brought into the stem?

2    A.      Yes, I believe so.

3    Q.      Okay, now I want to return to your whereabouts

4    while this is all happening.  I think you said you were

5    lifted to your feet in the stem.  Where did you go from

6    there?

7    A.      Well, eventually after the attack I was taken to

8    C-3 and then to a restraining room.

9    Q.      So, from the stem is there a door to go into C-3?

10   A.      Yes, there's a door for each unit.  And C-3 door

11   is to the right.

12   Q.      Okay.  And once you get into C-3, where is the

13   restraint room that you were taken to?

14   A.      There's four doors when you enter C-3, two on the

15   right, two on the left.  And I was taken into the second

16   door.

17   Q.      Second door on which side?

18   A.      On the right side.

19           MR. SPIRA:  Okay.  And let the record reflect, I

20   have marked representation of the four rooms and an arrow

21   to the one that you were taken into.

22   Q.      (BY MR. SPIRA)  When you were being taken from the

23   stem into C-3, and then into the restraint room, were you

24   fighting back against the staff at that time?

25   A.      No.  I was still in handcuffs.

1   Q.      Were you saying anything to the staff while you

2   were being taken into the restraint room?

3   A.      No.  I was actually -- I was probably in a shock.

4   Q.      Do any of the four defendants look significantly

5   different today than they did seven years ago when this

6   was happening?

7   A.      Yes.  You know, everybody ages but I don't -- I

8   cannot recognize Lucas -- I mean, excuse me -- Terry

9   Stewart.

10  Q.      He looks different today than he did seven years

11  ago?

12  A.      I don't even recognize him today.

13  Q.      Do you know if there is a camera in the entryway

14  between the stem and C-3?

15  A.      What do you mean, the entryway?

16  Q.      Is there a camera that looks into C-3 from close

17  to the -- from close to the stem?

18  A.      Yes.  There's a, a camera at the hallway of C-3

19  that shows the hallway of the living unit of C-3.  Just

20  like C-2 has its camera?  C-3 has a camera.

21          MR. SPIRA:  Your Honor, I'd like to move to admit

22  Plaintiff's Exhibit 15 into evidence and publish it to the

23  jury.

24          THE COURT:  Any objections?

25          MS. VINCENT:  No, Your Honor.

 1          THE COURT:  Plaintiff's Exhibit 15 is admitted and

 2     may be published to the jury.

 3     Q.      (BY MR. SPIRA)  And before we start this video,

 4     what is this -- what is this showing here?

 5     A.      This is the camera that's directly inside of C-3.

 6     This is the -- back this way where you can barely see the

 7     video is actually cut off?  That's the door to C-3.  So,

 8     that's the stem.  This is the beginning of the hallway and

 9     these are the doors that I was referring to.

10     Q.      So, where is the stem in relation to this hallway

11     we're seeing here?

12          THE COURT:  You can touch it.

13     A.      This is the door.  (Indicating.)

14     Q.      (BY MR. SPIRA)  Okay.  Thank you.  I'd like to

15     play a short clip from this video.

16          MR. SPIRA:  Miss Dudley, can you play Clip 1,

17     please?

18          (Video playing.)

19     Q.      (BY MR. SPIRA)  Can you describe for the jury what

20     you saw in that clip?

21     A.      I saw Josh Rackley and Lucas Nanney going and

22     entering into the stem.

23     Q.      Do you see a time stamp on that video?

24     A.      7:50:14.

25     Q.      Now, you mentioned the rooms to the left and right

1    on this hallway.  What are those?

2    A.      Those are restraint rooms.  As you could tell the

3    difference, the restraint rooms of the doors, they have a,

4    a big glass in the middle of the door, opposed to the

5    rooms that continue to go down that just, it's just a

6    door.  Those are actually rooms that we live in.

7    Q.      Were you taken into one of these rooms after the

8    attack in the stem?

9    A.      Yes, I was taken into one.

10   Q.      Which one?

11   A.      I was taken into this room that you can barely

12   see.  It's against the right wall.  (Indicating.)

13   Q.      Now, I'd like to play another short clip from this

14   video and I'd like you to count out loud how many people

15   you see following you into that restraint room.

16          MR. SPIRA:  Miss Dudley, could you please play

17   Clip 2?

18          (Video playing.)

19   A.      1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12.

20   Q.      (BY MR. SPIRA)  Okay.  Now I'd like to play that

21   same clip again and I want you to see if you can -- I know

22   it's hard to see because we're only seeing the backs of

23   everyone, but if you could identify the defendants in this

24   video, if you see them.

25          (Video playing.)

```
 1           Did you see the defendants in the video?
 2   A.      Yes, sir.
 3   Q.      Where were they?
 4   A.      Do you want me to point them out --
 5           MR. SPIRA:  Why don't we -- yeah, can we bring it
 6   back and bring it out?
 7           (Video playing.)
 8           Pause it there.
 9   Q.      (BY MR. SPIRA)  Do you see any of them there?
10   A.      Right here is Luke.  Right here is Josh.
11   (Indicating.)
12           MR. SPIRA:  Okay, if you could continue the video.
13           (Video playing.)
14   A.      This is Nordmann with the glasses.  (Indicating.)
15   Q.      Okay.
16           (Video playing.)
17   A.      Stop.  And this is Terry Stewart.  (Indicating.)
18   Q.      Okay.  Now I'd like to play one more clip from the
19   video.
20           MR. SPIRA:  Miss Dudley, can you pull up Clip 3,
21   please?
22           (Video playing.)
23   Q.      (BY MR. SPIRA)  Who is that individual?
24   A.      That's Terry Stewart.
25           MR. SPIRA:  Okay.  And can you actually play that
```

1   one more time please, Miss Dudley?

2          (Video playing.)

3   Q.      (BY MR. SPIRA)  What do you see Mr. Stewart do in

4   this video as he walks through the hallway?

5   A.      Looks and observes his hand.

6   Q.      He looks and observes his hand?

7   A.      Yes.

8   Q.      Was Mr. Stewart one of the individuals who had

9   just been punching you with his hands a few minutes

10  earlier?

11  A.      Yes.  He was involved in the attack.

12  Q.      Now, in the earlier clip we showed, were your

13  hands still handcuffed behind your back?

14  A.      Yes.

15  Q.      Were you struggling against any of the staff in

16  that video?

17  A.      No, sir.

18  Q.      What happened after you were taken into that

19  restraint room?

20  A.      I was slammed on the bed and I started being

21  choked again by Luke.

22  Q.      When you say you were slammed onto the bed, what

23  do you mean?

24  A.      Like I was thrown on the bed with force.  I was

25  already in handcuffs, so I couldn't brace falling on the

```
 1   bed.  I was like slammed by all the staff onto the bed.
 2   And when I was turned over roughly, I instantly started
 3   being choked again by Luke.  He started choking me and
 4   repeating the same stuff he repeated earlier, "Shut the
 5   fuck up, shut the fuck up, I'll kill you, motherfucker."
 6   Q.      Were you on your back at this point or were you on
 7   your stomach this time?
 8   A.      I was on my back.
 9   Q.      Were you able to see Mr. Nanney?
10   A.      Yes.  I could look right in his eyes.
11   Q.      How long was Mr. Nanney strangling you in the
12   restraining room?
13   A.      Like I said before, I can't give you second-wise.
14   That's some -- when it happens, you can't count.  You're
15   just trying to breathe as best as you can when you get
16   your air passage cut off.
17   Q.      Okay.  What do you remember happening after Mr.
18   Nanney was strangling you?
19   A.      A female voice yelled, "Luke, Luke, stop.  That
20   camera's on in there.  Stop."
21   Q.      And what happened after that?
22   A.      He stopped choking me right away.
23   Q.      So what then -- what happens then when you are
24   lying on the bed in handcuffs?
25   A.      Well, eventually they strapped my feet to straps,
```

```
 1    leather straps on each side of the bed.  And then they
 2    took one cuff out and put my arm in the strap, and each
 3    hand into a leather strap.
 4    Q.     And is that -- is there a name for that type of
 5    restraint?
 6    A.     Yeah, full leather restraints.
 7    Q.     Is that also called a four-point restraint?
 8    A.     Yes, sir.
 9    Q.     How long were you left in the four-point
10    restraints?
11    A.     Hours.
12    Q.     What were you doing during that time?
13    A.     I just laid in, in the bed tied down.
14    Q.     Were you crying?
15    A.     Yes.
16    Q.     Were you in pain?
17    A.     Yes, sir.
18    Q.     What sort of pain were you in?
19    A.     Like I said, my face was throbbing, you know.  But
20    I think even within that mentally, I was just hurt.  I was
21    shocked, utter disbelief that this was a hospital and this
22    was how I was being treated.  I couldn't believe what had
23    just happened.
24    Q.     Were you thinking about anything while you were
25    lying there in the restraints?
```

1    A.      I was just thinking about how I could call

2    somebody and let them know what happened, because I knew

3    that this was not supposed to happen and it shouldn't have

4    happened in a treatment center like this.

5    Q.      Who did you want to call?

6    A.      My mom and my step-dad.

7    Q.      Did any staff come into the restraint room while

8    you were in there for hours?

9    A.      Yes.  A nurse came right away, minutes after,

10   maybe even seconds, and checked my blood pressure.  She

11   ignored me, when I tried to speak to her initially.  And

12   later on throughout the day, staff kept coming in the room

13   gradually.

14   Q.      You said she ignored you when you tried to speak

15   to her.  What did you try to -- what were you trying to

16   say to her?

17   A.      I tried to let her know that I was just attacked

18   and beat, and if someone could come and talk to me.  And

19   she just ignored me, took my blood pressure and I guess

20   wrote down my vital signs.

21   Q.      Did you try to talk to anyone after that, while

22   you were still in restraints?

23   A.      No.  Right then and there, that just -- I was

24   discouraged.  That shut me down all the way.  When a nurse

25   wouldn't even acknowledge me, what I was trying to tell

1   her, I just shut down.

2   Q.      Do you know whether there is a video camera in the

3   restraint room while you were in there?

4   A.      Yes, there were.

5   Q.      How do you know that?

6   A.      Well, initially I didn't.  Like I said, it was my

7   first time in the room.  I heard the nurse yell, "Hey,

8   Luke, Luke, stop.  That camera's on in there."  He

9   stopped.  And eventually, laying in that bed for hours, I

10  looked up and there was a camera above the toilet, behind

11  a glass like a Plexiglas, it was a camera.

12  Q.      If you are lying in the bed, where is the camera

13  in relation to you?

14  A.      To the, to the left of me in a diagonal way.

15  There's a toilet, and above the toilet pointing diagonally

16  down in an angle directly to the bed there was a camera.

17  Q.      Have you seen any of the other restraint or

18  seclusion rooms in Unit C?

19  A.      Yes.

20  Q.      Do those have cameras in them?

21  A.      Yes.

22  Q.      Have you reviewed all the videos that the

23  defendants provided to you in this case?

24  A.      Yes, sir.

25  Q.      Did the defendants provide you with any video

1    footage from inside the restraint room?

2    A.      No.

3    Q.      Have you ever seen any footage from the camera

4    from inside the restraint room?

5    A.      No, sir.

6    Q.      Now, you mentioned earlier that when you were

7    escorted out of the dining room you went into this main

8    hallway --

9    A.      Yes, sir.

10   Q.      -- before entering the stem.  Do you know if

11   there's a video camera in that main hallway?

12   A.      Yes.  At the end of the hallway, specifically by

13   door C, Unit C, there is a camera right there as well.

14   Q.      How do you know that?

15   A.      That's the main hallway that we use every day to

16   go to anywhere, to the gym, to barber shop, to school, to

17   the dining hall.  There's a camera at the far end of the

18   hallway outside of door C.

19   Q.      Did the defendants provide you with any video

20   footage from that main hallway from December 26, 2011?

21   A.      No.  And I haven't reviewed any camera of that,

22   that footage.

23   Q.      Have you ever seen the footage from that main

24   hallway?

25   A.      No, sir.

1    Q.      Okay.  Now, where did you go on December 26, 2011,

2    after you were released from the restraint room?

