```
 1                    UNITED STATES OF AMERICA
                    SOUTHERN DISTRICT OF ILLINOIS
 2

 3   CHRISTOPHER NOVUS DAVIS,      )
                                   )
 4                  Plaintiff,     )
     v.                            ) No. 3:13-cv-01260-SMY-RJD
 5                                 )
     DEPARTMENT OF HUMAN SERVICES, )
 6   et al.,                       )
                                   )
 7                  Defendants.    )

 8

 9

10            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                          DAY 3 OF 3
11
              BEFORE THE HONORABLE STACI M. YANDLE
12                UNITED STATES DISTRICT JUDGE

13                      May 16, 2018

14

15

16

17

18

19

20

21   REPORTED BY:        Christine Dohack LaBuwi, RDR, RMR
                         Official Court Reporter
22                       301 West Main Street
                         Benton, Illinois  62812
23                       (618) 439-7725
                         Christine_Dohack@ilsd.uscourts.gov
24
     Proceedings recorded by mechanical stenography, produced
25   by computer-aided transcription.
```

```
 1    APPEARANCES:

 2    FOR PLAINTIFF:         Daniel A. Spira, Esq.
                             Elizabeth M. Chiarello, Esq.
 3                           Caitlyn Maly, Esq.
                             Julie Becker, Esq.
 4                           SIDLEY AUSTIN LLP
                             One South Dearborn Street
 5                           Chicago, IL  60603
                             (312) 853-9203
 6                           dspira@sidley.com
                             echiarello@sidley.com
 7                           cmaly@sidley.com
                             Julie.Becker@sidley.com
 8

 9
      FOR DEFENDANT:         Ashley M. Vincent, Esq.
10                           Samantha J. Costello, Esq.
                             Sean Edward Miller, Esq.
11                           OFFICE OF THE ATTORNEY GENERAL
                             500 South Second Street
12                           Springfield, IL  62706
                             (217) 782-1090
13                           avincent@atg.state.il.us
                             scostello@atg.state.il.us
14                           smiller@atg.state.il.us

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

PAGE:

Chambers Conference                      4:1
Court Instructions                       7:5
Closing Argument by Mr. Spira            20:10
Closing Argument by Ms. Vincent         37:11
Closing Argument by Mr. Spira            51:5
Note from the Jury                       55:7
Verdict                                  58:2

```
 1                    (Proceedings began in chambers at 8:30 a.m.)

 2              THE COURT:  So, I have advised the parties that I

 3    made changes to two of the instructions after our formal

 4    conference last night, but after I reviewed it.  The first

 5    was, there was a change to what the Court indicated it

 6    would give as it relates to the admissions.  So, I'm

 7    giving Court's Jury Instruction No. 16 that advises the

 8    jury that I have taken judicial notice of an admission.

 9    What I took out was the second admission that the

10    plaintiffs read that had to do with the proximate cause

11    and injuries.  And the reason I did it is because, as

12    phrased in the pleadings -- which we have to use what's in

13    the pleadings -- it's equivocal.  So, it's really not

14    technically an admission and it would be really confusing.

15    And so I took that one out and left in the admission about

16    the hemorrhaging.

17              First of all, plaintiff have any objections to the

18    revision?

19              MR. SPIRA:  Yes, Your Honor.  Just for the record,

20    we do object to the revision.  There was the second aspect

21    of the answer was read into the record before the jury.

22    Although we --

23              THE COURT:  Trust me, they didn't understand what

24    the hell it was.