3    A.      I went down this hallway, which is the unit I was

4    living on, to try to use the phone.

5    Q.      When you say "this hallway," you are referencing

6    the hallway that's still up on the exhibit here?

7    A.      Yes, sir.

8    Q.      Okay.  Did you see anyone on the way to the phone?

9    A.      Yes, I did.

10   Q.      Who did you see?

11   A.      I don't recall the patient's name off top, but two

12   patients stopped me, pointing at me face, and telling me

13   like, "What happened to you?  They whooped you?  They beat

14   you?"

15   Q.      Where did you go next?

16   A.      They told me actually like, go look in the mirror,

17   because I didn't know my face looked like this.  I knew it

18   had happened but I didn't know there was results to my

19   face.  And I went directly to my room, took a look in the

20   mirror.

21   Q.      What did you see?

22   A.      A swollen face.  My face was swole.  I had bloody

23   eyes, not like bloodshed but bloody eyes.  Knots and

24   bruises about my face, and a knot behind my neck.  I could

25   feel that, but I noticed the swelling in my face.

1   Q.      Were any pictures taken of you after this

2   incident?

3   A.      Yes.

4   Q.      When was that?

5   A.      The next day.

6           MR. SPIRA:  Your Honor, I'd like to move to admit

7   and publish to the jury Defendants' Exhibit 4, which is a

8   stipulated photograph.

9           THE COURT:  Any objections?

10          MS. VINCENT:  No objection.

11          THE COURT:  Defendants' Exhibit 4?  Or Plaintiff's

12  Exhibit 4?

13          MR. SPIRA:  Defendants' Exhibit 4.

14          THE COURT:  Defendants' Exhibit 4 is admitted and

15  you may publish it.

16          MR. SPIRA:  Thank you.

17          Miss Dudley, can you pull up Defendants'

18  Exhibit 4?

19  Q.      (BY MR. SPIRA)  Now, I know this picture is a

20  little dark, the contrast isn't great, but what is this a

21  picture of?

22  A.      That's a picture of me holding up the sign with

23  the investigator.

24  Q.      Do you know what it says on that sign?

25  A.      Case type:  Abuse.

```
1              Incident date:  12/26/11.

2              Incident time:  Approximately 0745.

3              Photo date:  12/27/11.

4              Photo time:  1040 hours.

5     Q.       And it looks like it says "photo's by."  Do you

6     know the name beside that?

7     A.       Yes.  That's R. Hecht.

8     Q.       What does the R stand for?

9     A.       Russell.

10    Q.       Who is Russell Hecht?

11    A.       He's our investigator.

12    Q.       Is he -- was he an STA at Chester?

13    A.       Yes, sir.

14             MR. SPIRA:  Your Honor, I'd like to move to admit

15    Plaintiff's Exhibit 3, which is another stipulated

16    picture.

17             THE COURT:  Any objections?

18             MS. VINCENT:  No objection.

19             THE COURT:  Plaintiff's Exhibit 3 -- which is also

20    Defendants' 5, I believe?

21             MR. SPIRA:  Correct.

22             THE COURT:  -- is admitted without objection.

23    Q.       (BY MR. SPIRA)  Chris, do you recognize this

24    picture?

25    A.       Yes, sir.
```

1   Q.     When was this taken?

2   A.     On 12/27/2011.

3   Q.     What do you see here?

4   A.     A picture of me.

5   Q.     Can you describe any injuries that you see in this

6   picture?

7   A.     Yes.  Clearly you can see the blood clots in my

8   eye, the busted blood vessels.  You could also see

9   swelling about my face and my cheeks, specifically under

10  my left eye.  You can see the swelling and the darkness

11  around my eyes.

12  Q.     Can you point to those on your video screen there,

13  highlight them?

14  A.     (Witness complies.)

15  Q.     And then the redness in your eyes you mentioned?

16  A.     (Indicating.)

17        MR. SPIRA:  Your Honor, I'd like to move to admit

18  Plaintiff's Exhibit 4 and publish it to the jury.

19        THE COURT:  Any objections?

20        MS. VINCENT:  No objection.

21        THE COURT:  Plaintiff's Exhibit 4 is admitted

22  without objection.

23        MR. SPIRA:  Exhibit 4, please.

24  Q.     (BY MR. SPIRA)  Chris, can you describe to the

25  jury any injuries that you see in this photograph?

1    A.     Yes.  You can see the darkness around my eyes as

2    well as the blood clot.  And I believe that's a little

3    bruising going into my forehead above my eyebrow.

4    Q.     Now, Chris, do bruises show up easily on your

5    body?

6    A.     Well, no, because I'm a colored skin person.  A

7    black person.  It's hard to visibly see, especially in a

8    photo.  You have to be there in person to actually take

9    notice of the injuries.

10          MR. SPIRA:  Your Honor, I'd like to move to admit

11   Plaintiff's Exhibit 4 -- excuse me -- Plaintiff's Exhibit

12   5 and admit that -- publish that to the jury.

13          THE COURT:  Any objections?

14          MS. VINCENT:  No objection.

15          THE COURT:  Plaintiff's Exhibit 5 is admitted.

16   Q.     (BY MR. SPIRA)  Can you describe to the jury what

17   you see in this photograph?

18   A.     Yes.  This is just a different angle, version of

19   me.  It shows more how much the effects they did to my

20   eye, and my eye on the other side, and it also shows the

21   tenderness of around my eye from being hit.

22          MR. SPIRA:  Your Honor, I'd like to move to admit

23   Plaintiff's Exhibit 6 and publish it to the jury.

24          THE COURT:  Any objections?

25          MS. VINCENT:  No objections.

```
1              THE COURT:  Plaintiff's Exhibit 6 is admitted.
2    Q.     (BY MR. SPIRA)  Chris, can you tell the jury what
3    you see in this picture?
4    A.     There's a knot.  You can't really notice, you
5    know, like I said once again, because I'm a colored skin
6    person, it wouldn't stand out as much, but there's a knot
7    behind my ear.
8              MR. SPIRA:  Your Honor, I'd like to move to admit
9    Plaintiff's Exhibit 7 and publish it.
10             THE COURT:  Any objections?
11             MS. VINCENT:  No objections.
12             THE COURT:  Plaintiff's Exhibit 7 is admitted.
13   Q.     (BY MR. SPIRA)  What do you see in this picture,
14   Chris?
15   A.     It's a picture of me trying to show my neck and
16   the abrasions around my neck from being choked.
17             MR. SPIRA:  I'd like to move to admit Plaintiff's
18   Exhibit 8 into evidence.
19             THE COURT:  Any objections?
20             MS. VINCENT:  No objection.
21             THE COURT:  Plaintiff's Exhibit 8 is admitted.
22   Q.     (BY MR. SPIRA)  Chris, can you tell the jury what
23   you see here?
24   A.     You can't see much, but it's a darkened handprints
25   like you can see around my neck, the tenderness.  That's
```

```
 1   why I was holding my shirt right here, you can see that I
 2   was being choked.
 3              MR. SPIRA:  Your Honor, I'd like to move to admit
 4   Plaintiff's Exhibit 9.
 5              THE COURT:  Any objections?
 6              MS. VINCENT:  No objection.
 7              THE COURT:  Plaintiff's Exhibit 9 is admitted.
 8   Q.     (BY MR. SPIRA)  What do you see here?
 9   A.     It's just another area of my neck, showing the
10   tenderness from my neck of being choked.
11              MR. SPIRA:  Your Honor, I'd like to move to admit
12   Plaintiff's Exhibit 10.
13              THE COURT:  Any objections?
14              MS. VINCENT:  No objection.
15              THE COURT:  Plaintiff's Exhibit 10 is admitted.
16   Q.     (BY MR. SPIRA)  Chris, what do you see here?
17   A.     It just shows the swelling of my wrists from the
18   handcuffs being so tight.  And once again, you can't see,
19   but there's cuts and like abrasions like from the
20   handcuffs on my wrist.  Again, you can't see them in these
21   photographs but they were actually there.
22              MR. SPIRA:  Your Honor, I'd like to move to admit
23   Plaintiff's Exhibit 11.
24              THE COURT:  Any objections?
25              MS. VINCENT:  No objection.
```

```
1              THE COURT:  Plaintiff's Exhibit 11 is admitted.
2    Q.       (BY MR. SPIRA)  What do you see here?
3    A.       It's the same thing, it's just a different angle
4    of my wrist that showed probably another mark.
5              MR. SPIRA:  Your Honor, I'd like to move to admit
6    Plaintiff's Exhibit 12.
7              THE COURT:  Any objections?
8              MS. VINCENT:  No objection.
9              THE COURT:  Plaintiff's Exhibit 12 is admitted.
10   Q.       (BY MR. SPIRA)  What do you see here?
11   A.       This is just the same thing, another angle of my
12   wrist.
13   Q.       Do you see any swelling?
14   A.       No, not in the picture, but it's there.
15             MR. SPIRA:  Your Honor, I'd like to move to admit
16   Plaintiff's Exhibit 13.
17             THE COURT:  Any objections?
18             MS. VINCENT:  No objection.
19             THE COURT:  Plaintiff's Exhibit 13 is admitted.
20   Q.       (BY MR. SPIRA)  And what do you see here?
21   A.       See right here, you can see a little bit of the
22   redness on my wrist.  I was identifying it with this
23   marker.  You can see a little bit there, a little bit
24   right here.  (Indicating.)  But it just shows the
25   abrasions of the handcuffs, I guess.
```

```
 1          MR. SPIRA:  Miss Dudley, can you please pull back

 2    up what's been admitted as Plaintiff's Exhibit 3?  Thank

 3    you.

 4    Q.     (BY MR. SPIRA)  Chris, between the time you

 5    arrived at Chester and Christmas of 2011, the day before

 6    the incident, were your eyes bloody?

 7    A.     The day before the incident?

 8    Q.     Between the time you arrived at Chester and the

 9    day before the incident, were your eyes bloody?

10    A.     No, they weren't.

11    Q.     Between the time you arrived at Chester and

12    December 25th, 2011, was your face swollen?

13    A.     No, not at all.

14    Q.     Between the time you arrived at Chester and

15    December 25th, 2011, was your face tender or sensitive?

16    A.     No, sir.

17    Q.     Between the time you arrived at Chester and

18    December 25th, 2011, did you have any bruises or knots on

19    your body?

20    A.     No, sir.

21    Q.     Chris, at any time in your life other than

22    following the incident on December 26, 2011, have your

23    eyes ever been bloody like this?

24    A.     No, sir.  That was the first time my eyes have

25    ever looked like that in my life.
```

Q.      Have they ever looked like that since, once you recovered?

A.      No, sir.

Q.      Do you have any explanation besides the incident on December 26, 2011, for your bloody eyes, swelling, tenderness, and bruising?

A.      No, sir.

Q.      Were you seen by a doctor to evaluate or treat your injuries after December 26, 2011?

A.      Yes, I was.

Q.      And what was that doctor's name?

A.      Dr. Tariq.

Q.      Did Dr. Tariq examine you?

A.      Yes, he did.

Q.      Do you recall what you told Dr. Tariq for the purpose of his medical examination?

A.      When I first saw Dr. Tariq, he said, "Oh, my, what happened to you?"

        THE COURT:  You need to listen to the question. He didn't ask you what Dr. Tariq said to you.  He asked you what you said to Dr. Tariq.

        THE WITNESS:  Okay.

        THE COURT:  Okay.

Q.      (BY MR. SPIRA)  I'll repeat for the record. Chris, can you tell me what you told Dr. Tariq for the

1    purpose of his medical examination of you?

2    A.      I just told him that I was beat.

3    Q.      How long did it take for the blood in your eyes to

4    go away?

5    A.      About three weeks.

6    Q.      How long did it take for the swelling to go away?

7    A.      Roughly a month.

8    Q.      How long did it take for the tenderness to go

9    away?

10   A.      The tenderness was about a month and a half.  The

11   swelling went down, but I could still feel the soreness

12   and the tenderness within my face.