25              MR. SPIRA:  Although we acknowledge it is, it is
```

1    equivocal, we think that equivocation itself is still part

2    of their pleading and part of the judicial admission, and

3    so we do object to that one for the record.

4         THE COURT:  Mr. Spira, you know, I really like

5    you.  And so, one day I'm going to let you convince me how

6    an equivocation can be an admission.

7         Any objection from the defendants?

8         MS. VINCENT:  No objection.

9         THE COURT:  Then on the second change, I just took

10   out the second paragraph on the prior inconsistent

11   statement instruction because we didn't have any witnesses

12   that fell into that category.

13        Any objections from the plaintiff?

14        MR. SPIRA:  We do not have an objection to that

15   one, Your Honor.

16        THE COURT:  From the defendants?

17        MS. VINCENT:  No objection.

18        THE COURT:  Okay.  All right.  That's the record.

19        (Court recessed from 8:35 a.m. to 9:15 a.m.)

20        (Proceedings continued in open court, plaintiff

21   and jury present.)

22        THE CLERK:  The Court calls Case No. 13-CV-1260,

23   *Davis versus Department of Human Services, et al.*  This

24   matter is called for day three of jury trial.

25        Would the parties please state your presence for

1    the record?

2        MR. SPIRA:  Good morning.  Dan Spira on behalf of

3    the plaintiff, Christopher Davis.

4        MS. CHIARELLO:  Beth Chiarello on behalf of the

5    plaintiff.

6        MS. MALY:  Caitlyn Maly on behalf of the

7    plaintiff.

8        MS. BECKER:  Julie Becker on behalf of the

9    plaintiff.

10        MS. VINCENT:  Ashley Vincent on behalf of the

11    defendants.  And Samantha Costello on behalf of the

12    defendants, and Sean Miller.

13        THE COURT:  Okay.  Thank you, counsel.  Thank you,

14    everybody.

15        Good morning, ladies and gentlemen.  I am about to

16    give you the instructions on the law.  You have a copy of

17    the instructions in your chair; those are just provided to

18    you for your convenience.  You can read along as I read

19    them.  Some people process information better that way.

20    You don't have to.  There will be a set for you all to use

21    as a jury in the jury room.  So, those are just your

22    copies.  You will leave those in your chair and there will

23    be a set in the back.

24        Also, before I read the instructions I need to let

25    you know that I have excused the defendant Mr. Tom

1    Nordmann from being here this morning.  He remains a party

2    in the case, so it should not -- you should not allow that

3    to affect or impact your deliberations or your verdict in

4    any way.  Okay?

5         Members of the jury, you have seen and heard all

6    the evidence.  Now I will instruct you on the law, and

7    then you will hear the arguments of this attorneys.

8         You have two duties as a jury.  Your first duty is

9    to decide the facts from the evidence in the case.  This

10   is your job and yours alone.

11        Your second duty is to apply the law that I give

12   you to the facts.  You must follow these instructions,

13   even if you disagree with them.  Each of the instructions

14   is important, and you must follow all of them.

15        Perform these duties fairly and impartially.

16        Nothing I say now, and nothing I said or did

17   during the trial, is meant to indicate any opinion on my

18   part about what the facts are or about what your verdict

19   should be.

20        During your deliberations, you must not

21   communicate with or provide any information to anyone by

22   any means about this case.  You may not use any electronic

23   device or media, such as a telephone, cell phone, smart

24   phone, iPhone, Blackberry or computer; the internet, any

25   internet service, or any text or instant messaging

1    service; or any internet chat room, blog, or website such

2    as Facebook, MySpace, LinkedIn, YouTube or Twitter, to

3    communicate to anyone any information about this case or

4    to conduct any research about this case until I accept

5    your verdict.

6            I do not anticipate that you will need to

7    communicate with me.  If you do need to communicate with

8    me, the only proper way is in writing.  The writing must

9    be signed by the presiding juror, or, if he or she is

10   unwilling to do so, by some other juror.  The writing

11   should be given to the marshal, who will give it to me.  I

12   will respond either in writing or by having you return to

13   the courtroom so that I can respond orally.

14           If you do communicate with me, you should not

15   indicate in your note what your numerical division is, if

16   any.

17           The evidence consists of the testimony of the

18   witnesses, exhibits admitted in evidence, and stipulations

19   between the parties.

20           A stipulation is an agreement between both sides

21   that certain facts are true.

22           I have taken judicial notice of certain facts.

23   You must accept those facts as proved.

24           Certain things are not to be considered as

25   evidence.  I will list them for you:

1          First, if I told you to disregard any testimony or

2   exhibits or struck any testimony or exhibits from the

3   record, such testimony or exhibits are not evidence and

4   must not be considered.

5          Second, anything that you may have seen or heard

6   outside the courtroom is not evidence and must be entirely

7   disregarded.

8          Third, questions and objections or comments by the

9   lawyers are not evidence.  Lawyers have a duty to object

10  when they believe a question is improper.  You should not

11  be influenced by any objection, and you should not infer

12  from my rulings that I have any view as to how you should

13  decide the case.

14         Fourth, the lawyers' opening statements and

15  closing arguments to you are not evidence.  Their purpose

16  is to discuss the issues and the evidence.  If the

17  evidence as you remember it differs from what the lawyers

18  said, your memory is what counts.

19         Certain diagrams have been shown to you.  Those

20  diagrams are used for convenience and to help explain the

21  facts of the case.  They are not themselves evidence or

22  proof of any facts.

23         Any notes you have taken during this trial are

24  only aids to your memory.  The notes are not evidence.  If

25  you have not taken notes, you should rely on your

1    independent recollection of the evidence and not be unduly

2    influenced by the notes of other jurors.  Notes are not

3    entitled to any greater weight than the recollections or

4    impressions of each juror about the testimony.

5           You should use common sense in weighing the

6    evidence and consider the evidence in light of your own

7    observations in life.

8           In our lives, we often look at one fact and

9    conclude from it that another fact exists.  In law, we

10   call this inference.  A jury is allowed to make reasonable

11   inferences.  Any inference you make must be reasonable and

12   must be based on the evidence in the case.

13          You may have heard the phrases "direct

14   evidence" and "circumstantial evidence."  Direct evidence

15   is proof that does not require an inference, such as the

16   testimony of someone who claims to have personal knowledge

17   of a fact.  Circumstantial evidence is proof of a fact, or

18   a series of facts, that tends to show that some other fact

19   is true.

20          As an example, direct evidence that it is raining

21   is testimony from a witness who says, "I was outside a

22   minute ago and I saw it raining."  Circumstantial evidence

23   that it is raining is the observation of someone entering

24   a room carrying a wet umbrella.

25          The law makes no distinction between the weight to

be given to either direct or circumstantial evidence.  You should decide how much weight to give to any evidence.  In reaching your verdict, you should consider all the evidence in the case, including the circumstantial evidence.

You must decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all.  You also must decide what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, including any party to the case, you may consider, among other things:

The ability and opportunity the witness had to see, hear, or know the things that the witness testified about;

The witness's memory;

Any interest, bias, or prejudice the witness may have;

The witness's intelligence;

The manner of the witness while testifying; and

The reasonableness of the witness's testimony in light of all the evidence in the case.

You have heard evidence that plaintiff Christopher Davis has been convicted of a crime.  You may consider this evidence only in deciding whether plaintiff's

1   testimony is truthful in whole, in part, or not at all.

2   You may not consider this evidence for any other purpose.

3        You may consider statements given by parties and

4   witnesses under oath before trial as evidence of the truth

5   of what they said in their earlier statements, as well as

6   in deciding what weight to give their testimony.

7        In considering prior inconsistent statements, you

8   should consider whether it was simply an innocent error or

9   an intentional falsehood and whether it concerns an

10   important fact or an unimportant detail.

11        You may find the testimony of one witness or a few

12   witnesses more persuasive than the testimony of a larger

13   number.  You need not accept the testimony of the larger

14   number of witnesses.

15        The law does not require any party to call as a

16   witness every person who might have knowledge of the facts

17   related to this trial.  Similarly, the law does not

18   require any party to present as exhibits all papers and

19   things mentioned during this trial.

20        During this trial, I have asked a witness a

21   question myself.  Do not assume that because I asked

22   questions I hold any opinion on the matters I asked about,

23   or on what the outcome of the case should be.

24        When I say a particular party must prove something

25   by a preponderance of the evidence, or when I use the

expression "if you find," or "if you decide," this is what
I mean:  When you have considered all the evidence in the
case, you must be persuaded that it is more probably true
than not true.

In determining whether any fact has been proved,
you should consider all of the evidence bearing on the
question regardless of who introduced it.

The parties have stipulated or agreed to the
following facts:

1.  On December 26, 2011, plaintiff Christopher
Davis was a resident at Chester Mental Health Center,
operated by the Illinois Department of Human Services.

2.  On December 26, 2011, the defendants were
employed by the Illinois Department of Human Services and
assigned to Chester Mental Health Center.

3.  On December 26, 2011, the defendants were on
duty as Security Therapy Aides, or STAs, at Chester Mental
Health Center.

You must now treat these facts as having been
proved for the purpose of this case.

I have taken judicial notice of the following
admission:

The defendants admit that plaintiff experienced
subconjunctival hemorrhaging following the alleged
incident.

1        You must now treat this fact as having been proved
2    for the purpose of this case.
3        The defendants in this case are being sued as
4    individuals for their alleged personal acts.  Neither the
5    State of Illinois nor the Department of Human Services is
6    a party to this lawsuit.
7        Plaintiff must prove by a preponderance of the
8    evidence that a defendant was personally involved in the
9    conduct that plaintiff complains about.  You may not hold
10   any of the defendants liable for what others did or did
11   not do.
12       You must give separate consideration to each claim
13   and party in this case.  Although there are four
14   defendants, it does not follow that if one is liable, the
15   other is also liable.
16       In considering a claim against a defendant, you
17   must not consider evidence admitted only against the other
18   defendants or only as to other claims.
19       In Count 1, plaintiff claims that the defendants
20   used excessive force against him.  To succeed on this
21   claim, plaintiff must prove by a preponderance of the
22   evidence that one or more of the defendants used
23   unreasonable force against him.
24       If you find that plaintiff has proven his claim
25   against one or more of the defendants by a preponderance

1    of the evidence, then you must decide for plaintiff and

2    against that or those defendants and go on to consider the

3    question of damages.

4         If, on the other hand, you find that plaintiff did

5    not prove his claim against any of the defendants by a

6    preponderance of the evidence, then you must decide for

7    the defendants, and you will not consider the question of

8    damages for Count 1.

9         To succeed on his claim in Count 2 that one or

10   more of the defendants failed to intervene on his behalf,

11   plaintiff must prove each of the following things by a

12   preponderance of the evidence:

13        1.   There was a strong likelihood that plaintiff

14   would be seriously harmed as a result of the use of

15   excessive force;

16        2.   The defendant was aware of this strong

17   likelihood that plaintiff would be seriously harmed as a

18   result of the use of excessive force;

19        3.   The defendant consciously failed to take

20   reasonable measures to prevent the use of excessive force.

21   In deciding this, you may consider how serious the

22   potential harm to plaintiff was, how difficult it would

23   have been for the defendant to take corrective action, and

24   whether the defendant had legitimate reasons related to

25   safety or security for failing to take corrective action;

and

    4.   Plaintiff would not have been harmed or would have suffered less harm if the defendant had taken reasonable measures.

    If you find that plaintiff has proved each of these things by a preponderance of the evidence as to one or more of the defendants, then you must decide for plaintiff and against that or those defendants and go on to consider the question of damages.  If, on the other hand, you find that plaintiff has failed to prove any of these things by a preponderance of the evidence as to any of the defendants, then you must decide for defendants, and you will not consider the question of damages for Count 2.

    If you find in favor of plaintiff, then you must determine the amount of money that will fairly compensate plaintiff for any injury that you find he sustained as a direct result of the excessive force used against him by one or more defendants and/or as a direct result of one or more defendants' failure to intervene.

    Plaintiff must prove his damages by a preponderance of the evidence.  Your award must be based on evidence and not speculation or guesswork.  This does not mean, however, that compensatory damages are restricted to the actual loss of money; they include both

1  the physical and mental aspects of injury, even if they

2  were not easy to measure.

3      Whether or not plaintiff proves an injury, you may

4  award nominal damages and punitive damages, so long as you

5  find that plaintiff has met the standard for obtaining

6  those damages.

7      You should consider the following type of

8  compensatory damages, and no other:  The physical and