13   Q.      By the way, on December 26, 2011, did you ever get

14   your breakfast?

15   A.      No, I didn't eat.

16   Q.      Following this incident on December 26, 2011, did

17   you have any additional interactions with the defendants

18   while you were at Chester?

19   A.      Yes, I did.

20   Q.      And, and what were those interactions?

21           MS. VINCENT:  Objection, relevance.

22           THE COURT:  Sustained.

23           MR. SPIRA:  Thank you.

24   Q.      (BY MR. SPIRA)  How else has the attack on

25   December 26, 2011, impacted you?

A.      I believe it scarred me in my life, like it still
affects me to this day, every day.  I think about it, that
they did what they did to somebody who went to a facility
for treatment, and to be beat when you went there for help
and to receive help.  I have flashes and I had nightmares.
I even had sleep insomnia.

        It just bothers me when a security person
approaches me or gets a little aggressive or loud.  I kind
of like get alert to make sure they're not going to do
something like what they did, because what they did was
without cause or justification.

Q.      Chris, what are you looking to get from this
lawsuit?

A.      Well, in all honesty, I don't believe that I can
ever be repaid for what they did and how it affected my
psyche.  But I just want somebody to be held accountable,
because if no one is held accountable this will continue
to happen, especially in a mental hospital.  It should
never be happening where somebody is going there for
treatment.

        And right now, this is at an all-time high in this
world, so I believe that someone needs to be held
accountable to make an example so they can stop doing it
or they'll think twice before they do it again.

        Money can't actually pay me from what I suffer

```
 1    from, because it's mentally more than anything.  And when
 2    you are being beat, when you can't fight back, when you
 3    can't ball up, when you can't pull their arms away when
 4    you are being choked, I can't explain in words how that
 5    affected me, at the moment especially.  I feel like I was
 6    going to die.  So, money can't really repay me.
 7         But since I can't make anyone prosecute these guys
 8    or make them be thrown in jail, I just want somebody to be
 9    held accountable and to have an impact on everybody else
10    who is in any Chester facility or any mental health
11    facility, because they specifically said, "This is how we
12    do it in Chester, we're going to show you."  And it should
13    never happen again.
14         MR. SPIRA:  Your Honor, can I just confer with
15    counsel for one moment?
16         THE COURT:  Yes.
17         (Off the record.)
18         MR. SPIRA:  No further questions, Your Honor.
19         MS. VINCENT:  Your Honor, could we have a bathroom
20    break before I do my cross?
21         THE COURT:  Step up to the bar.
22         (Off the record discussion at the bench.)
23         (Proceedings continued in open court, plaintiff
24    and jury present.)
25         THE COURT:  Okay.  We are going to go ahead and
```

```
 1    take a real short break, like, five minute short, because
 2    we're going to be taking another break here shortly, so --
 3    but if any jurors need to relieve yourselves right now,
 4    feel free to go out and -- why don't we go ahead and take
 5    a quick ten minutes.
 6              (Court recessed from 2:09 p.m. to 2:14 p.m.)
 7              (Proceedings continued in open court, plaintiff
 8    and jury present.)
 9              THE CLERK:  Please be seated.
10              THE COURT:  Okay.  Cross-examination?
11                        CROSS-EXAMINATION
12    BY MS. VINCENT:
13    Q.       Hi, Mr. Davis.
14    A.       Good afternoon.
15    Q.       Mr. Davis, you testified earlier that you arrived
16    at Chester on December -- I believe you said 23rd, 2011;
17    is that right?
18    A.       Yeah, if I'm not mistaken.  Or maybe the 22nd,
19    yes.
20    Q.       Okay.  And you testified earlier that you were not
21    combative with the staff members on December 26, 2011;
22    right?
23    A.       That's correct.
24    Q.       You had made a statement earlier that a staff
25    member told you that they don't feel like dealing with
```

```
 1    retarded motherfuckers today.  Do you recall that?
 2    A.      Yes, ma'am.
 3    Q.      And is it your testimony that you are saying that
 4    Tom Nordmann said that to you on December 26?
 5    A.      I don't recall exactly who it was, but Tom
 6    Nordmann was one of the guys who approached me in the
 7    dining room and that occurred.
 8    Q.      Okay.  And earlier you testified that after the
 9    staff told you to sit down, that you sat down; is that
10    right?
11    A.      Yes, ma'am.
12    Q.      And that you complied when the staff members
13    applied handcuffs to you; is that correct?
14    A.      Yes, ma'am.
15    Q.      You testified that there were several patients in
16    the dining room.  I think you said about 50 to 60.  Do you
17    recall that?
18    A.      Yes, ma'am.
19    Q.      And was it your testimony that there were about
20    ten staff members in the dining room at that time, too?
21    A.      Approximately eight to ten.
22    Q.      Okay.  And it's your testimony that you complied
23    with all orders while you were being escorted; right?
24    A.      Yes, ma'am.
25    Q.      And that you did not struggle with the staff at
```

1    all during the escort?

2    A.      No, I didn't.

3    Q.      It's also your testimony that you were punched in

4    the face; is that right?

5    A.      Yes, ma'am.

6    Q.      And you were also punched in the stomach; right?

7    A.      Yes.

8    Q.      And the head?

9    A.      Yes, ma'am.

10   Q.      And you were kneed in the face; correct?

11   A.      Correct.

12   Q.      And you were kneed in the head?

13   A.      No.

14   Q.      Okay.  And kneed in the face again?

15   A.      Yes, ma'am.

16   Q.      And you also claim that you were punched in the

17   genitals; is that correct?

18   A.      Correct.

19   Q.      You also testified that Lucas Nanney choked you in

20   the stem; is that correct?

21   A.      Yes, ma'am.

22   Q.      And you also testified that Lucas Nanney choked

23   you again when you got into the restraint room; is that

24   right?

25   A.      Yes, ma'am.

1    Q.      Are you also claiming that you were punched in the

2    eyes?

3    A.      I was punched in the face near my eyes.

4    Q.      And you are also claiming that Mr. Rackley punched

5    you on both sides of your face?

6    A.      He was the one kneeing me initially.  And when I

7    was trying to run from the kneeing, I was being punched on

8    the other side of my face.

9    Q.      You testified earlier today that you knew that

10   Terry Stewart had pulled you back and down to the ground.

11   Do you remember that?

12   A.      Yes, ma'am.

13   Q.      Are you positive that Terry was the one who pulled

14   you down to the ground?

15   A.      Yes, ma'am.

16   Q.      Are you sure it's not just your belief that he

17   pulled you down to the ground?

18   A.      It could be my belief.  But in all actuality,

19   knowing that Tom and Terry were the ones who escorted me

20   from the dining room, and when I was pulled to the ground,

21   it was a heavier guy and a big arm.  So, I'm positive that

22   it was Terry, as well as Tom was the one holding my arm,

23   if I'm not mistaken.  Because he was the one jerking me

24   back and forth, making the racial slurs as well as the

25   comments, saying, "I'm going to show you guys" -- saying,

1    "I'm going to show you how we do it down here at Chester."

2    Q.      And, Mr. Davis, you can't recall how many times

3    you were punched on that day; right?

4    A.      No.

5    Q.      And you can't recall exactly who hit you where; is

6    that correct?

7    A.      Besides the specifics that I already gave, no, I

8    can't.

9    Q.      And you can't say about how many times anyone

10   punched you in total; is that right?

11   A.      Right.

12   Q.      Now, we saw the video of you being escorted to the

13   restraint room.  Do you recall that?

14   A.      Yes, ma'am.

15   Q.      And you counted about 12 people that followed you

16   to the restraint room; was that right?

17   A.      I believe 11, including the nurse makes it 12.

18   Q.      Okay.  And you also testified that the nurse came

19   into the restraint room about like seconds later after you

20   were brought in there; is that correct?

21   A.      Yeah, possibly seconds, possibly a minute or two.

22   But, yes, I know a nurse came in.

23   Q.      And that nurse took your vitals?

24   A.      Yes, ma'am.

25   Q.      And it's your testimony that she just ignored what

1    you said?

2    A.      Yes, ma'am.

3    Q.      And after she ignored you, you decided that you

4    wouldn't tell her anything else; is that right?

5    A.      You can't tell someone something who is not

6    responsive.

7    Q.      And the evidence of your injuries, you presented

8    the pictures to the jury.  You recall that?

9    A.      Yes, ma'am.

10   Q.      And you think that those pictures show your

11   injuries that you suffered; is that correct?

12   A.      Partially shows that evidently something happened

13   to my face.

14   Q.      And you suffered from red eyes; is that right?

15   A.      Bloody eyes, yes, ma'am.

16   Q.      Okay.  And you are claiming that you also had

17   bruises all over your face and swelling?

18   A.      Yes, ma'am.

19   Q.      And is it your testimony today that those pictures

20   do not show all of your injuries?

21   A.      Yes, ma'am.

22   Q.      Do you remember taking a deposition in this case?

23   A.      Yes, ma'am.

24   Q.      And you took that deposition on April 27, 2017.

25   Do you recall that?

```
 1    A.      I recall taking a deposition.  I'm not sure if
 2    that's the exact date but it sounds about right.
 3    Q.      And that deposition was actually conducted by me.
 4    Do you recall that?
 5    A.      Yes, ma'am.
 6    Q.      And we did that deposition via video?
 7    A.      Yes, ma'am.
 8    Q.      And do you recall having the court reporter in the
 9    video room with you on that day?
10    A.      Yes, ma'am.
11    Q.      And you took an oath to tell the truth when you
12    took that deposition; correct?
13    A.      Yes, ma'am.
14    Q.      And that's the same oath that you took here today
15    in court?
16    A.      Yes, ma'am.
17    Q.      Okay.  I'm going to turn to -- I'm looking at
18    plaintiff's deposition.
19            MS. VINCENT:  Do you have a copy?
20            MR. SPIRA:  I have a copy.
21            MS. VINCENT:  Okay.
22    Q.      (BY MS. VINCENT)  You were asked this question and
23    you gave this answer.
24            THE COURT:  Which page and line?
25            MS. VINCENT:  Oh, I apologize, Your Honor.  It's
```

1   page 72.  I'm looking at lines 20 through 4, and it ends

2   on page 73.

3          THE COURT:  Thank you.

4   Q.     (BY MS. VINCENT)  So, Mr. Davis, I had asked you

5   this question in the deposition:  "So tell me, what

6   injuries did you sustain as a result of this alleged

7   force?"

8          And your response was:  "Well, my eyes were bloody

9   red and in pain.  I had busted blood vessels.  I had knots

10  and bruises all over my face, swelling.  My ankles were

11  sore.  Of course there was soreness to my body from being

12  punched, but most of all my face.  And later on this huge

13  knot in the back of my head, which is still here to this

14  day, has arose."

15         That was your testimony during your deposition;

16  right?

17  A.     Yes, ma'am.

18  Q.     The next question I asked you, and we're on page

19  73, I'm looking at lines 5 through 8, I asked you:  "what

20  evidence do you have of those injuries?"

21         Your response was:  "There were pictures tooken by

22  an investigator."

23         That was your answer to my question on that day;

24  correct?

25  A.     Correct.

```
 1              MS. VINCENT:  I don't have any further questions.
 2              THE COURT:  Redirect?
 3              MR. SPIRA:  No further questions, Your Honor.
 4              THE COURT:  All right.  Now, ladies and gentlemen,
 5     we're going to take a for-real break, but it will only be
 6     15 minutes, so we will reconvene at 2:40.  Please remember
 7     my admonitions.
 8              (Court recessed from 2:25 p.m. to 3:00 p.m.)
 9              (Proceedings continued in open court, plaintiff
10     and jury present.)
11              THE COURT:  Plaintiff can call his next witness.
12              MR. SPIRA:  Your Honor, we'd like to call Dr.
13     Ahmed Tariq.
14              THE COURT:  Dr. Tariq, you can please step forward
15     and be sworn by the clerk.
16              (Witness sworn by clerk.)
17              THE WITNESS:  My first name is A-H-M-E-D, Ahmed.
18     Last name is T-A-R-I-Q.
19                          DR. AHMED TARIQ,
20     having been first duly sworn, was examined and testifies
21     as follows:
22                          DIRECT EXAMINATION
23     BY MS. MALY:
24     Q.      Thank you, Dr. Tariq.  What is your occupation?
25     A.      Physician.
```

1   Q.      And where do you work?

2   A.      I work couple of places.  One of them is Chester

3   Mental Health.

4   Q.      And how long have you worked at Chester Mental

5   Health?

6   A.      I have worked there 13 years, then I took

7   retirement, then I went back as, as, as filling jobs like

8   here and there.  But I am retired from Chester Mental

9   Health.

10  Q.      Now, Dr. Tariq, would you please open the binder

11  of exhibits in front of you to Plaintiff's Exhibit 2.