9  mental/emotional pain and suffering that plaintiff has

10 experienced.  No evidence of the dollar value of physical

11 and mental/emotional pain and suffering has been or needs

12 to be introduced.  There is no exact standard for setting

13 the damages to be awarded on account of pain and

14 suffering.  You are to determine an amount that will

15 fairly compensate plaintiff for the harm that he has

16 sustained.

17     If you find for plaintiff, you may not award

18 compensatory damages for mental or emotional pain and

19 suffering unless you find that plaintiff has suffered a

20 physical injury as a result of defendant's wrongful

21 conduct.

22     If you find in favor of plaintiff but find that

23 plaintiff has failed to prove compensatory damages, you

24 must return a verdict for plaintiff in the amount of one

25 dollar.

If you find for plaintiff, you may, but are not required to, assess punitive damages against defendants. The purposes of punitive damages are to punish a defendant for his or her conduct and to serve as an example or warning to defendants and others not to engage in similar conduct in the future.

Plaintiff must prove by a preponderance of the evidence that punitive damages should be assessed against one or more defendant.  You may assess punitive damages only if you find that a defendant's conduct was malicious or in reckless disregard of plaintiff's rights.  Conduct is malicious if it is accompanied by illwill or spite, or is done for the purpose of injuring plaintiff.  Conduct is in reckless disregard of plaintiff's rights if, under the circumstances, one or more defendant simply did not care about plaintiff's safety.

If you find that punitive damages are appropriate, then you must use sound reason in setting the amount of those damages.  Punitive damages, if any, should be in an amount sufficient to fulfill the purposes that I have described to you, but should not reflect bias, prejudice, or sympathy toward any party.  In determining the amount of any punitive damages, you should consider the following factors:

The reprehensibility of defendants' conduct;

1      The impact of defendants' conduct on plaintiff;

2      The relationship between plaintiff and defendants;

3      The likelihood that defendants would repeat the

4  conduct if an award of punitive damages is not made; and

5      The relationship of any award of punitive damages

6  to the amount of actual harm the plaintiff suffered.

7      Upon retiring to the jury room, you must select a

8  presiding juror.  The presiding juror will preside over

9  your deliberations and will be your representative here in

10  court.

11      A verdict form has been prepared for you.

12      Take this form to the jury room, and when you have

13  reached unanimous agreement on the verdict, your presiding

14  juror will fill in the form, and all of you will sign it.

15      The verdict must represent the considered judgment

16  of each juror.  Your verdict, whether for or against the

17  parties, must be unanimous.

18      You should make every reasonable effort to reach a

19  verdict.  In doing so, you should consult with one

20  another, express your own views, and listen to the

21  opinions of your fellow jurors.  Discuss your differences

22  with an open mind.  Do not hesitate to reexamine your own

23  views and change your opinion if you come to believe it is

24  wrong.  But you should not surrender your honest beliefs

25  about the weight or effect of evidence solely because of

1  the opinions of other jurors or for the purpose of

2  returning a unanimous verdict.

3      All of you should give fair and equal

4  consideration to all the evidence and deliberate with the

5  goal of reaching an agreement that is consistent with the

6  individual judgment of each juror.  You are impartial

7  judges of the facts.

8      And with that, we are ready for the closing

9  arguments on behalf of the plaintiff.

10     MR. SPIRA:  May it please the Court.

11     "We're going to show you how we do it at Chester."

12  "I don't feel like dealing with you stupid retarded

13  motherfuckers."  "I'm going to kill you."

14     Christopher Davis was a mental health patient with

15  his hands cuffed behind his back.  He was pulled to the

16  ground, punched, kneed in the face, and strangled.  That's

17  how a 20-year-old scared kid, who stood up for a carton of

18  milk, was welcomed to Chester.

19     Ladies and gentlemen, we are here today because

20  the four defendants in this case used excessive force

21  towards Christopher Davis on December 26, 2011, and none

22  of them did anything to intervene or stop the attack.

23     Two days ago, in this court, Chris told you

24  exactly what happened on that day, December 26, 2011.  You

25  heard that the day after Christmas was his first time in

1   the dining hall at Chester.  And when he stood up because

2   he forgot to get his carton of milk, he was immediately

3   yelled at to sit back down, in a demeaning and degrading

4   show of authority.  Chris was called retarded.

5           Now, Chris told you that he cursed back at staff.

6   He didn't think he deserved to be talked that way, and he

7   stood up for himself.  And maybe the staff weren't used to

8   seeing someone speak up and stand up for themselves like

9   that.  But that did not give them the right to tell him to

10  stand back up, put his hands behind his back, and put him

11  in handcuffs.  It didn't give defendants Terry Stewart and

12  Tom Nordmann the right to manhandle Chris, jerking him

13  back and forth like a rag doll, spewing racial slurs, and

14  telling him they were going to show him exactly how they

15  do it at Chester.

16          Chris had been in the mental health facility for

17  four days.  They were the Security Therapy Aides.  They

18  were supposed to be the adults in the room.

19          You heard the evidence that when they entered the

20  stem, Mr. Stewart put his -- put Chris in a choke hold and

21  yanked him to the floor.  Mr. Nanney began choking Chris,

22  telling him he was going to kill him.  Chris was turned

23  over, and Mr. Rackley kneed him in the face.  Standing

24  behind Chris, Mr. Nordmann punched him in the genitals.

25  The four defendants continued beating on Chris for what he

1     told you felt like a lifetime.

2            During this entire time, Chris was handcuffed,

3     unable to protect himself, unable to block his face, block

4     his throat, call out for help.  When Chris was taken to

5     the restraint room, he was again choked before being left

6     there for hours, eyes bloodied, lying in pain and crying

7     in the bed.  Apparently, that's how they do it at Chester.

8            Now, yesterday the defendants had their

9     opportunity to take the stand and tell you what happened.

10    Most of them told you practically nothing about December

11    26, 2011.  They didn't refute Chris's testimony.  They

12    didn't explain their actions.  They couldn't even tell you

13    whether they did this or not.  One of the defendants, Mr.

14    Nordmann, didn't take the stand at all.  He didn't tell

15    you a single thing.

16           As the jury, you are well within your rights and

17    your duties to draw whatever inferences from that you

18    think make sense.  Why didn't Mr. Nordmann take the stand?

19    What were they afraid of him telling you?

20           One of the only defendants who did say at least

21    something about December 26, 2011, Mr. Stewart, read from

22    a prepared statement that his attorney handed him on the

23    witness stand.  But Mr. Stewart also admitted that, if he

24    had said in that same prepared statement that he had

25    pulled a handcuffed mental health patient to the ground,

1    he would have been disciplined.  The other defendants

2    confirmed, they could have been fired.  Mr. Stewart also

3    admitted that he would have discussed with the other

4    defendants what to put in that report before he ever

5    drafted it.

6         And Mr. Stewart admitted that he does not have any

7    explanation for Chris's eye bleeding, tenderness, or

8    swelling, other than the defendants' actions during this

9    incident on December 26, 2011.

10         In fact, the defendants didn't offer one single

11    piece of evidence to point to any explanation for Chris's

12    injuries other than their own excessive force on December

13    26, 2011.  That's it for defendants' testimony.  That's

14    all they had to say.  Again, Mr. Nordmann didn't even

15    bother to take the stand.  He told you nothing.

16         Now, you have also heard a lot of talk about

17    videos over the past couple days, cameras and videos.  So,

18    I want to break that down for you and review that

19    evidence.  First, it is undisputed that there is a video

20    camera in the restraint room where Chris was taken.  Now,

21    one of the defendants suggested that camera wasn't

22    recording.  Well, that either means there was footage that

23    the defendants had and never provided of the restraint

24    room, or, it means they took Chris to a room where they

25    knew there was no recording camera.

1      Second, Chris testified that there is a camera in

2  the main hallway, after he is taken out of the dining hall

3  into the main hallway, where he was manhandled.  He was

4  never provided with any of that footage.  That is

5  completely undisputed.  None of the defendants disputed

6  that there was a camera or video footage in the main

7  hallway.  None of the defendants disputed that they never

8  provided that footage to Chris.

9      You can be sure that if that camera, if that

10 footage had something helpful to say for them you would

11 have seen it here in court.  They would have played it for

12 you.  They didn't do that.

13     Third, defendants provided us with a video from

14 Unit C-2 looking into the stem.  Remember, the stem is

15 right behind those double doors.  But a door just happens

16 to close right around the time that Chris is being brought

17 into the stem.

18     (Video playing.)

19     The defendants did not offer you any explanation

20 for why that door was closed, moments before Chris was

21 attacked behind that door.  Nothing.  Not a word.

22     Fourth, the only unobstructed view of anything

23 that happened was a video the defendants provided showing

24 Chris right after he was attacked in the stem, being taken

25 by 11 or 12 staff, including each of the defendants, into

1    a restraint room.

2         (Video playing.)

3         One, two, three, four, five, six, seven, eight,

4    nine, ten, eleven.  Think about what you just saw there,

5    what you saw when that video was introduced into evidence.

6    Chris wasn't struggling.  He wasn't fighting with the

7    staff.  He had his hands cuffed behind his back and he was

8    under control, with a dozen Chester staff, including each

9    of the defendants, taking him to a room where he was about

10   to be tied down on a bed and left there for nearly four

11   hours.

12        Again, it's your job as the jury to draw whatever

13   inferences you think are appropriate from all of this

14   evidence about videos.

15        Why didn't the defendants provide us with footage

16   from the main hallway?  Why is the door suddenly closed,

17   obstructing our only view into the stem?  You can infer

18   that there is something there the defendants didn't want

19   us to see.  You have that ability as the jury in this

20   case.  Now, you also heard from two doctors in this case

21   who examined Chris in the days after the attack.  Dr.

22   Tariq, a medical doctor who works at Chester, made his own

23   objective observations the day after the attack of

24   conjunctival redness in both of Chris's eyes.  He noted

25   tenderness around Chris's eyes.  He noticed swelling of

 1    left wrist; swelling behind the left ear.  He noted that

 2    physical evidence was present of abuse by the staff.

 3         Let me repeat that.  A doctor at Chester, who

 4    works at the same facility as the defendants, found

 5    physical evidence of abuse by the staff.  Chris didn't

 6    arrive like that at Chester a few days earlier.  Remember,

 7    Dr. Tariq was the same doctor who examined him when he got

 8    there on December 22nd.  He testified on the stand, there

 9    were no injuries.  That changed a few days later.

10         Now, the defendants did not dispute any of that

11    evidence either.  Instead, they presented evidence from

12    Dr. Soellner.

13         MS. VINCENT:  Your Honor, just real quick,

14    defendants object to --

15         THE COURT:  Approach, please.

16         (Proceedings continued at the bench, outside the

17    hearing of the jury.)

18         MS. VINCENT:  Real quick, Your Honor.  You ruled

19    that any -- the redactions referencing the OIG are not

20    present on these documents.  They should be redacted

21    pursuant to your order on our motion in limine regarding

22    that the investigations are not relevant.

23         THE COURT:  Where is there a reference -- is there

24    a reference to OIG?

25         MR. SPIRA:  The previous one is the document that

had been redacted.  I don't -- if it wasn't redacted in the slide, it was a complete oversight and I apologize for that.

THE COURT:  There's nothing else you have that's not redacted?

MR. SPIRA:  Correct.

THE COURT:  We'll make sure that what we send back to the jurors is redacted.

MS. VINCENT:  Okay.  Thank you.

(Proceedings continued in open court, plaintiff and jury present.)

MR. SPIRA:  As I was saying, ladies and gentlemen, the defendants did not refute the testimony of Dr. Tariq. They didn't refute that physical evidence was present of abuse by the staff.

Instead, they presented Dr. Soellner, and he told you that the reason he saw Chris was because of possible trauma to his eyes.  And when he examined him, he saw hemorrhaging or bleeding in all four quadrants of each of Chris's eyes, completely consistent with Chris's testimony, completely consistent with what Dr. Tariq saw.

Now, you also heard testimony from Donna Cole, a nurse, also who works at Chester with all of the defendants.  She told you that when this box at the bottom of the screen for "no apparent injury" is not checked, as

1    in this case, that means there is an apparent injury.

2        She told you that if the "no treatment

3    required" box is not checked, there was treatment

4    required.  The patient needed to see a doctor.

5        She told you that if the "minor first aid" box was

6    not checked, the injury was not something minor like

7    scrapes or scratches or bruises.  It was something more

8    serious.  It was something a doctor needed to see him for.

9        In this case, the box for "medical

10   intervention" was checked.  Chris needed medical

11   intervention from a doctor because of the events of

12   December 26.

13       Now, you also heard about a document that the

14   defendants submitted to the court earlier in this case.

15   We refer to it as a judicial admission.  We read it into

16   the record at the end of our case, after Chris had

17   testified and after Dr. Tariq had testified.  And here is

18   what they said:

19       Defendants admit plaintiff experienced

20   subconjunctival hemorrhaging following the alleged

21   incident.

22       Now, Judge Yandle has instructed you that she has

23   taken judicial notice of that statement.  That means you

24   can accept that as a fact.  It is not disputed.  Chris had

25   injuries after this attack.