12  A.      Yes, ma'am.

13  Q.      Dr. Tariq, are you familiar with this type of

14  document?

15  A.      Yes, ma'am.

16  Q.      What is this document?

17  A.      Well, we call this as an injury report.  Anytime

18  any incidence happens in the facility where any, any

19  patient get hurts or -- we are called upon to come

20  evaluate the patient and write our findings in that

21  report.

22         MS. MALY:  Your Honor, may I approach the witness?

23  I believe he may have the wrong document open.

24         THE COURT:  Sure.

25  Q.      (BY MS. MALY)  Dr. Tariq, are you familiar with

1    Plaintiff's Exhibit 2 that you are looking at right now?

2    A.      Yes, ma'am, I do.

3    Q.      And what is this document?

4    A.      This is admission history physical.  Whenever

5    anybody comes to Chester Mental Health, they go through a

6    physical examination before they go to their respective

7    units.  So, this is the exam done when he gets into the

8    facility.

9    Q.      And do you regularly fill out these history forms

10   in the course of your work as a physician at Chester?

11   A.      Yes.  We have a couple of physicians there, but

12   also whoever's turn it is, we all do the same job.

13   Q.      And who is the patient listed on this medical

14   history form?

15   A.      Davis, Christopher.

16   Q.      And if you turn to the second page of that

17   document, is your signature on this document?

18   A.      Yes.  In the bottom, yes.

19   Q.      And did you fill out this medical history form?

20   A.      Yes, ma'am.

21   Q.      And did you fill out this document around the time

22   that you met with Chris for his admission history?

23   A.      I would say yes.

24   Q.      And is this document typically kept in the

25   patient's medical file?

1    A.      Yes, it is in that.  Yes, ma'am.

2            MS. MALY:  Your Honor, I'd like to move into

3    evidence Plaintiff's Exhibit 2.

4            THE COURT:  Any objections?

5            MS. COSTELLO:  No objections, Your Honor.

6            THE COURT:  Plaintiff's Exhibit 2 is admitted and

7    you may publish, if you wish.

8            MS. MALY:  Thank you, Your Honor.

9            Miss Dudley, can you please publish Exhibit 2?

10   Q.      (BY MS. MALY)  Dr. Tariq, what is the date of this

11   document?

12   A.      11/22/11.

13   Q.      I'm sorry, at the top --

14   A.      Sorry.  Sorry.  12/22/11.  December 22nd, 19 -- I

15   mean 2011.

16   Q.      Great.  Thank you, Doctor.  Did you examine Mr.

17   Christopher Davis on December 22nd, 2011?

18   A.      This page -- I think I did it.  That's how I

19   filled it.

20   Q.      And next to chief complaint presenting problem,

21   the first section, what did you write?

22   A.      Admission history and physical, the purpose of my

23   exam -- examining this patient was to do the introduction,

24   history and physical of the patient.

25   Q.      And underneath that, in the second section?

1    A.      Yeah, second, history of present illness.  So,

2    it's no complaints.  He didn't voice any concern at that

3    point.

4    Q.      Did you note anywhere on this document that Chris

5    had swelling on December 22nd, 2011?

6    A.      On just on this page, or I can flip the other

7    side, also?

8    Q.      You can flip to the other side.

9    A.      (Pause.) No, ma'am.  I didn't mention any swelling

10   on that day.

11   Q.      And did you write anywhere in this document that

12   Chris had redness in his eyes on December 22nd, 2011?

13   A.      No, ma'am.

14   Q.      And did you write anywhere in this document that

15   Chris had tenderness around his eyes on December 22, 2011?

16   A.      No, ma'am.

17   Q.      And did you write anywhere in this document that

18   Chris had a swollen left wrist on December 22nd, 2011?

19   A.      No, ma'am.

20   Q.      Did you observe any physical injuries on Chris

21   when you examined him on December 22nd, 2011?

22   A.      No, ma'am.

23           MS. MALY:  Miss Dudley, can you please take down

24   Plaintiff's Exhibit 2?  Thank you.

25   Q.      (BY MS. MALY)  Now, Dr. Tariq, could you please

```
 1    turn to Plaintiff's Exhibit 1 in the binder in front of
 2    you?
 3    A.      Go back?
 4    Q.      Yes.
 5            MS. MALY:  Your Honor, permission to move into
 6    evidence Plaintiff's Exhibit 1.  I believe --
 7            THE COURT:  Any objections?
 8            MS. COSTELLO:  No objections, Your Honor.
 9            THE COURT:  Plaintiff's Exhibit 1 is admitted.
10    Q.      (BY MS. MALY)  Dr. Tariq, are you familiar with
11    this document?
12    A.      Yes, ma'am.
13            MS. MALY:  And, Miss Dudley, can we please publish
14    to the jury Plaintiff's Exhibit 1?
15    Q.      (BY MS. MALY)  What is this document, Doctor?
16    A.      Injury report.
17    Q.      And is your signature on this document?
18    A.      Yes, ma'am.
19    Q.      And who is the patient listed on this injury
20    report?
21    A.      Davis, Christopher -- Christopher Davis.
22    Q.      And, Dr. Tariq, do you see your handwriting in
23    this document?
24    A.      Handwriting, my own?  Yeah.
25    Q.      And where is your handwriting in this document?
```

```
 1    A.      I would say on the right side, lower -- lower
 2    one-third.
 3    Q.      Is your handwriting in the box titled "physician's
 4    examination, comments and disposition"?
 5    A.      Yes, ma'am.
 6    Q.      And what is the date of this injury report?
 7    A.      12/27/11.
 8    Q.      Did you examine Chris on December 27, 2011?
 9    A.      Yes, ma'am.
10    Q.      Doctor, do you see this document projected on the
11    computer in front of you?
12    A.      Yes, ma'am.
13            THE COURT:  It's on the screen in front of you
14    also, too.
15            THE WITNESS:  Oh, that's easier.  Yes, I do.
16    Q.      (BY MS. MALY)  Can you please read for the jury
17    what you wrote on this document that I just underlined?
18    A.      Okay.  This is my note in SOAP format, like
19    Subjective, Objective, Assessment and Plan.  The
20    subjective is the first one, and like any patient when
21    comes to the doctor, the first thing you ask him, you
22    know, "how are you doing" --
23            THE COURT:  Doctor, she just asked you to read
24    what you wrote.
25            THE WITNESS:  Oh, okay.
```

     1    A.       Reports was hit by staff.  And the second half,

     2    patient had physical hold and restraints.

     3    Q.       (BY MS. MALY)  And underneath that where it says

     4    "o slash" -- what does "O slash" mean?

     5    A.       O is objective findings.

     6    Q.       And next to that, can you please read what you

     7    wrote for your objective findings?

     8    A.       Yeah.  I said, conjunctival redness positive,

     9    bilateral.  Both eyes.  And then periorbital tenderness,

    10    around the eye, you know, tenderness.  And P-E-R-L-A,

    11    pupil equal, reacting to light and accommodation, slash

    12    E-O-M-I, extraocular muscles intact.

    13             And then I am saying, swelling left wrist.  And

    14    one more comment I have made on the exam is, slight

    15    swelling behind left ear.  Those were findings from me.

    16    Q.       Thank you, Doctor.  Did you observe redness in

    17    Chris's eyes on December 27, 2011?

    18    A.       Yes, ma'am.

    19    Q.       Did you observe slight swelling behind Chris's

    20    left ear on December 27, 2011?

    21    A.       Yes, ma'am.

    22    Q.       And did you observe swelling on Chris's left wrist

    23    on December 27, 2011?

    24    A.       Yes, ma'am.

    25    Q.       And did you observe periorbital tenderness on

1    Chris on December 27, 2011?

2    A.     Yes, ma'am.

3    Q.     Now, Doctor, can you please read the next portion

4    of this document that you wrote on December 27, 2011, that

5    I just underlined on the screen?

6    A.     Yes.  Assessment and plan.  And my assessment

7    after that subjective and objective is "alleges physical

8    abuse by the staff." And then the second comment is

9    "physical evidence present as above."  Those injuries

10   which we mentioned.  And I'm going on to say, "will do

11   X-ray, will do Tylenol for pain, and then unit MD is going

12   to follow."

13          And I think I have a few more things here on the

14   -- yes, I think I read that.

15   Q.     And, Doctor, when you write a plus sign on a

16   document, what do you mean by the plus sign?

17   A.     Plus sign means positive.  It's present.

18   Q.     Thank you, Doctor.

19          MS. MALY:  I have no further questions.

20          THE WITNESS:  Thank you.

21                    CROSS-EXAMINATION

22   BY MS. COSTELLO:

23   Q.     Good afternoon, Dr. Tariq.

24   A.     Good afternoon.

25   Q.     I just have a few followup questions.

1    A.        Sure.

2    Q.        Can you explain the objective findings in the SOAP

3    format? -- Oh, I'm sorry.  Can you explain the subjective

4    findings?

5    A.        Okay.  The first is that, you know, patient

6    alleges, he complains to me that he was hit by staff and

7    so that was my first thing.  And the second part was, it

8    says patient has physical hold and restraints.  Yeah,

9    physical hold and restraints, that's a very important and

10   crucial piece of this whole thing.  Because working in

11   Chester Mental Health, patients --

12            THE COURT:  Dr. Tariq?  She didn't ask you all

13   that.

14            THE WITNESS:  Uh?

15            THE COURT:  She didn't ask you all that.

16            THE WITNESS:  So what she ask me?

17            THE COURT:  Okay, pay attention and listen to the

18   question.

19            THE WITNESS:  Yeah, she said explain.

20            THE COURT:  Will you reask the question?

21            THE WITNESS:  She said explain, Judge.  No?

22            THE COURT:  She asked you to explain subjective.

23   She didn't ask you to give your opinions on what is

24   important and what is not, Dr. Tariq.  Could you please

25   listen to the question --

```
 1              THE WITNESS:  Okay.  Okay.  State again, please.
 2              THE COURT:  -- and just answer the question.
 3     Q.      (BY MS. COSTELLO)  Can you explain the physical
 4     hold and restraints?
 5     A.      Okay.  Physical hold is when a patient get
 6     agitated, restless, he is harm to himself or other patient
 7     or staff.  Then in that situation, security staff try to
 8     get around the patient and try to contain him so he ends
 9     up not hurting himself, number one, or his surroundings
10     which include patient and the staff.  So, physical hold is
11     carried out to stop that aggravation or, you know,
12     likelihood of harm to himself or others.  That is physical
13     hold.
14              And the intention of physical hold is to limit any
15     physical injuries to patient or to his surroundings.
16     Surroundings mean other security staff, number one, and
17     sometime there are other patient there, too.  So that's
18     physical hold.
19     Q.      Thank you.  What did your examination consist of
20     with Mr. Davis?
21     A.      Well, to me, the positive findings were
22     conjunctival redness; there was periorbital tenderness;
23     and there was a mark behind his left ear; also, I noticed
24     some injury on his left wrist.  These were like positive
25     findings.  Other than that, I mentioned that pupil is
```

```
 1   still equal and reactive to light and accommodation, so
 2   that tells me intraocular muscles were intact and pupils
 3   were reacting to light and accommodation.  So,
 4   functionality was pretty normal to me on naked eye.
 5           And then those obvious findings, injuries which I
 6   noticed, I did mention.  And things which I could not
 7   elaborate and find further, I left for what you call eye
 8   doctor.
 9   Q.     Can you explain conjunctival redness?
10          MS. MALY:  Objection, Your Honor.
11   A.     It's the --
12          THE COURT:  Hold on.
13          What's the objection?
14          MS. MALY:  Doctor was not disclosed as an expert
15   witness.
16          THE COURT:  Yeah, could you approach, please,
17   counsel?
18          (Proceedings continued at the bench, outside the
19   hearing of the jury.)
20          THE COURT:  Okay.  Yeah, Dr. Tariq was not
21   disclosed as an expert.  Meaning, he cannot give any
22   opinions.  You can go over -- which basically he has
23   already done -- what he wrote on his report.  But anytime
24   you are getting into an area where you are getting into
25   diagnoses and opinions about the causes of different
```

1    things, that's beyond the scope of my motion in limine

2    rulings.  This witness has already demonstrated that he

3    has to be restrained from him giving -- getting up on the

4    soapbox.