```
 1            Now, at the end of these closing remarks, Judge
 2    Yandle's going to ask you to go back and deliberate.  And
 3    to help you do that, she's read some instructions to you
 4    in how you can apply the facts you have heard in this case
 5    to the law.  And there's a lot of instructions, and I want
 6    to just go over a couple of them with you to explain what
 7    they mean; how we think you should interpret them.
 8            First, Chris has alleged that the four defendants
 9    in this case, Mr. Danny, Mr. Stewart, Mr. Rackley, and Mr.
10    Nordmann, used excessive force against him in violation of
11    his constitutional rights.  Now, in front of you on your
12    screen there is a really important instruction on
13    excessive force.  This is an instruction the judge just
14    provided you a moment ago.  And it says two particularly
15    important components that I want you to think about:
16    First, when we talk about excessive force, what that means
17    is that the defendants used an unreasonable force towards
18    Chris.  That's all it means, unreasonable force.  That's
19    the standard for you to apply.
20            At the end of the day, this case is not about how
21    severe Chris's physical injuries were.  It's about whether
22    the defendants acted unreasonably.
23            Ladies and gentlemen, based on the evidence you
24    have heard from Chris, the other evidence presented over
25    the past couple days, you can easily find that the
```

1  defendants used an unreasonable amount of force towards

2  Chris.

3          When you go back into that jury room and you think

4  about how you are going to decide his claim for excessive

5  force, ask yourself, "Is it reasonable for staff at a

6  mental health facility to pull a handcuffed patient to the

7  ground, let alone one in handcuffs, and pull him down by

8  his neck?"  "Is it reasonable to choke that patient while

9  he is lying on the floor?"  "Is it reasonable to punch and

10  knee that patient in the face?"  "Is it reasonable to tie

11  that patient to a bed, choke him again, and then leave him

12  there lying in pain for nearly four hours, eyes bleeding

13  and crying?"

14          What security, what therapy, what aide, are STAs

15  providing when they beat a 20-year-old mental health

16  patient with his hands tied behind his back?

17          As I said before, Chris was a 20-year-old kid who

18  had been at a mental health center for a few days.  The

19  defendants were the STAs; they were the Security Therapy

20  Aides.  They were supposed to be the adults in the room.

21  Defendants' actions here were profoundly unreasonable.

22          Now, the second important part of this instruction

23  I want to talk to you about that Judge Yandle just

24  instructed you on is preponderance of the evidence.  This

25  is essentially a fancy legal term that has a really simple

1    meaning.  All this means is that it is more probably true

2    than not true.  More likely than not.  That's all it

3    means.

4         If you think about a scale and you are weighing

5    the evidence on a scale, all you have to find, to find for

6    Mr. Davis, to find for Chris Davis, is that the evidence

7    weighs ever so slightly in his favor.  That the scale is

8    tipped just a hair over 50 percent.  That's it.

9         Is it more likely true than not that the

10   defendants used an unreasonable amount of force with Mr.

11   Davis?  Consider the evidence in this case and weigh it on

12   that scale.

13        You've got Chris's testimony about what happened

14   on December 26, 2011.  You've got pictures showing some of

15   his injuries.  You've got video evidence showing staff

16   closing off our only view into the stem.  You've got video

17   evidence showing 12 staff following Chris into a

18   restraining room.  You've got medical records from two

19   doctors who each objectively observed Chris's eyes in the

20   days following the attack.  And you've got defendants' own

21   admission that Chris suffered injuries after this

22   incident.

23        All you have to find is this.  (Demonstrating.) A

24   hair over 50 percent.  In this case, it's not even close.

25        On the other side of the scale, you've got the

1    defendants.  One didn't testify at all.  The others don't

2    know one way or the other whether Chris was punched.  They

3    don't know one way or the other whether Chris was

4    strangled.  And they don't have any explanation for his

5    injuries.  Besides their own excessive force.  That's the

6    only explanation you have been given.

7          We trust that when you weigh that evidence, you

8    will find it is more likely true than not that the

9    defendants used unreasonable force.

10          Now, this is the verdict form that you will be

11   handed when you go to deliberate with regard to Chris's

12   first claim for excessive force against each of the

13   defendants.  And if you find for Chris against the

14   defendants, you are just going to check each of those

15   boxes along the left-hand column.  You are going to check

16   the box next to Chris's name saying, yes, this was an

17   unreasonable amount of force.  It is more likely true than

18   not that the defendants used an unreasonable amount of

19   force.

20          Now, in addition to Chris's claim for excessive

21   force against each of the defendants, he has a second

22   claim for failing to intervene.  What this means is that

23   the defendants in this case each had an opportunity to

24   stop this from happening, and they didn't.  They joined

25   in.  Each requirement of failure to intervene is easily

1  met here.

2     I'm going to walk through those with you now.  And

3  again, all you have to find on this claim is more likely

4  true than not.  The scale tips just slightly in Chris's

5  favor.

6     The first requirement is that there is a strong

7  likelihood that the plaintiff would be seriously harmed as

8  the result of the use of excessive force.  This is an easy

9  requirement to satisfy in this case.  Beating Chris and

10  strangling him obviously had a strong likelihood of

11  causing him serious harm.

12     The second requirement is that the defendants were

13  aware of this strong likelihood that Chris would be

14  seriously harmed as a result of excessive force.  The

15  defendants were the STAs.  They knew what they were doing.

16  They knew that if they threw a handcuffed mental health

17  patient to the ground, and beat him and strangled him,

18  they would cause serious harm.

19     The third requirement is that the defendants acted

20  consciously -- excuse me -- consciously failed to take

21  reasonable measures to prevent the use of excessive force.

22  Each of the defendants in this case was there.  Each of

23  them could have tried to intervene.  They had every

24  opportunity to do so, and none of them did.  They joined

25  in.

1      The last requirement is that the plaintiff would

2   not have been harmed or would have suffered less harm if

3   the defendants had taken reasonable measures.  If any of

4   the defendants had intervened, if any of them had tried to

5   stop this, maybe Chris wouldn't be tied down.  Maybe he

6   wouldn't be lying there in pain for four hours.

7      Now, if you find for Chris against the defendants,

8   again, this is the verdict form you'll look at.  You'll

9   check each of the boxes next to Chris's name on the

10  left-hand column.  Now, if you find in favor of Chris on

11  either of his claims, if you find it's more likely true

12  than not that any of the defendants used unreasonable

13  force --

14      THE CLERK:  Five minutes.

15      MR. SPIRA:  -- or if you find any of the

16  defendants failed to intervene, you must enter a verdict

17  for Chris -- that's the instruction, the law that Judge

18  Yandle gave you -- and consider the amount of compensation

19  he should get in this case.

20      You'll need to consider what's called compensatory

21  damages and what's considered punitive damages.  First,

22  compensatory damages.  It's just what they sound like.

23  They are meant to compensate Chris for his pain and

24  suffering.

25      Chris told you about the physical pain he was in

1    from this attack.  Following the attack, his eyes were
2    bloody; his face was swollen; it was tender.  He had
3    bruising on his face and other parts of his body.  Dr.
4    Tariq told you about the redness, the conjungtival
5    redness, the swelling, the tenderness, the physical
6    evidence plus presence.  Dr. Soellner told you the same
7    injuries to the eyes.  Defendants admitted the same
8    injuries to the eyes.  It's really not in dispute at all.
9        But more impactful than that are the physical
10   injuries -- than the physical injuries is the emotional
11   harm that Chris endured.  He told you he had trouble
12   sleeping.  He has had nightmares and flashbacks to this.
13   Anytime an authority figure approaches him, he gets
14   scared.  He thinks back to this incident.  That attack
15   haunts him to this day.
16       Now, there's no exact standard for setting the
17   amount of money to be awarded for compensatory damages for
18   pain and suffering.  Judge Yandle has told you the same
19   thing.  But when you are deliberating, keep in mind the
20   physical harm that Chris has endured.  Keep in mind the
21   emotional injuries he suffered on his fourth day at a
22   mental health hospital at the hands of the very people who
23   were supposed to protect him.
24       Chris is asking you to compensate him for those
25   injuries by awarding $25,000 for each defendant for each

1   claim.  So, that's $100,000 for the excessive force.  It's

2   $100,000 for the failure to intervene.  It's a total of

3   200,000.  We believe that this amount will fairly

4   compensate Chris for the physical and emotional pain and

5   suffering he has endured.

6          Now, the second category of damages is punitive

7   damages.  Punitive means punish, and Judge Yandle has told

8   you the purpose of punitive damages is to punish defendant

9   for his or her conduct, and to serve as an example or

10  warning to defendants and others not to engage in similar

11  conduct.  Now, this is important.  Remember what Chris

12  told you he hopes to gain from this case.  He doesn't want

13  this kind of thing to happen to anyone ever again.  He

14  told you that nobody should go through what he went

15  through.  No patient in Chester.  No patient in any mental

16  health facility should receive the welcome that he

17  received for standing up in a dining hall for a carton of

18  milk, for standing up for himself.

19         You should award whatever number you believe will

20  serve to punish these defendants and serve as an example

21  to others.

22         As the jury, you have the power to send a message

23  today.  You can send that message to the defendants and to

24  anyone in a position of authority working with mental

25  health patients.