5         So the bottom line is, he can testify as to what

6    he noted on these dates, which I think he already has

7    done.  But what you are getting into, asking him the

8    significance of subjective versus objective, you're really

9    going beyond my motions in limine.

10        So, unless you have something else to ask him

11   about what, what he wrote, I think you've exhausted this

12   witness that, you know, within the parameters of my

13   motions in limine -- my rulings on the motions in limine

14   because he was not, was not disclosed as an expert.  Okay?

15        MS. VINCENT:  Your Honor, can we just make a quick

16   record?

17        THE COURT:  This is her witness.

18        MS. COSTELLO:  Can we just make a quick record,

19   that I'm not asking -- he was not disclosed as an expert.

20   I'm not asking for diagnoses, I just was asking for the

21   definition essentially of what --

22        THE COURT:  You are eliciting -- you are getting

23   him into opinion testimony.  So, no -- he can describe

24   what he means by -- you know, "what does subjective mean?"

25   That's not -- when you asked him, what does subjective

1    mean, he went way left.  So, unless you can control him,

2    you can't ask him those questions because otherwise you're

3    inviting him to violate my rulings.  Okay.

4            MS. COSTELLO:  Thank you, Judge.

5            (Proceedings continued in open court, plaintiff

6    and jury present.)

7    Q.     (BY MS. COSTELLO)  Dr. Tariq, based on your

8    examination, what treatment did you provide?

9    A.     I, I had three things mentioned.  For pain, I

10   wrote Tylenol.  To evaluate further by imaging, X-ray of

11   the orbits.  And then I also recommended further

12   evaluation by eye doctor because he has more equipment and

13   those things available to him than my examination at that

14   time and on the night, so I asked for him to be seen by

15   what you call optometrist.

16           MS. COSTELLO:  Thank you.  No further questions.

17           THE COURT:  Any redirect?

18           MS. MALY:  May I just have one moment to confer

19   with my colleague?

20           THE COURT:  Sure.

21           (Off the record.)

22                       REDIRECT EXAMINATION

23   BY MS. MALY:

24   Q.     Dr. Tariq, were you in the dining hall with Chris

25   on December 26, 2011?

```
1    A.       No.
2    Q.       Were you in the stem with Chris on December 26,
3    2011?
4    A.       No.
5    Q.       You don't know the circumstances under which Chris
6    was placed in a physical hold; correct?
7    A.       No -- yes.
8             MS. MALY:  Thank you.
9             THE COURT:  Anything else?
10            MS. COSTELLO:  No, Your Honor.
11            THE COURT:  Thank you, Doctor.  You may step down.
12            THE WITNESS:  I'm done?
13            THE COURT:  Yes.
14            THE WITNESS:  Okay.  Thank you.
15            THE COURT:  May this witness be excused?
16            MS. MALY:  Yes, Your Honor.
17            THE COURT:  You are excused, Doctor.  Thank you.
18            THE WITNESS:  Thank you so much.
19            THE COURT:  Mm-hmm.
20            Call your next witness.
21            MR. SPIRA:  Your Honor, at this time we'd like to
22    read a judicial admission into the record.
23            THE COURT:  Okay.
24            (Off the record.)
25            MS. VINCENT:  Your Honor, may I be heard?
```

```
 1            THE COURT:  Yes.
 2            MS. VINCENT:  Could we please have a sidebar?
 3            THE COURT:  Yes.
 4            (Proceedings continued at the bench, outside the
 5    hearing of the jury.)
 6            THE COURT:  Okay.
 7            MS. VINCENT:  Yes, Your Honor, I would just like
 8    to make a note for the record that the defendants are
 9    unaware of what judicial admission the plaintiff is
10    attempting to read into the record.  So, I would not have
11    an opportunity to object to it outside of the presence of
12    the jury prior to them reading it.
13            THE COURT:  Yeah, could you please inform counsel
14    what it is you intend to read?
15            MS. CHIARELLO:  Sure.  I can actually give you a
16    copy of this.  It's the two admissions that I had in my
17    opening PowerPoint.
18            MS. VINCENT:  Okay.
19            MS. CHIARELLO:  So I'll provide a copy --
20            THE COURT:  Yes, if you would provide a copy.
21    Take a look at it and then, if you have any objections,
22    let me know, beyond what -- because I think you already
23    objected based on -- these are from the Answer?
24            MR. SPIRA:  Yes.
25            MS. CHIARELLO:  Yes.
```

```
 1            MS. VINCENT:  Yes.  My objection would be based on
 2     them trying to get this into evidence to prove causation.
 3     Or I don't know what it is, actually --
 4            THE COURT:  It's an admission.  It doesn't matter
 5     what they -- they get to get an admission in.  So, I mean,
 6     other than I think you made your record this morning on
 7     your objections, do you have anything to add beyond that?
 8            MS. VINCENT:  I may.  I have to look at that
 9     because I don't have it.
10            THE COURT:  Okay.  Could you give her a copy?
11            MS. CHIARELLO:  Yes.
12            THE COURT:  Miss Vincent, take a look at it.  And
13     then, like I said, you -- I already know what your
14     objections are from this morning.  I overruled that.
15            MS. VINCENT:  Yes.
16            THE COURT:  But take a minute, look at it, and let
17     me know if you have any additional objections that you
18     need to make a record on.  But I'm going to allow them to
19     read it.
20            MS. VINCENT:  Yes, Your Honor.
21            (Proceedings continued in open court, plaintiff
22     and jury present.)
23            THE COURT:  And actually, counsel, can I have a
24     copy of it, too, real quick, so I can look at it?
25     (Pause.)  Thank you.  (Pause.)  It looks to me like it's
```

1    the same, Miss Vincent.

2         MS. VINCENT:  Your Honor, could I make a quick

3    record on the sidebar?

4         THE COURT:  I think we already made a record on

5    this, this morning.

6         MS. VINCENT:  Thank you, Your Honor.

7         THE COURT:  Okay.  We'll show the defendants'

8    continuing objection.  But subject to that objection,

9    these are judicial admissions by the defendants.  You may

10   read them, counsel.

11        MS. CHIARELLO:  "Defendants admit plaintiff

12   experienced subconjunctival hemorrhaging following the

13   alleged incident.

14        "To the extent defendants' lawful action may have

15   caused any injuries to the plaintiff, defendants admit

16   those injuries were potentially a direct and proximate

17   result of defendants' actions."

18        THE COURT:  Thank you.  Any additional evidence?

19        MR. SPIRA:  Your Honor, none at this time, subject

20   to the potential for plaintiff to call a witness tomorrow,

21   as we discussed this morning.

22        THE COURT:  Was that Hecht?

23        MR. SPIRA:  Right.

24        THE COURT:  All right.  So, can I get you and Miss

25   Vincent to approach for a second?

```
1                (Proceedings continued at the bench, outside the
2      hearing of the jury.)
3                THE COURT:  So, just so I'm clear, the plaintiffs
4      intend to call Mr. Hecht, but I understand he's not
5      available until tomorrow.
6                MR. SPIRA:  Correct.
7                THE COURT:  But that would be the only -- the
8      remainder of your evidence; correct?
9                MR. SPIRA:  Correct.
10               THE COURT:  And then, Miss Vincent, are you guys
11     prepared to present somebody today?
12               MS. VINCENT:  We could put two witnesses on.
13               THE COURT:  You could put two witnesses on?
14               MS. VINCENT:  Yes.  In our case in chief, yeah.
15               THE COURT:  So, I'm just trying to think how we
16     would do that if we -- so we can't -- I could -- I mean,
17     plaintiff could rest subject to --
18               MR. SPIRA:  Subject --
19               THE COURT:  What is Mr. Hecht going to add to the
20     equation?
21               MR. SPIRA:  So, he -- well, it depends on what the
22     defendants say.  But he took the pictures of Mr. Davis and
23     is familiar with the videos.  He's familiar with the
24     layout of the facility.
25               THE COURT:  Is there any question about the
```

1    authenticity of the pictures or the videos?

2           MR. SPIRA:  Not of the authenticity.

3           MS. VINCENT:  No, Your Honor.

4           MR. SPIRA:  It depends --

5           THE COURT:  What else -- what other knowledge

6    would he have to, to bring to bear?

7           MR. SPIRA:  Well, he's a supervisor at the

8    facility.  And we understand the defendants are going to

9    try to -- I'm not sure -- admit or use, perhaps just use

10   is their word, written statements that were -- no?

11          MS. VINCENT:  We're not going to use any written

12   statements as to Hecht.

13          THE COURT:  What are you guys calling Mr. Hecht

14   for?

15          MS. VINCENT:  We're not.

16          THE COURT:  So what is his -- again, Mr. Spira, he

17   doesn't -- he was not a fact witness.  Correct?

18          MR. SPIRA:  Right.  Correct.

19          THE COURT:  There's no issue as to the

20   authenticity of the photos, videos, or any of that.  So,

21   what does he add to the equation?

22          MR. SPIRA:  So, I know they're not using a

23   statement of Mr. Hecht.  But I thought there was a

24   possibility that they might use statements that were

25   submitted to Mr. Hecht or given to Mr. Hecht.

```
 1              THE COURT:  They can't use that.  I think I
 2      ruled --
 3              MR. SPIRA:  Okay.
 4              THE COURT:  -- that that was not independently
 5      admissible.  So the bottom line is, Mr. Hecht -- any
 6      testimony he would have is irrelevant and immaterial.  So,
 7      there's no reason to bring him here.
 8              And so -- and you guys are not planning on calling
 9      him?
10              MS. VINCENT:  We are not.
11              THE COURT:  I mean honestly, unless -- counsel,
12      unless you have something else to present, honestly, his
13      testimony as I understand, your representations would be
14      irrelevant and immaterial; therefore, there's no need to
15      waste his time.  You can go ahead and, and rest your case.
16      And then --
17              MS. VINCENT:  Judge, we got Dr. Soellner coming in
18      at 4:00.
19              THE COURT:  Okay.  Why don't you do this:  You can
20      go ahead and rest your case.  We can take up the Rule 50
21      motions at the end of plaintiff's case.  Okay.  And then
22      we can let the jurors take another quick break until 4:00.
23      You can present him.  He shouldn't take longer than a half
24      an hour, should --
25              MS. VINCENT:  No.
```

```
 1          THE COURT:  Okay.  And then we would just go ahead
 2   and break for the day.  So, if we took Soellner today, how
 3   many witnesses -- would that leave you just with your
 4   defendants tomorrow?
 5          MS. VINCENT:  Just with my defendants.  Now,
 6   Judge, if we do have time, Mr. Terry Stewart has a family
 7   member that is on her death bed, is what I was told this
 8   morning.  He would be quick, if we can get him off and on
 9   today.
10          THE COURT:  Yeah, we can get him off and on today.
11   And then he, he would -- I would excuse him from having to
12   come back.  And I would just explain to the jurors
13   tomorrow that he had been excused.  They don't need to
14   know anything else.
15          MS. VINCENT:  Okay.
16          THE COURT:  So what I would suggest is, Soellner
17   is coming at 4:00.  He ain't going anywhere.  Put him on
18   first.  So, you rest.
19          MR. SPIRA:  Okay.
20          THE COURT:  And Rule 50 should be quick.  You
21   rest, we'll do the Rule 50 -- unless, Ashley, if you are
22   comfortable with it, so we don't have the jurors breaking
23   again, why don't -- if plaintiff rests, why don't we go
24   ahead and put him on --
25          MS. VINCENT:  Terry?
```

1          THE COURT:  -- Terry on.  And then at that point,

2     if it's not 4:00, we can let the jurors break at that

3     point, take up Rule 50, and then put Soellner on.