```
 1          You, alone, have the power to make sure this does
 2     not continue to happen.  By writing down a number on those
 3     lines for punitive damages, you can stop the way they do
 4     it at Chester.
 5          Ladies and gentlemen, I want to thank you one last
 6     time for your presence here over the past couple days.  I
 7     want to thank you on behalf of my colleagues, on behalf of
 8     my client Chris Davis, for your careful attention to this
 9     case.
10          Thank you.
11          MS. VINCENT:  So, I spent a lot of time thinking
12     about this case, and I was replaying plaintiff's testimony
13     over in my head last night.  And specifically, I was
14     thinking to myself, okay, we have it, he was a patient at
15     a mental health hospital.  And he claims that he was
16     severely beaten, choked, strangled, his genitals were
17     punched, he was beaten in the ribs and in the face.
18          And then I went back to plaintiff's attorney's
19     opening statement where she said that this is all over a
20     carton of milk.  And I just kept thinking about it over
21     and over because I just don't understand how that could be
22     even possible.
23          Here is what we know about this case.  We know
24     that Mr. Davis entered Chester Mental Health on or about
25     December -- it was 23rd -- 22nd or 23rd of 2011.  We know
```

that a few days later there was an incident in the dining hall.

He alleges that, after he got up to get a carton of milk, he was told, "sit down," racial slurs were used, and an altercation ensued between him and the STAs.

Plaintiff wants you to believe that during this entire time that he was never verbally aggressive, he never threatened any of the staff, and that he complied with all orders.  We know that that's not true.

You heard from Terry Stewart, who was able to read his incident report to you.  And in that incident report, Terry told you the following:  He told you that plaintiff began to become angry in the dining room about his breakfast.  He told you that plaintiff actually threatened to kill staff.  He said that plaintiff refused to deescalate the situation and, therefore, he was placed in handcuffs in a physical hold.

Now, you know from the testimony yesterday that none of my clients, which are all STA-1s, they do not carry handcuffs.  Only STA-2s, which would be a supervisor over them, can carry handcuffs.  So, none of these guys right here have the authority to approve that handcuffs are placed on Mr. Davis.  That was out of their control. And according to Mr. Stewart, the incident in the dining room with plaintiff and his behavior caused the STA-2 to

1    put the handcuffs on him.

2          Now, Mr. Davis continued to escalate and a

3    decision was made to take him to the restraint room.  You

4    heard testimony from Dr. Tariq and Nurse Cole that a

5    patient is handcuffed and taken to a restraint room

6    because of their behavior.  Not only are they taken to

7    this room and handcuffed because of their behavior, but

8    it's also for their own safety and for the safety of

9    others within the facility.  You saw the video yesterday,

10   and you'll also have an opportunity to watch the entire

11   video, both videos.  And you'll see in those videos that

12   there's staff members walking around and there's patients

13   walking around.  So, it's very important that, if there's

14   a situation going on with a patient, where if the

15   potential safety of that patient and others could be

16   impacted, that the situation is controlled and the

17   situation is deescalated and the patient is removed from

18   the area.

19          You also heard from Terry that plaintiff shoulder

20   checked him.  Actually, in fact, you heard that from Josh

21   Rackley.  Josh Rackley didn't -- he doesn't have a memory

22   of this incident.  But the one thing that he did remember

23   is that plaintiff shoulder checked Terry.  And Terry also

24   told you that during this incident the plaintiff kicked

25   him and slammed him into other staff members.

1          Now, I'm not going to get up here and tell you

2     today that there wasn't some type of struggle or some type

3     of incident that occurred on this day.  Something did

4     happen.  But what I'm telling you, and as I continue to

5     present the facts to you -- in my view?  It didn't happen

6     exactly the way plaintiff says.  There was some type of

7     struggle here.  And we're not hiding behind the fact that

8     he had some bruising behind his left ear.  We're not

9     hiding behind the fact that he had redness in his eyes or

10    that he had a swollen wrist, probably from the handcuffs

11    being on.  What I'm saying is, those injuries, it appears

12    that there was a struggle and, as a result of that

13    struggle, some injuries did occur.  But those injuries did

14    not occur because these gentlemen choked him, strangled

15    him, punched him in the genitals and in the face.

16          Plaintiff alleges that Mr. Rackley, the man in the

17    orange shirt, was kneeing him in his face.  A man of this

18    size, if he is kneeing you in your face, you would see

19    more injuries to your face than just redness in the eyes.

20          Now, I also kind of want to explain the scene to

21    you as best as I can with what we can piece together from

22    what you heard over these past two days.  Like I said,

23    plaintiff says that this all started in the dining room.

24    We don't dispute that.  Terry told you that, pursuant to

25    his incident report.

1          What you also heard from plaintiff is that there
2     were about 50 to 60 patients in the dining room that day,
3     and there were only ten staff members.  Does it make any
4     sense that two staff members -- they are saying Terry and
5     Mr. Nordmann -- would start an altercation with one
6     patient out of 50 -- with one patient out of about 60,
7     calling him racial slurs and instigating an incident such
8     as plaintiff says, in front of all these patients?  That
9     doesn't make sense.
10          And as plaintiff's story continues when he is
11     escorted to C-3 -- which C-3, mind you, is the only place
12     where restraint rooms are.  C-2, where plaintiff alleges
13     he was beat up?  There is no restraint rooms there.  So,
14     it doesn't make any sense why staff members would take him
15     past the C-3 doors to the C-2 doors to beat him up, and
16     then back over there.  And as they would be walking, to
17     allegedly beat him up, to the C-2 doors, you are passing
18     what they told you, a charge aide station, and I believe
19     that Mr. Nanney said that that's a supervisor's station --
20     or, I'm sorry, it was a supervisor's office.  You are also
21     passing nurses at their desks.
22          You could also see in the video that there's
23     patients freely walking in the hallways.  It doesn't make
24     sense that these guys would just take a patient in the
25     middle of this hallway and savagely and maliciously beat

1    him with people walking about the facility.

2         You saw, when that door was closed, the

3    housekeeper was there vacuuming.  And there -- when the

4    door was closed, there was somebody looking out of the

5    door.  So, for you to believe their story, you have to

6    believe that the housekeeper, that these nurses, that

7    these random patients walking around, that the 12 people

8    that helped escort plaintiff to the restraint room, you

9    have to believe that numerous people all saw this and did

10   absolutely nothing.  And the reason why you can't believe

11   that is because it didn't happen the way plaintiff said.

12        Now, I want to talk about Dr. Tariq.  Immediately

13   after plaintiff reported that he was abused by staff,

14   which he has every right to do that, immediately after, he

15   was seen by Dr. Tariq.  Yeah, Dr. Tariq noted that he had

16   some injuries.  Like I said before, the swelling on the

17   wrist, the red eyes.  He had some redness on his wrists

18   from the handcuffs, it appears.  Dr. Tariq noted that and,

19   as a result, he referred him to the doctor.

20        If staff members are going to beat up a patient,

21   would it make sense to do that out in the open, knowing

22   that this patient has a right to report this abuse?  And

23   in turn, if these gentlemen did what plaintiff said he

24   did, you heard that they would have been disciplined.  You

25   have heard no evidence of that.