4          MS. VINCENT:  Okay.

5          THE COURT:  Okay?  Does that sound okay?

6          MR. SPIRA:  Okay.

7          THE COURT:  Okay.  Thank you.

8          (Proceedings continued in open court, plaintiff

9     and jury present.)

10          THE COURT:  Okay.  Ladies and gentlemen, sorry for

11     that.  We plan these trials for everything to flow like,

12     like they're supposed to flow.  But in life, that doesn't

13     happen, so we have to backtrack and make adjustments and

14     try to do what makes sense.  And that's just the nature of

15     the beast.

16          But it's my understanding that the plaintiff is

17     resting.  In other words, the plaintiff is resting his

18     evidence.

19          Is that correct, Mr. Spira?

20          MR. SPIRA:  Yes.  Subject to the judge's

21     instruction, we would rest our case at this time.

22          THE COURT:  All right.  So then we will now

23     proceed with the defendants' case in chief.

24          Would you call your first witness?

25          MR. MILLER:  We call Terry Stewart, Your Honor.

```
 1              THE COURT:  Okay.  Mr. Stewart?
 2              (Witness sworn by clerk.)
 3              THE WITNESS:  The name is Terry Stewart.
 4      S-T-E-W-A-R-T.
 5              MR. MILLER:  May I proceed?
 6              THE COURT:  You may.
 7                        TERRY STEWART,
 8      having been first duly sworn, was examined and testifies
 9      as follows:
10                      DIRECT EXAMINATION
11      BY MR. MILLER:
12      Q.      All right, Terry.  Good afternoon.
13      A.      Hi.
14      Q.      Terry, did you work at Chester Mental Health
15      Center on December 26, 2011?
16      A.      Yes, I did.
17      Q.      Okay.  What was your position there?
18      A.      Security Therapy Aide 1.
19      Q.      Okay.  What were your duties as a Security Therapy
20      Aide?
21      A.      To oversee recipients, to help them with their
22      daily activities, to try to keep them safe.
23      Q.      Okay.  Do you remember the plaintiff?
24      A.      No, I sure don't.
25      Q.      Okay.  Do you remember an incident involving the
```

1    plaintiff on December 26, 2011?

2    A.      Until reading some of these reports, no, I, I

3    didn't remember it.

4    Q.      Okay.  You talked about a report.  Would that help

5    you remember the incident at all?

6    A.      It will remind me of what I wrote, yes.

7    Q.      Okay.  I am handing you what has -- what will be

8    marked for identification purposes as Defendants' Exhibit

9    20.

10          MR. MILLER:  And just for counsel, that is

11   Defendants' Bates Stamp No. 6.

12          May I approach the witness, Your Honor?

13          THE COURT:  You may.

14   Q.      (BY MR. MILLER)  Terry, can you tell me what I

15   just handed you?

16   A.      It is an information report that I wrote on the

17   26th of December.

18   Q.      How soon after the incident did you write that

19   report?

20   A.      It looks approximately 20 minutes.

21   Q.      Okay.  How clear was your memory of the event

22   after you wrote that report?

23   A.      You mean now, how clear is it?

24   Q.      Oh, yeah, how clear?

25   A.      Other than reading this, I have no recollection of

1    the incident.

2    Q.      Okay.  Terry, why don't you take a minute, look at

3    that report, and then when you are done look at me and --

4    A.      Okay.  (Witness complies.)

5    Q.      Okay.  I'll take that back from you.  Thank you.

6    A.      Mm-hmm.

7    Q.      Now, without looking at your report, do you

8    remember what happened on December 26, 2011?

9    A.      Without looking, no.

10   Q.      Okay.  And, Terry, do you know how that is your

11   report?

12   A.      It's my handwriting, my signature on the bottom.

13   Q.      Okay.  Terry, could you read that report to the

14   jury, please?

15           THE COURT:  No.  Hold on, counsel.

16           You got an objection?

17           MR. SPIRA:  I do, Your Honor.

18           MR. MILLER:  Could we have a sidebar?

19           THE COURT:  Yes.

20           (Proceedings continued at the bench, outside the

21   hearing of the jury.)

22           THE COURT:  That's clearly hearsay.  I assume you

23   think an exception applies?

24           MR. MILLER:  Yes, past recollection recorded, Your

25   Honor.  That was a report that he wrote, he just

1    testified, 20 minutes after the incident occurred.  He

2    also said that he was able to verify that that was in fact

3    his report.

4              THE COURT:  So his, his past recollection can be

5    refreshed.

6              MR. MILLER:  Right, and I did that.

7              THE COURT:  No, you didn't.

8              MR. MILLER:  Okay.

9              THE COURT:  He basically said he looked at the

10   report but that did not refresh his independent

11   recollection of the incident.  He still couldn't testify.

12             MR. MILLER:  Okay.

13             THE COURT:  What are the elements of past

14   recollection recorded?

15             MR. MILLER:  Past recollection recorded.  The

16   witness has no full or accurate present recollection of

17   the facts; the witness had firsthand knowledge of the

18   facts when they occurred; witness made a record of the

19   event at or near the time the facts occurred; record was

20   accurate and complete when made; record is in the same

21   condition now as when it was made; and record or permanent

22   facts are read and not shown to the jury unless offered by

23   the opponent.

24             THE COURT:  Unless offered by the opponent.

25             MR. MILLER:  Okay.

1          THE COURT:  The opponent has not offered that.

2          MR. MILLER:  Okay.

3          THE COURT:  Anything to add, counsel?

4          MR. SPIRA:  No, just from the motion in limine.

5          THE COURT:  Yeah, that's --

6          MR. MILLER:  Okay.

7          THE COURT:  You attempted to refresh his

8   recollection.  In other words, if you were able to show

9   him the report, if he looked at the report and said, *Okay,*

10  *yes, this refreshes my recollection and I can now testify*

11  *as to my recollection or to what happened*, that would be

12  admissible.

13         MR. MILLER:  Okay.

14         THE COURT:  But you can't have him read in the

15  report and that report does not come in.  It's not

16  independently admissible.  If that doesn't refresh his

17  recollection --

18         MR. MILLER:  Okay.

19         THE COURT:  -- he can't testify to it, I guess.

20         MR. MILLER:  Okay.

21         THE COURT:  All right?

22         MR. MILLER:  Thanks, Judge.

23         (Proceedings continued in open court, plaintiff

24  and jury present.)

25  Q.     (BY MR. MILLER)  Sir, you testified that you don't

1    remember the incident.  Why is that?

2    A.    Well, I've had a head injury at work and I suffer

3    from memory loss, short term memory loss and amnesia.

4    Q.    Okay.  Now, plaintiff is claiming that you pulled

5    him to the ground with a choke hold and beat him.  Did you

6    do that?

7         THE COURT:  Hold on, counsel.  He just said he

8    doesn't remember anything about the incident.

9         MR. MILLER:  Okay.  I'll withdraw my question.

10   May I have one second?

11        THE COURT:  Mm-hmm.

12        (Off the record.)

13   Q.    (BY MR. MILLER)  Would you have beaten the

14   plaintiff?

15        THE COURT:  Counsel approach, please.

16        (Proceedings continued at the bench, outside the

17   hearing of the jury.)

18        THE COURT:  Mr. Miller, come on.  This witness has

19   testified he had -- he has no recollection, independent

20   recollection of the incident.  That pretty much ends your

21   examination.

22        MR. MILLER:  Okay.

23        THE COURT:  Anything else you are asking him, you

24   are asking him for rank speculation.

25        MR. MILLER:  Okay.

```
 1              THE COURT:  And I think you know it.  He doesn't

 2    remember.  I have even given you -- allowed you to explain

 3    why he doesn't remember.  He has amnesia.  He can't have

 4    selective amnesia.  Okay?

 5              MR. MILLER:  Sure.

 6              THE COURT:  He's either got it or he ain't.  Okay?

 7              MR. MILLER:  Okay.  Yes, Your Honor.

 8              (Proceedings continued in open court, plaintiff

 9    and jury present.)

10              MR. MILLER:  I have no further questions, Your

11    Honor.

12              THE COURT:  Any cross-examination of this witness?

13              MR. SPIRA:  One question.

14                         CROSS-EXAMINATION

15    BY MR. SPIRA:

16    Q.     Good afternoon, Mr. Stewart.

17    A.     Hello.

18    Q.     You are not maintaining that the head injury or

19    amnesia is in any way related to Mr. Davis; correct?

20    A.     Oh, no, it's not with him.

21              MR. SPIRA:  No further questions.

22              THE COURT:  You may step down, sir.  Watch your

23    step.

24              THE WITNESS:  All right.  Thank you.

25              THE COURT:  Okay, ladies and gentlemen, we have to
```

```
 1   take up a matter outside of your presence, and then we
 2   have one more witness for the day that, that we will be
 3   taking up at that time.  So, you get one more break today.
 4   We'll reconvene at 4:00.  Please remember my instructions
 5   to you.
 6             (Proceedings continued in open court, plaintiff
 7   present, jury not present.)
 8             THE COURT:  Is there a Rule 50 motion at the close
 9   of plaintiff's case?
10             MR. MILLER:  There is, Your Honor.
11             We move for Rule 50 -- actually, may I have a few
12   minutes to confer with co-counsel?
13             THE COURT:  Sure.
14             (Off the record.)
15             MS. VINCENT:  Your Honor, defendants now move
16   pursuant to Federal Rule of Civil Procedure 50.  This case
17   has two counts.  The first count is unconstitutional
18   force.
19             Specifically with regard to Terry Stewart, the
20   only evidence we have heard today was that it was
21   plaintiff's belief that Terry Stewart had pulled him back
22   and to the ground.  We heard no testimony that Terry
23   Stewart was a defendant that punched, kicked, or choked
24   Mr. Davis.  For those reasons, he hasn't satisfied his
25   burden to show that Mr. Terry -- or, I'm sorry -- Mr.
```

1    Stewart was involved in any of the force that plaintiff
2    alleges.
3            In addition to that, the case law is very clear
4    that a push or shove does not violate the Constitution.
5    So, to the extent that the plaintiff is testifying that
6    it's his belief that Terry pulled him down, it's
7    defendants' position that that does not rise to the level
8    of unconstitutional force.  And for that reason, Rule 50
9    should be entered in Terry Stewart's favor.
10           Secondly, in Count 2, plaintiff alleges that all
11   defendants failed to interview on his behalf.  Plaintiff
12   has not presented any evidence that he would be seriously
13   harmed as a result of any force.  The evidence does show
14   that plaintiff did suffer from some redness from the eyes,
15   and he also had a bruise behind his -- I believe it was
16   his left ear.  This Court can recognize the extent of
17   plaintiff's injuries when coming to a conclusion as to
18   whether or not the force was unconstitutional in this
19   situation.
20           As to the first prong, plaintiff cannot meet his
21   burden as to whether or not he would be seriously harmed
22   as a result of the force because the injuries do not
23   indicate that the force was used as alleged.  And for
24   those reasons, defendants move for Rule 50 on Count 2.
25           In addition, the defendants also allege that

1     plaintiff is not entitled to punitive damages.  Plaintiff

2     has not presented any evidence that the defendants acted

3     maliciously or sadistically entitling the plaintiff to ask

4     this Court for punitive damages in this case.

5             Thank you.

6             THE COURT:  Response.

7             MR. SPIRA:  Yes, Your Honor.

8             First of all, with regard to the conduct of Mr.

9     Stewart and whether that rises to the level of

10    unconstitutional force, the plaintiff testified he did not

11    push or shove him.  He put him in a choke hold and pulled

12    him to the ground, and then continued to participate in

13    the beating that he received from all four defendants.