```
 1            The day after Mr. Davis saw Dr. Tariq, he was
 2    referred to the eye doctor.  He saw Dr. Soellner.  And you
 3    heard Dr. Soellner testify, yes, he had redness in his
 4    eyes.  We all know that.  But what Dr. Soellner also said
 5    was, the redness in the eyes would resolve in about one to
 6    two weeks.  And that's what it says in his medical record.
 7    Plaintiff got up on the stand and he told you, yeah, it
 8    resolved in about three weeks, is what I think he said.
 9            About a month later, Mr. Davis sees Dr. Soellner
10    again for a routine eye exam.  And Dr. Soellner told you
11    that he did an internal exam of plaintiff's eyes and he
12    said it was within normal limits.  And I said, "What does
13    that mean?"  "That means that everything looks good.  He's
14    fine."  Not only was his internal exam unremarkable, he
15    has nearly perfect vision.  No glasses required.  No
16    injuries, lasting injuries to his eyes.
17            As the Court instructed you, you should use your
18    common sense when you go back there and you discuss
19    amongst each other how you are going to decide this case.
20    And I'm going to show you what I think -- what conclusions
21    I think that you guys should come to.
22            So, we know that Mr. Davis had his pictures taken
23    on December 27.  This was exactly the day after he alleges
24    he was attacked.  And you'll have these pictures back with
25    you in the deliberation room to review yourself.
```

1     Now, I just want to go through a few of these

2  pictures.  I'm not going to go through all of them because

3  I believe there's quite a few, but I'm just going to make

4  some quick points about them.

5     So, in this picture we see Mr. Davis's wrists.

6  You know, and I feel like you can't really see this --

7  what's depicted here that well, but you'll have this

8  picture back with you.  And to me, yes, I do see slight

9  redness on his wrists.  I mean, you see it.  It's there.

10  But what doesn't make sense to me is that the plaintiff

11  says, *Oh, here, you can see, you know, a bunch of*

12  *abrasions on my wrists from the handcuffs.*  I don't see

13  that.  I do see some redness.  But the injury doesn't

14  appear to be as severe as what he's telling you.

15     If plaintiff was manhandled as roughly as he says

16  he was, you'd expect to see some more significant injuries

17  there.

18     Dr. Tariq noted that plaintiff had some swelling

19  on a wrist.  Yes, I do see some swelling on the wrist.

20  But what you don't see here are any abrasions.  You don't

21  see any cuts.  You don't see any bruising.  Nothing

22  consistent with how vicious this attack was.

23     Now, here is a picture that does show slight

24  swelling and bruising or discoloration behind Mr. Davis's

25  ear.  Specifically, Mr. Davis told you yesterday that that

picture shows marks from being choked.  That was his exact
testimony.  I don't see any marks on this picture from
being choked.

The other thing that Mr. Davis also said is that
bruises don't show up well on him.  According to this
picture, you can see the discoloration in his skin the day
after this incident.  If you look at all the other
pictures, you don't see any other bruising or
discoloration.  And Dr. Tariq, he didn't note any other
discoloration or bruising but for right here behind his
left ear.

If Mr. Davis had slight -- if Mr. Davis had more
bruising or discoloration, you would think that the doctor
would have noted it.  You know, plaintiff had an
examination by him, plaintiff reported his injuries to the
doctor.  The doctor only noted bruising, slight
discoloration behind the left ear, you see it in the
picture, you're not going to see it anywhere else.

And again, this picture, when plaintiff was
testifying, he said that you could see darkened handprints
on his neck.  I don't see any darkened handprints on his
neck.

And finally, there is a picture of Mr. Davis's
neck.  He says that Mr. Nanney choked him not only once
but twice; that he also choked him inside the restraint

room.  And during this, plaintiff says that Mr. Danny was
saying, "I'm going to kill you, motherfucker, I'm going to
kill you," all out in the open, in this hospital, with
other employees and patients walking around.

If Mr. Nanney choked plaintiff the way that he
says, you would see some physical evidence of that.  Look
at this picture.  Look at all the pictures.  And I ask you
to use your common sense when it comes to whether or not
plaintiff's story is believable regarding the level of
force that he's saying that they used.

There's one thing -- there's another thing I'd
like to address.  Plaintiff testified that the pictures
didn't capture all of his injuries, and his counsel
alluded to that also in his closing statement, and I just
want to address that.  Plaintiff had two opportunities
besides talking to the eye doctor to report his injuries.
He had an opportunity to talk to Dr. Tariq to report his
injuries.  Dr. Tariq reported them.  You will have his
medical record back there to look.  I'm not disputing that
that record is inaccurate.  And plaintiff isn't saying
that that record is inaccurate either.

Plaintiff also had the opportunity to tell the guy
who took the photos of him on the day after the incident
where his injuries were.  And that person took these
photos.  I asked plaintiff in his deposition, "Do these

1   photos evidence all of your injuries?"  He told me yes.
2   It wasn't until yesterday that now he wants to slip in,
3   "no, that didn't show all my injuries."
4         Plaintiff can't provide you any proof that he
5   suffered further injury.  The proof that you have before
6   you is the doctor's testimony, his medical records, and
7   those pictures.  Yes, those do show some injuries.  But
8   like I said before, those injuries are not consistent with
9   the type of attack and beating that plaintiff claims
10  because these guys did not do that.
11        I want to address a few more things about what
12  counsel said in his closing.  He is insinuating that the
13  video in the restraint room was recording.  I just want to
14  clear that up.  Mr. Nanney did testify that there's a live
15  feed -- there's a camera in there and it has a live feed.
16  That means it's just constantly running.  It's not being
17  recorded.  So, there was no video surveillance in there to
18  actually turn over.
19        In addition to that, none of these defendants --
20  they told what you their duties are.  Their duties are to
21  help patients with their daily activities.  They are to
22  escort patients to the dining hall, places amongst the
23  facility.  None of those duties included maintaining and
24  controlling the video system at Chester.
25        So, I don't want to take up too much more of your

1    time because I know it's been a long three days.  But if

2    you have ever heard the saying, "there is three sides to

3    every story," you have one extreme, the other extreme, and

4    what's in the middle?  The truth.

5          Plaintiff's story is one extreme, that he was

6    savagely beaten by these defendants.  Kicked, punched,

7    choked, for no reason other than because he got up to get

8    a carton of milk.  That's why.

9          The other side, the other extreme of the story

10   would be, "We didn't do that at all" or "We didn't use any

11   force.  We didn't touch him.  We never touched him."

12         So, one side is, "We beat him up."  The other side

13   is, "No, we didn't touch him at all."

14         In the middle, there is the truth.  And the truth

15   is what I'm telling you.  There was some type of struggle

16   that happened on that day.  We're not denying that.  What

17   I'm telling you, what the truth shows in the pictures, is

18   that the struggle, the force that was used was reasonable

19   to control the situation.  If this man was choked and

20   punched and beaten, you would see more injuries.

21         I do want to point out one thing to you guys from

22   the jury instructions that you'll have back with you.  And

23   I just want you to know that the law doesn't require us to

24   call every single party in this case that has knowledge

25   about it.  So, if you are thinking to yourself why you

1    didn't hear from someone?  We are not required to call

2    every single person.  And you did hear the majority of the

3    defendants.  They just -- they don't remember this.

4    There's, there's no more that some of them can add because

5    they truly just don't remember an incident that occurred

6    over six years ago.

7           Mr. Davis testified that this beating lasted about

8    four to five minutes.  And I just want to point something

9    out to you in the video.  The videos are about 15 minutes

10   long, and I just want to point this one thing out to you.

11          So, Sean, if you could just pull up the first

12   picture?  So, this is just a picture, like a still shot of

13   the C-3 stem door video.  And in this video, you see Mr.

14   Nanney in the dark shirt, and then you see Mr. Rackley

15   right there in the white shirt.  I want you to take note

16   of the time stamp on that.  If you look at the top, it's

17   at 7:50 in the morning.  Okay?

18          Now if you turn to -- like if you were to fast

19   forward a little bit, at 7:51:53, there you see plaintiff

20   along with several staff members heading to the restraint

21   room.  This beating that he says that he endured for four

22   to five minutes is just not true.  The evidence doesn't

23   support that.

24          In order for you to find for plaintiff, you have

25   to -- you have to find that each of my clients

1    individually used unreasonable force against plaintiff on

2    this day.  There's no evidence here besides plaintiff's

3    own testimony that these guys viciously attacked him.

4    There's no evidence that any of these guys witnessed

5    another person viciously attack plaintiff.

6            In fact, you heard from Josh that if he saw --

7    he's never seen a staff member kick, choke, punch, or beat

8    a patient.  And he's never done that himself.  So, when it

9    comes to the jury instructions, I anticipate that you're

10   not going to be able to find that they used unreasonable

11   force against him.  And also, turn to those pictures.

12   Those pictures, you know, really speak to the truth in

13   this case and will fill in the gaps in your head, because

14   these guys don't remember.  You know, this is six and a

15   half years ago.  Look at the pictures and think to

16   yourself, does this look like a guy who is severely beaten

17   the day before?

18           So, I'm just going to pick a day, like two years

19   ago, um, I don't know, like March 1, 2016.  I can't tell

20   you what I did that day.  But I could tell you that I

21   didn't run over my neighbor's dog.  Just because these

22   people don't remember what they did six and a half years

23   ago, it doesn't mean that they did what plaintiff alleges.

24           When you go back to the deliberation room, I ask

25   that you carefully consider all the evidence in this case