14    So, we think that there is certainly enough evidence to

15    meet that standard.

16            With respect to failing to intervene.  The

17    plaintiff testified that these people yanked him to the

18    ground, punched him, kneed him, strangled him, et cetera,

19    and we think it easily meets the standard that they were

20    aware that doing so would seriously harm him.

21            With respect to the punitive damages, there was

22    evidence of statements that were made to Mr. Davis leading

23    up to the attack suggesting this was a malicious event.

24    There was evidence that from -- that he was taken into

25    areas where it could not be seen, from which the jury

could reasonably infer that this was a premeditated act
where they acted sadistically.  And for all those reasons,
we do not believe that a Rule 50 judgment should be
entered.

THE COURT:  The Court believes the evidence
presented by the plaintiff is sufficient to go to the jury
for the jury's verdict and decision on both Counts 1
and 2.

As to specifically Defendant Stewart, the
plaintiff testified and the evidence from the plaintiff is
that Mr. Stewart pulled him backwards and to the ground
while he was handcuffed and, and under other circumstances
which would allow a reasonable jury to conclude that it
was excessive -- the force was excessive given the
totality of the circumstances.

The jury may not believe that that constitutes
excessive force, but it's the jury's determination and not
one that can be made as a matter of law based on the
evidence that's been presented.

As to Count 2, against all of the defendants for
failing to intervene, if the jury accepts the plaintiff's
testimony as to the nature -- as to the incident, what
occurred, the punches, the kicks, all of the things that
he said that went on in the presence of all of these
defendants, the jury could easily conclude that each of

these defendants failed to intervene on the plaintiff's

behalf to prevent a constitutional deprivation.

In terms of the amount of force and, and how that

relates to the injuries presented, there is evidence as to

injuries that Mr. Davis suffered as a result of this

incident.  There is testimonial evidence.  There is

evidence in terms of the photographs that were taken.

There's evidence from Dr. Tariq in terms of what the

plaintiff's physical condition was when he was admitted to

Chester Mental Health and what it was the day after this

incident; he noted it was positive for the presence of

physical injuries.  So, there's more than enough evidence

for the jury to reach that conclusion.

As to punitive damages.  Again, that's a jury

determination.  The jury may find that under all of the

circumstances, if they accept and believe that Mr. Davis

was assaulted as he alleges, if they accept and believe

the circumstances, and even the video being circumstantial

evidence of -- I think it was 12 people that were counted

rushing into that room?  They may find that that is worthy

of punitive damages.  They may not.  But it's their

decision.

So, for all the reasons stated, defendants' Rule

50 motion at the end of plaintiff's case is denied.

So, we got five minutes and then when Dr. Soellner

1   shows up, you guys let me know and we will get him on the
2   stand.
3           THE CLERK:  All rise.
4           (Court recessed from 3:55 p.m. to 4:08 p.m.)
5           (Proceedings continued in open court, plaintiff
6   and jury present.)
7           THE COURT:  Defendants can call their next
8   witness.
9           MS. VINCENT:  Yes, Your Honor.  The defendants
10  call Dr. Soellner to the stand.
11          THE COURT:  All right.  Dr. Soellner, please
12  approach the witness stand and be sworn by the clerk.
13          (Witness sworn by clerk.)
14          THE WITNESS:  My name is Lawrence Soellner.
15  S-O-E-L-L-N-E-R.
16                  DR. LAWRENCE SOELLNER,
17  having been first duly sworn, was examined and testifies
18  as follows:
19                  DIRECT EXAMINATION
20  BY MS. VINCENT:
21  Q.      Hi, Dr. Soellner.
22  A.      Good evening.
23  Q.      I just have a couple questions for you.  Dr.
24  Soellner, what is your current occupation?
25  A.      I'm an optometrist.

```
 1   Q.      And where do you practice optometry?
 2   A.      I have a private practice in Chester,
 3   Pinckneyville, Sparta, and Du Quoin.  And I also am a
 4   contract employee or vendor for services at Chester Mental
 5   Health Center.
 6   Q.      Can you describe to the jury your educational
 7   background and what it took for you to become an
 8   optometrist?
 9   A.      My undergraduate was at Purdue University, and
10   then optometry school at Indiana University, graduating in
11   1990.
12   Q.      How long have you been practicing as an
13   optometrist?
14   A.      1990, 28 years.
15   Q.      And how long have you been seeing patients at
16   Chester Mental Health?
17   A.      Twenty-two years.
18   Q.      In December of 2011, did you see patients at
19   Chester Mental Health Center?
20   A.      I did.
21   Q.      And back then, were you employed full time or part
22   time as an optometrist at Chester?
23   A.      I have always been employed part time.
24   Q.      And what were your job responsibilities as an
25   optometrist at Chester?
```

1   A.      As an optometrist, we would see patients for

2   admission examinations.  I would also see them annually

3   for just routine eye care.  And then also for acute cases,

4   whether it be as simple as infections or trauma.

5   Q.      And Mr. -- I'm sorry -- Dr. Soellner, I'm going to

6   direct your attention to December 28, 2011.  Okay.  I

7   understand that you weren't here for plaintiff's testimony

8   today because you just arrived?

9   A.      True.

10  Q.      And also, Dr. Tariq also testified today, but you

11  weren't present for that either.

12  A.      I was not.

13  Q.      Okay.  Dr. Tariq testified today that he had

14  referred Mr. Davis to you on December 28th, 2011.  And

15  actually, before we get to that, do you recall Mr. Davis?

16  A.      I'm sorry, I do not.

17  Q.      Could -- okay.

18  A.      Other than through reviewing documents.

19  Q.      Mr. Davis is sitting at this table over here with

20  his counsel.  Do you recognize him by looking at him

21  today?

22  A.      Difficult.  I'm sorry.

23  Q.      That's fine.  So, like I said, Dr. Tariq said that

24  he referred plaintiff to you following plaintiff's

25  complaint that he had been assaulted by staff in December

1    of 2011.  Is that something -- back in 2011, was it normal

2    for you to get referrals from the physician at Chester?

3    A.      Not unusual.  Generally, if they could manage the

4    cases.  But a lot of times, if I'm arriving at the

5    facility the next day, it wouldn't be unusual for them to

6    send a referral sometimes just reaffirming their diagnosis

7    and treatment.

8    Q.      Okay.

9           THE COURT:  Counsel, could you approach for one

10   second?

11          MS. VINCENT:  Yes.

12          (Proceedings continued at the bench, outside the

13   hearing of the jury.)

14          THE COURT:  I know we had some discussion about

15   Dr. Soellner's testimony during final pretrial.  I don't

16   remember the extent of it, but I knew there was some issue

17   as to whether or not he even had relevant, admissible

18   testimony.  Is there -- does he have a record -- did he

19   have a treatment record?

20          MS. VINCENT:  I'm going to give it to him right

21   now, Judge.

22          THE COURT:  Okay.  So he did treat him?

23          MS. VINCENT:  He treated him the day after, and

24   then he saw him a month later.

25          THE COURT:  He has records for that?

1          MS. VINCENT:  Yes, and I'll get to that right now.

2          THE COURT:  Okay.  Thank you.

3          (Proceedings continued in open court, plaintiff

4     and jury present.)

5     Q.    (BY MS. VINCENT)  Okay.  Dr. Soellner, I'm going

6     to hand you what's been marked for identification purposes

7     as Defendants' Exhibits 2 and 3.

8          MS. VINCENT:  Your Honor, permission to approach

9     the witness?

10         THE COURT:  Yes.

11    Q.    (BY MS. VINCENT)  Mr. Soellner -- I keep wanting

12    to say mister.  I keep forgetting you are a doctor.  I'm

13    sorry.

14         Dr. Soellner, Defendants' Exhibit No. 2, what is

15    that?

16    A.    Sometimes referred in the facility as a DMHDD-30.

17    This is a referral for consult.

18    Q.    Okay.  And can you tell from this record whether

19    or not you filled it out?

20    A.    Under the report and consultation section, that is

21    my handwriting, yes.

22    Q.    Did you sign this document?

23    A.    I did.

24    Q.    And what was the date of your -- what date did you

25    put on this document?

1    A.      12/28/2011.

2    Q.      And what is the purpose of this document?

3    A.      In a situation where either nursing staff and/or

4    really any medical staff could send a referral for

5    consult, and that would be in the reason for referral

6    section above that.

7    Q.      Is it fair to say that you created this document

8    on December 28th when you saw Mr. Davis?

9    A.      I would fill it in, yes, during, during the

10   examination of the patient.

11   Q.      And you know what, let me back up to -- based on

12   this document, can you see what patient this medical

13   record refers to?

14   A.      Sure.  It's Mr. Christopher Davis.

15   Q.      And would you fill out this document in the

16   regular course of your practice as an optometrist at

17   Chester?

18   A.      I would.

19          MS. VINCENT:  Your Honor, at this time defendants

20   ask that Exhibit -- Defendants' Exhibit No. 2 be admitted

21   into evidence.

22          THE COURT:  Any objections?

23          MS. MALY:  No objection.

24          THE COURT:  Defendants' Exhibit No. 2 is admitted

25   and you may publish it, if you wish.

1    Q.      (BY MS. VINCENT)  Okay, Mr. -- Dr. Soellner, let's

2    just walk the jury through this real quick.  The top of

3    the document where it says "to," is this your handwriting?

4    A.      No.  That looks to be the handwriting of a nurse

5    Miss McDonnough [phonetic spelling].

6    Q.      Okay.  And can you explain to the jury what the

7    purpose of this referral was?

8    A.      I would -- Dr. Tariq most likely would have made

9    the assessment and the nurse, as a courtesy, filled out

10   the document probably after Dr. Tariq asked for the

11   referral.  So she -- her handwriting would be in the

12   reason for the referral section.

13   Q.      Okay.  So, it looks like you drafted this section

14   where it says "report and consultation"; is that right?

15   A.      That is correct.

16   Q.      Can you explain to the jury what the purpose of

17   this section is of the document?

18   A.      Not unusually, we -- or not unusual.  We follow

19   what's called a SOAP format, so we'll list a Subjective,

20   an Objective, an Assessment, and a Plan.  The first line

21   quotes -- a lot of times hard to write -- in the patient's

22   words, the quote's being "hurt worse yesterday," and that

23   was actually his words.  And I'm guessing I asked, *was*

24   *there any change or complaints about your vision today?*

25   And I added, no complaints, CO, with VA, vision.  So, no

1    complaints with vision.

2    Q.      And I'm pointing to --

3    A.      Thank you.

4    Q.      Is that correct?

5    A.      That is correct, "no complaints with vision."

6    Q.      And then I see there's -- I'm not an eye doctor

7    and I don't think any of our jurors are, either.  So, can

8    you explain to the jury what this section of your report

9    says?

10   A.      You'll see the letters VA, standing for visual

11   acuity.  There's an SC with a line above it, means without

12   correction.  So, taking your glasses off or having no

13   correction at all, equals the acuity, 20/20 in the right

14   eye, and beneath that is 20/25, which is the left eye.

15   Q.      And then moving on to this next notation is, it

16   looks like SWP.  What is that?

17   A.      That's bad handwriting, but it's SLEX.  Slit lamp

18   examination.  S-L-E-X.

19   Q.      And what does that mean?

20   A.      This is the microscope we use during the

21   examination.  So, a patient would insert their head in the

22   microscope.  Microscopes makes things larger and bigger to

23   see, and that's what we use to examine the eyes.