```
 1    and draw upon your common sense and come back with a
 2    verdict that says that my clients are not liable.
 3               Thank you.
 4               THE COURT:  Mr. Spira.
 5               MR. SPIRA:  I'd just like to quickly respond to a
 6    few things that Miss Vincent said.  What I heard her get
 7    up and say is, essentially his injuries weren't that bad;
 8    they were resolved.  This, this beating wasn't that bad.
 9    There was a scuffle but, you know, hey, it happens.
10               He was the patient.  He was a patient in a mental
11    health facility with his hands behind his back.  They were
12    the ones who were supposed to know how to do this, how to
13    deescalate, as she said.  They didn't do that.  They
14    brought him to the floor.  That's undisputed.
15               The injuries are undisputed.  She's trying to say,
16    this doesn't -- you know, this doesn't look like someone
17    who would be beaten badly.  You know, there's a, a bruise
18    behind his neck.  They didn't explain how that happened.
19    How does that happen if you are using appropriate
20    restraints?  They didn't explain that.  They never
21    explained that.  How could that happen?  They didn't give
22    you any explanation.
23               Now, it's true that the defendants aren't required
24    to have every witness testify.  But you can draw an
25    inference -- as I told you earlier, you can draw an
```

1    inference from the fact that one of them didn't bother to

2    get up there and tell you a thing.

3            Miss Vincent also said that this story doesn't

4    make sense.  How could this be over milk?  Why would they

5    do this?  Well, Chris admits, you know, he cursed at the

6    staff.  He got, he got upset.  They called him retarded

7    and he got upset.  He said, "You can't talk to me like

8    that."

9            Maybe they weren't used to that, I don't know.

10   Maybe that's not how other patients have responded in

11   Chester.  But when you're in a mental health facility,

12   when you are a 20-year-old kid in that facility, you don't

13   check your rights at the door.  You still have rights.

14   You still have constitutional rights.  That doesn't mean

15   they get to manhandle you and throw you to the ground.

16   Any beating, any injury should be considered unreasonable

17   here.

18           You don't have to find that his injuries were

19   horrible or that he went blind.  We're not saying his

20   vision was impaired long term.  That's, that's not what

21   the standard is.  The standard is unreasonable force, and

22   that is met in this case.

23           Miss Vincent told you this doesn't make sense.

24   His story doesn't make sense, doesn't add up.  What

25   doesn't make sense is that they never showed you any video

1    evidence.  They never explained why that door is closed.

2    They never explained the video evidence.  What doesn't

3    make sense is why one of the defendants never even took

4    the stand, didn't tell you anything.  What didn't -- what

5    doesn't make sense is these defendants offered no

6    explanation whatsoever, including in closing arguments for

7    what caused these injuries, other than to say, it doesn't

8    look that bad to me.

9           What doesn't make sense is that these defendants

10   offered virtually no evidence of what happened.  Chris is

11   the patient.  These guys work at Chester.  They're the

12   ones who have access to pictures and videos and other

13   employees and other patients.  He's the patient.  And his

14   testimony was corroborated by everything you saw.  The

15   doctors, they noted the same injuries.  The photos showed

16   injuries.  Now, Miss Vincent says the photos aren't that

17   bad.  They show injuries.  She pointed out the bruise on

18   his neck.  It's pretty clear.  The eyes are obvious.  No

19   explanation for it, other than excessive force.

20          Now, she showed you the time stamp on that video

21   and she said, oh, this -- you know, this attack must have

22   not lasted very long.  Chris doesn't know how long it

23   lasted.  He told it you felt like a lifetime.  He didn't

24   time it.  You don't time how long you are getting beat up,

25   when you are thrown to the ground in handcuffs and

1    surrounded by the people who are supposed to protect you.

2          THE CLERK:  One minute.

3          MR. SPIRA:  Ladies and gentlemen, the injuries in

4    this case are not in dispute.  It's not disputed there's a

5    -- I think Miss Vincent's word was a scuffle.  But these

6    are the STAs.  They're supposed to provide security,

7    therapy and aide.  Chris was the patient.  He was in

8    handcuffs.  No injuries.  No force of throwing someone to

9    the ground should be tolerated.  This was unreasonable.

10          Thank you.

11          THE COURT:  Okay, ladies and gentlemen.  It's now

12   just about time for you to go back and start your job in

13   this case and begin your deliberations.  As soon as Miss

14   Hurst swears in the marshal, you can follow him into the

15   jury room.  She will be back momentarily to give you

16   further direction on how to deal with the exhibits and the

17   instructions, and then it will be time.

18          (CSO sworn by clerk.)

19          THE COURT:  You can follow him out.  And you can

20   leave the instructions in your chair.  You can take your

21   notes with you.

22          (Jury out to begin deliberations at 10:32 a.m.)

23          (Proceedings continued in open court, Plaintiff

24   present, jury not present.)

25          THE COURT:  Okay.  So, you have somebody's

1    information how to reach somebody?

2              THE CLERK:  They're going to, give it to me.

3              THE COURT:  Okay.  And then Miss Hurst is going to

4    go back on the -- give them instructions on how to deal

5    with the digital exhibits.  And I think that's it.

6              (Court recessed from 10:33 a.m. to 1:20 p.m.)

7              (Notification of notes from the jury at 1:20 p.m.)

8              (Proceedings continued in open court, plaintiff

9    present, jury not present.)

10             THE COURT:  Okay.  We don't have a verdict but I

11   have a couple notes.  The first note -- both notes were

12   sent out at 1:13.

13             The first note is from Juror No. 6, and it reads:

14   "Judge, may I use my phone to call in to work?  I must

15   call before 2:30.  Nasco Industries requires employees to

16   call in each day he or she may miss, even for jury duty."

17             It's my intent to write a response back to ~~***~~

18   ~~******~~, let him know he will be allowed to make a phone

19   call, and then we'll have the CSOs get somebody to go out

20   with him to -- I think they -- he has to get his phone out

21   of the car.  So, I am going to allow him to do that.  I

22   will write that note back.

23             The second note says:  "During the testimony of

24   Lucas Nanney on May 15, 2018, Nanney was asked the name of

25   an individual in the video marked as Plaintiff's Exhibit

1   15.  Mr. Nanney identified the individual as ~~*******~~

2   ~~********~~, a patient at Chester mental hospital.  If this

3   case becomes a part of the public record, will it not be a

4   violation of that patient's rights, HIPAA, for his name to

5   be included in the transcript?  It, of course, is

6   irrelevant to the case but, as a matter of rights, I

7   thought I would bring it to the Court's attention for

8   consideration."

9         So, now we know they're not spending their time on

10  a verdict.  Okay.  But to -- but to reassure the jurors,

11  it's my intent -- well, first of all, we would -- the

12  Court -- and we were going to take care of it after the

13  fact, but the Court would ask if the plaintiffs would file

14  a Notice Of Intent To Redact.  That will then freeze the

15  transcript in the public record.

16        And so I intend to -- and you can talk to Stacie

17  or Chris about that.  I intend to respond and to reassure

18  them so that perhaps they can get refocused, that we will

19  protect the record and, and the individual's identity in

20  the public record.

21        Those are the two -- this is probably the most

22  amazing note I've ever had.

23        So, I will write responses.

24        (Off the record.)

25        THE COURT:  Okay.  Both counsel have reviewed the