24   Q.      And what did -- based on this record, what did you

25   observe of plaintiff's eyes?

```
 1   A.      Well, looking at the diagram right next to it, you
 2   see equal large areas.  These are descriptions of the
 3   subconjunctival hemorrhages at the top, bottom, left, and
 4   right.  Looking to be equal in both eyes.
 5          Other examinations would have actually gone then
 6   deeper into the eye.  We would have gone into the anterior
 7   chamber.  So, this chamber behind the cornea, up into the
 8   iris of the pupil, and then everything looked fine.
 9   That's the AC section that says, quote -- or AC, colon,
10   clear and quiet, meaning nothing was seen in that front
11   chamber.
12          And then even further yet is the internal exam.
13   So, even going beyond the pupil, all the way back into the
14   retina.  Internal exam, colon, WNL, stands for within
15   normal limits.
16   Q.      What does that mean in layman's terms?
17   A.      Means a normal examination.  It was unremarkable.
18   Q.      What does unremarkable mean?
19   A.      There was nothing to see that was of -- outside of
20   the normal.
21   Q.      And then I see there's a P --
22   A.      Mm-hmm.
23   Q.      -- here.  What does that stand for?
24   A.      So, it would be the last of the S-O-A-P plan.  So,
25   P being Plan.  And again, that was a colon, plan,
```

1    reassured resolution in one to two weeks.  And so there

2    would be no other treatment other than time and

3    reassurance.

4    Q.     Okay.  Now, Dr. Soellner, I'm going to turn your

5    attention to Defendants' Exhibit No. 3 that's been marked

6    for identification purposes.  Let me know when you have

7    that in front of you.

8    A.     I do.

9    Q.     And looking at this document, Dr. Soellner, what

10   patient is this document in connection with?

11   A.     Mr. Christopher Davis.

12   Q.     And did you make this medical record at the time

13   that you saw the patient?

14   A.     I would.  I'd be filling this in as we go through

15   certain portions of the examination, yes.

16   Q.     Did you fill out Defendants' Exhibit 3 as part of

17   your regular practice as an optometrist?

18   A.     This would have been a new admission exam.  Yes.

19   These are completed upon admission and then annually

20   thereafter.

21          MS. VINCENT:  Defendants move to admit Exhibit 3

22   into evidence.

23          THE COURT:  Any objections?

24          MS. MALY:  No objections.

25          THE COURT:  Defendants' Exhibit 3 is admitted.

1     MS. VINCENT:  Permission to publish to the jury,

2  Your Honor.

3     THE COURT:  You may.

4  Q.     (BY MS. VINCENT)  Okay.  Dr. Soellner, this

5  document looks very foreign, so we're going to walk the

6  jury through this, okay?  We're just going to start at the

7  top.  Can you explain what this top line is?

8  A.     This examination can be used for both a new

9  admission examination or an annual visit.  In this -- in

10 this case, it was marked for new admission.  Upon

11 admission, patients are usually seen within the first few

12 months for a comprehensive visual exam, an eye exam.

13 Q.     Okay.  So, is it fair to say that this document is

14 used when you see a patient for a full eye exam?

15 A.     That is true.

16 Q.     So, turning to this section, the CC with the

17 semicolon, what does this section mean?

18 A.     Chief complaint.

19 Q.     And what did you write in that box?

20 A.     I would ask if there's been any significant

21 history as far as their eyes.  And in this case, there was

22 a history of glasses, 11 to 12 years old, so glasses as a

23 child.  And then underneath that is written, no complaints

24 since then -- or since.  I'm sorry.

25 Q.     And then underneath that there's a box that says

1    "distance."  Can you explain to the jury what the purpose
2    of this box is?
3    A.      So, this would have the visual acuities, how well
4    we see.  So, distance vision, looking toward the -- in
5    this case, the end of the room and looking at the eye
6    chart.  Always, the right eye is above the left, so in
7    this case it's distance acuity, VA, without RX, or without
8    a correction or wearing glasses.  And then looking off at
9    a distance, 20/20 in the right eye and 20/25 in the left
10   eye.
11   Q.      What does 20/20 mean?
12   A.      So 20/20 being perfect vision, 20/25 being simply
13   the line right above that.
14          MS. MALY:  Objection, Your Honor.
15          THE COURT:  Yes?
16          MS. MALY:  I think that counsel's getting into
17   opinion and causation testimony and diagnosis.
18          THE COURT:  I'm not sure where we're going with
19   this, counsel.
20          MS. VINCENT:  Yes, Your Honor.  I can continue to
21   my next question, just to explain the document and what he
22   observed of the plaintiff on this day.
23          THE COURT:  I think we can get through that in a
24   couple of questions.
25          MS. VINCENT:  Yes, Judge.

1          THE COURT:  Okay, go ahead.

2     Q.    (BY MS. VINCENT)  Dr. Soellner, can you please

3     explain to the jury what you observed of plaintiff's eyes

4     on July 27, 2012 -- I'm sorry, January 27, 2012?

5     A.    As a summary of the entire exam it was, it was

6     fairly unremarkable.  At the impressions at the very end,

7     trivial hyperopia, which is a small sense of

8     farsightedness which -- not unusual.  Again, visual

9     acuities were 20/20 and -- nearly 20/20 in both eyes.  And

10    then the plan section, there was -- there was no

11    prescription.

12          The other examination that was done throughout,

13    whether it be the microscope exam, internal exam, all that

14    was unremarkable or seen as normal.

15    Q.    And what was -- what is the date of this exam?

16    A.    This is 1/27/2012.

17    Q.    Thank you, Doctor.

18          MS. VINCENT:  I don't have any further questions.

19          THE COURT:  Cross-examination.

20                       CROSS-EXAMINATION

21    BY MS. MALY:

22    Q.    Dr. Soellner, you observed a significant amount of

23    hemorrhaging in Chris's eyes when you examined him on

24    December 28, 2011; correct?

25    A.    As per the drawings, I -- and, honestly, I don't

1    remember.  But the drawings, they were in all four

2    quadrants, top, bottom, left, and right, and equal.

3    Q.      And, Doctor, when you say all four quadrants, do

4    you mean -- (Indicating on exhibit.)

5    A.      Exactly.  That's -- as per my drawings, yes.

6    Q.      So, your drawings of the circles there represent

7    Chris's eyes; correct?

8    A.      This is true.

9    Q.      And the scratches represent the bleeding you

10   observed; correct?

11   A.      Those -- yeah, those kind of darkened areas at the

12   top, bottom, left, and right, correct.

13   Q.      And some of the hemorrhaging on Chris's eyes would

14   not have been visible to someone simply looking at him;

15   correct?

16   A.      I think in his case, I think those would have been

17   dramatic enough to see initially, yes.  And I think that's

18   probably resulted in the referral.

19   Q.      So, some of the bleeding would have been visible

20   to someone looking at him; right?

21   A.      True.

22   Q.      And some of the bleeding you observed on your exam

23   would not have been visible to someone simply looking at

24   him; correct?

25   A.      I think you would see it -- obviously with the

1    microscope, seeing it enlarged nearly 10 to 15 times.  I

2    think it's much, much easier to appreciate with a

3    microscope, yes.

4         MS. MALY:  Your Honor, I'd like to publish to the

5    jury what has previously been admitted as Plaintiff

6    Exhibit No. 1.

7         THE COURT:  Okay.

8         MS. MALY:  Miss Dudley, can you please pull up

9    Plaintiff's Exhibit 1?

10        (Off the record.)

11        THE COURT:  There's something that's happening

12   with the Elmo.  The screen won't pull it back up.

13   Q.   (BY MS. MALY)  You have an exhibit binder in front

14   of you, I believe.

15   A.   I do.

16   Q.   Can you please turn to Exhibit No. 1?

17   A.   Yes.

18   Q.   Dr. Soellner, you see that this is an injury

19   report; correct?

20   A.   It is.

21        MS. MALY:  And, Your Honor, may I show this

22   document to the jury so they know what document I am

23   discussing currently?

24        THE COURT:  Yes.

25        (Displays document to the jury.)

1    Q.      (BY MS. MALY)  You review injury reports in the

2    course of your employment at Chester; correct?

3    A.      If they're available to me, yes, I do.

4    Q.      And you are aware that Dr. Tariq wrote the portion

5    of this document titled "physician's examination comments

6    and disposition"; correct?

7    A.      It is.

8    Q.      You don't have any reason to question Dr. Tariq's

9    observations in this injury report; right?

10   A.      I wouldn't question a professional.  But

11   sometimes, given the examination that we are able to

12   perform, sometimes it's a bit more involved.  And, and in

13   turn he would send a referral.  So, sometimes he might

14   make the assessment of injection or redness, not knowing

15   exactly the basis of it, and in turn refer him to me.

16   Which, I think this is why this occurred.

17           THE COURT:  Doctor, I don't think she asked you a

18   general question about -- in general.

19           THE WITNESS:  Oh, I'm sorry.

20           THE COURT:  I think she asked you if you have any

21   reason to dispute his assessment.

22   A.      No, I don't.

23   Q.      (BY MS. MALY)  Now, you and I have met before

24   today; right?

25   A.      This is true.

```
 1    Q.      And I took your deposition and I asked you

 2    questions about your knowledge of Chris and your

 3    examination of him on December 28, 2011; right?

 4    A.      Yes.

 5    Q.      And Miss Ashley Vincent, who is sitting right

 6    here, she represented you as your lawyer at that

 7    deposition; correct?

 8    A.      That is correct.

 9    Q.      Okay.

10            MS. MALY:  I have no further questions.

11            THE COURT:  Anything else?

12            MS. VINCENT:  Nothing, Your Honor.

13            THE COURT:  Okay.  Thank you, Doctor.  You may

14    step down.

15            THE WITNESS:  Thank you.

16            THE COURT:  Can I see lead counsel?

17            (Proceedings continued at the bench, outside the

18    hearing of the jury.)

19            THE COURT:  So, you guys will have three witnesses

20    tomorrow; right?

21            MS. VINCENT:  Yep.

22            THE COURT:  Okay.  And -- because I'm planning on

23    telling the jury I think we will finish before --

24            MR. SPIRA:  Four.

25            MS. VINCENT:  You're right.
```

```
1              THE COURT:  Four.  We'll finish before, before
2     noon tomorrow.  I know we will.  The witnesses are going
3     pretty quickly.  So the plan would be, finish the evidence
4     tomorrow, then I'm just going to keep the jurors here a
5     half a day.  Then we'll do the instructions tomorrow after
6     we finish, and I'll have the jurors come back in Wednesday
7     morning and get the case.
8              MS. VINCENT:  Okay.
9              THE COURT:  That way they're not sitting around.
10             MS. VINCENT:  Thank you.
11             THE COURT:  Because we can't really do anything
12    meaningful with the instructions until the defendants puts
13    on their case.
14             MR. SPIRA:  Okay.
15             (Proceedings continued in open court, plaintiff
16    and jury present.)
17             THE COURT:  Okay, ladies and gentlemen, we have
18    completed the day.  What I want to let you know is, we are
19    going to continue with the defendants' case tomorrow
20    morning.  But we will finish with the evidence sometime
21    before noon tomorrow.  The problem is, is that there are
22    some things that we have to take up outside of your
23    hearing, and some work we have to do to get the case to
24    you, that we can't do until the evidence is completed.
25    So, I'm not going to have you guys sitting around
```

1    tomorrow.

2         When we finish the evidence before noon, I'm going

3    to dismiss you guys for the day.  I'll have you come back

4    Wednesday morning.  At that time, you'll get the

5    instructions from me, you'll hear the closing arguments,

6    and then you'll get the case.  Okay?

7         All right.  Please remember my instructions, don't

8    discuss the case with anyone or do any research overnight,

9    and I'll see you tomorrow morning.  We'll reconvene at

10   9:00.  And then, like I said, we'll finish the evidence

11   and let you guys go, and I'm going to make these people

12   work all day.

13        (Court adjourned at 4:32 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>REPORTER'S CERTIFICATE</u>

2          I, Christine Dohack LaBuwi, RDR, RMR, Official

3     Court Reporter for the U.S. District Court, Southern

4     District of Illinois, do hereby certify that I reported

5     with mechanical stenography the proceedings contained in

6     pages 1-145; and that the same is a full, true, correct

7     and complete transcript from the record of proceedings in

8     the above-entitled matter.

9

10              DATED this 18th day of May, 2018,

11

12                          s/*Christine Dohack LaBuwi, RDR, RMR*
                            _____
13                          Christine Dohack LaBuwi, RDR, RMR

14

15

16

17

18

19

20

21

22

23

24

25