```
1    response -- responses.  My response to the juror's inquiry
2    regarding the telephone call?  I wrote:  "I will have the
3    marshal arrange for you to make the call."  And I signed
4    it and put the time of 1:35 p.m. on it.
5         The other note, I wrote:  "The Court will take
6    steps to protect the individual's identity in the public
7    record.  Thank you, Judge Yandle.  Time 1:35 p.m."
8         Okay.
9         (Court recessed from 1:38 p.m. to 4:15 p.m.)
10        THE COURT:  So, I just want to let counsel know
11   what my plan is.  I'm going to have Stacie go back and
12   just give the jurors a simple message, which is, if they'd
13   like to continue working, that's fine.  If they'd like to
14   recess for the day, that's fine.  I'm going to leave it up
15   to them.  So, I just wanted to let you guys know what,
16   what I was going to do.
17        Stacie, why don't you go back and give them that
18   simple message and see what they say.
19        (Off the record.)
20        THE COURT:  They're going to talk amongst
21   themselves and let us know in about 15 minutes.
22        (Court recessed from 4:21 p.m. to 4:45 p.m.)
23        (Notification of verdict at 4:45 p.m.)
24        (Proceedings continued in open court, plaintiff
25   and jury present.)
```

```
 1            THE COURT:  Ladies and gentlemen, I understand
 2   that the jury has reached a verdict.  Is that correct?
 3            FOREPERSON:  We have, Your Honor.
 4            THE COURT:  And who is the foreperson?
 5            FOREPERSON:  (Indicating.)
 6            THE COURT:  **** *********?
 7            FOREPERSON:  Yes.
 8            THE COURT:  Has the jury reached unanimous
 9   agreement on the verdict?
10            FOREPERSON:  We have, Your Honor.
11            THE COURT:  Okay.  Could you hand the forms to the
12   marshal, please?
13            Okay, I will now publish the verdict.  As to Count
14   1, excessive force, on Plaintiff Christopher Davis's claim
15   against Defendants Lucas Nanney, Tom Nordmann, Joshua
16   Rackley, and Terry Stewart, we find:
17            In favor of Plaintiff Christopher Davis and
18   against Defendant Lucas Nanney;
19            In favor of Plaintiff Christopher Davis and
20   against Defendant Tom Nordmann;
21            In favor of Plaintiff Christopher Davis and
22   against Defendant Joshua Rackley;
23            In favor of Plaintiff Christopher Davis and
24   against Defendant Terry Stewart.
25            As to Count 2, failure to intervene.  On Plaintiff
```

1   Christopher Davis's claim against Defendants Lucas Nanney,

2   Tom Nordmann, Joshua Rackley, and Terry Stewart, we find:

3           In favor of Plaintiff Christopher Davis and

4   against Defendant Lucas Nanney;

5           In favor of Plaintiff Christopher Davis and

6   against Defendant Tom Nordmann;

7           In favor of Plaintiff Christopher Davis and

8   against Defendant Joshua Rackley; and,

9           In favor of Plaintiff Christopher Davis and

10  against Defendant Terry Stewart.

11          We assess compensatory damages in the following

12  amount:  One dollar.  We assess punitive damages against

13  the following defendants, and in following amounts:

14          Against Defendant Lucas Nanney in the amount of

15  one dollar;

16          In favor of defendant -- I mean -- against

17  Defendant Tom Nordmann and in the amount of one dollar;

18          Against Defendant Joshua Rackley and in the amount

19  of one dollar; and

20          Against Defendant Terry Stewart, and in the amount

21  of one dollar.

22          It is signed by eight jurors and dated today's

23  date.

24          I will now poll the jurors.

25          (Whereupon, the jury was polled and the verdict

```
 1    rendered unanimous.)

 2          THE COURT:  I have now polled the jurors and we

 3    will enter judgment on the verdict.

 4          Ladies and gentlemen, we really want to thank you

 5    for your service.  I think everybody in this courtroom,

 6    certainly the Court, and I believe it's true for the

 7    parties and the attorneys, know how attentive you were

 8    throughout the course of trial.  We know how seriously you

 9    have taken your duties, and you have done exactly from the

10    Court's perspective exactly what was asked of you from the

11    time you walked in this courtroom.  And we appreciate it.

12    And so, on behalf of the United States District Court for

13    the Southern District of Illinois, again, we thank you for

14    your service.

15          I'm going to ask you to return to the jury room

16    just for a short minute and Miss Hurst will be back.

17    We're going to process you out and get you along the way.

18    Thank you very much.

19          (Jury excused.)

20          THE COURT:  Okay, and I -- before we break up, I

21    just want to, first of all, say to counsel, I appreciate

22    all of your professionalism, your civility, and the hard

23    work that all of you did.  And I always do -- I always

24    thank the AG's office.  I see them often.  And so I know

25    them and have an opportunity to talk to you guys a little
```

1   bit more often.

2        But I think even they agree that with respect to

3   recruited counsel, the one thing that always impresses me

4   in almost every case, with the exception of maybe on one

5   occasion I had a different feeling, but the fact that you

6   guys are recruited.  But if anybody didn't know that, they

7   would never know it.  Because it's obvious that you put

8   out the same amount of professionalism and you give it

9   your all like anybody else.

10        And in the system that we have, where we need

11   people like you to provide quality legal representation to

12   our pro se litigants, we really do appreciate it.  And it

13   makes it easier for the Court.  It makes it easier for the

14   AG's office when you guys do the kind of job that you do.

15   We really appreciate it.  Thank you so much.

16        I know that you guys want to inquire.  I got a

17   strong feeling that the answer is going to be no.  But I'm

18   going to ask them if they are willing to talk to you, and

19   then I'll send Nazia back in to let you know what they

20   say.

21        Thank you.

22        (Court adjourned at 4:57 p.m.)

23

24

25

1          <u>REPORTER'S CERTIFICATE</u>

2          I, Christine Dohack LaBuwi, RDR, RMR, Official

3    Court Reporter for the U.S. District Court, Southern

4    District of Illinois, do hereby certify that I reported

5    with mechanical stenography the proceedings contained in

6    pages 1-62; and that the same is a full, true, correct and

7    complete transcript from the record of proceedings in the

8    above-entitled matter.

9

10          DATED this 18th day of May, 2018,

11

12                          s/*Christine Dohack LaBuwi, RDR, RMR*

13                          _____
                            Christine Dohack LaBuwi, RDR, RMR

14

15

16

17

18

19

20

21

22

23

24

25