1

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF ILLINOIS

2

3  CHRISTOPHER NOVUS DAVIS,           )
                                     )
4                  Plaintiff,        )
   v.                                ) No. 3:13-cv-01260-SMY
5                                    )
   LUCAS NANNY, TOM NORDMAN, JOSH    )
6  RACKLEY, and TERRY STEWART,       ) Benton, Illinois
                                     )
7                  Defendants.       )

8

9

10            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                        DAY 1 OF 2
11
              BEFORE THE HONORABLE STACI M. YANDLE
12              UNITED STATES DISTRICT JUDGE

13                   December 9, 2019

14

15

16

17

18

19

20

21  REPORTED BY:      Christine Dohack LaBuwi, RDR, CRR
                      Official Court Reporter
22                    301 West Main Street
                      Benton, Illinois  62812
23                    (618) 439-7725
                      Christine_Dohack@ilsd.uscourts.gov
24
   Proceedings recorded by mechanical stenography, produced by
25  computer-aided transcription.

```
 1    APPEARANCES:

 2    FOR PLAINTIFF:        Julie Becker, Esq.
                            Christopher Batdorf-Barnes, Esq.
 3                          Daniel A. Spira, Esq.
                            SIDLEY AUSTIN LLP
 4                          One South Dearborn Street
                            Chicago, IL  60603
 5                          (312) 853-9203
                            julie.becker@sidley.com
 6                          cbarnes@sidley.com
                            dspira@sidley.com
 7
      FOR DEFENDANT:        Christine G. McClimans, Esq.
 8                          OFFICE OF THE ATTORNEY GENERAL
                            500 South Second Street
 9                          Springfield, IL  62706
                            (217) 782-1090
10                          cmcclimans@atg.state.il.us

11                          Robert Brandon Shultz, Esq.
                            OFFICE OF THE ATTORNEY GENERAL
12                          201 West Point Drive, Suite 7
                            Belleville, IL  62226
13                          (618) 236-8781
                            rshultz@atg.state.il.us
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2
                                              PAGE:
3
         Pretrial Matters                     4:1
4        Opening Statement by Ms. Becker      24:16
         Opening Statement by Mr. Shultz      30:7
5        Formal Instructions Conference by    38:10
         Stipulated Facts by the Court        57:6
6

7
     ALL WITNESSES:                           PAGE:
8
         CHRISTOPHER DAVIS for Plaintiff:
9        Direct Examination by Mr. Spira      58:13
         Cross-Examination by Ms. McClimans   85:6
10       Redirect Examination by Mr. Spira    99:11

11       AHMED TARIQ for Plaintiff:
         Direct Examination by Ms. Becker     100:10
12       Cross-Examination by Mr. Shultz      110:10
         Redirect Examination by Ms. Becker   118:8
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            (Proceedings began in chambers at 9:20 a.m.)

2            THE COURT:  Okay.  A couple of things.  So, I asked

3    Sona to give you guys a revised or an amended Final Pretrial

4    Order that will be filed.  And the only thing that was

5    changed really was the language of the Stipulations.

6            I don't think it's appropriate to inform the jury

7    that there was a previous jury trial.  That's not the point.

8    They just need to be informed that there has been a previous

9    determination, essentially, of liability.  And that the only

10   issue remaining in the case was any compensatory damages for

11   any injuries they find were directly caused by the acts of

12   the defendant.  So, that's pretty much what those

13   stipulations do.

14           The fifth -- the last added stipulation really came

15   from, I guess there's a proposed jury instruction that says

16   the Court takes judicial notice of an admission that the

17   plaintiff suffered from this condition.  It's a stipulation.

18   It's really not judicial notice of an admission, so I

19   incorporated that.

20           As I understand it, there are two witnesses, the

21   plaintiff and Dr. Ahmed --

22           MR. SPIRA:  Dr. Tariq.

23           THE COURT:  Will he be live?

24           MR. SPIRA:  Yes.

25           THE COURT:  And then I have been informed that there

1    is some other issue that you want to take up.

2         MR. SPIRA:   There is one issue we wanted to take up

3    just because it may impact the -- our openings, and that

4    relates specifically to, obviously, we know this is limited

5    to damages but I wanted to clarify one thing with regard to

6    that scope.  And Chris is going to explain that in detail.

7         MR. BARNES:   So, as is by pretrial order, punitive

8    damages remain an issue in this case, and it's our intent to

9    present evidence to carry our burden on punitive damages

10   requiring malice.

11        In the first trial, you specified, in denying

12   Defendants' Rule 50 motion, that certain evidence presented

13   at that trial was relevant on the issue of punitive damages.

14   Specifically, the video evidence that was presented in the

15   first trial as being circumstantial evidence.

16        THE COURT:   What video evidence?  I don't remember.

17        MR. SPIRA:   Sure.  So, there was a -- there's a

18   video of the defendants closing the door into the area where

19   Mr. Davis says this incident happened.  And there's evidence

20   -- video evidence of, I believe it's 11 or 12 staff

21   following him in handcuffs into a restraint room.

22        When defendants moved for a Rule 50 judgment on the

23   issue of punitive damages, Your Honor held that video

24   evidence as well as the circumstances of the incident as Mr.

25   Davis described them were probative of punitive damages.

1   And we just wanted to clarify that, so there's no confusion

2   if -- if -- some of that evidence, we'd like to present in

3   opening, but wanted to make sure everyone was on the same

4   page so there's no, no interruptions and we're all on the

5   same page in terms of --

6          MS. BECKER:  Your Honor held that this was

7   circumstantial evidence of punitive damages that the jury

8   could or could not choose to believe at the end of the day.

9          THE COURT:  Okay.  So, this is a trial on damages

10  only.  The plaintiff certainly is entitled to put on

11  evidence to support compensatory as well as punitive

12  damages.  That necessarily gets into the facts and

13  circumstances surrounding the incident and the injuries.

14         Obviously, that can get into a cloudy line because

15  liability is not an issue.  We're not relitigating

16  liability.  That said, you have to get -- the plaintiffs

17  have to be able to get, to some degree, into the conduct and

18  the mindset or what are those circumstances to establish

19  punitives.  So, there's no question about that.  The only

20  question is:  How far do you get to go in presenting

21  evidence and how far do the defendants get to go in

22  defending against that evidence.

23         I can't preemptively draw those lines with a crayon

24  before we start.  What I can do is rely on counsel to

25  understand that there is a limitation and to proceed in good

1    faith based on the parameters of this case.

2          So, if you are asking me, will you be able to put in

3    the video -- explain what's on that video again?

4          MR. SPIRA:  It's the video --

5          THE COURT:  Because it sounds like that video --

6    well, obviously, that video went to liability, as well.

7          MR. SPIRA:  Correct.  I think -- and our position

8    is, it went to both.

9          THE COURT:  What's on the video?

10         MS. BECKER:  It's a video blocking the door.

11         THE COURT:  Wait.  Hold on.  We have one person.

12         MS. BECKER:  Oh, excuse me, Your Honor.

13         THE COURT:  We got one person.  Somebody decide

14   who's going to address this.

15         MR. SPIRA:  Sure.  I can describe the video, Your

16   Honor.  So, there's two videos that were admitted last time

17   at trial.  The first one shows a view into the area where

18   Mr. Davis says this incident happened.  Immediately before

19   the incident occurs, according to Mr. Davis, a defendant

20   comes up and blocks the view into that area.  It's his

21   contention that that showed ill will and malice and this was

22   a premeditated event.

23         The second video shows Mr. Davis in handcuffs being

24   escorted by defendants and others at Chester into a

25   restraint room, where Mr. Davis will say he was

1    unnecessarily tied down to a bed.  So this is -- you could

2    -- this is during the incident, in effect, and shows the 12

3    of them following him.  That was the video that Your Honor

4    specifically determined last time went to the issue of

5    punitive damages and was sufficient for that issue to reach

6    the jury.

7            THE COURT:  Miss McClimans?

8            MS. McCLIMANS:  Thank you, Your Honor.

9            Just because Your Honor found that there was a Rule

10   50 motion that should be denied because there was

11   circumstantial evidence to show punitive damages, that

12   doesn't necessarily mean that they can reference a judge's

13   ruling.  I don't know if that's what they want to do.

14           THE COURT:  No.  They're just talking about being

15   able to show the videos.

16           MS. McCLIMANS:  Okay.  And as far as being able to

17   show the video, now that we, we are barred from putting on

18   any evidence at all, I think --

19           THE COURT:  Well, that -- don't mix it.  You are

20   barred because of your own conduct.  That doesn't limit --

21   that doesn't limit relevant evidence simply because you are

22   barred by Rule 37.

23           MS. McCLIMANS:  Well, we don't have a problem with

24   them putting on the video.

25           THE COURT:  Yes.

1          MS. McCLIMANS:  But as far as them referencing

2     punitive damages by what the defendants did or did not do, I

3     think it's improper to just -- it's fine to put the video

4     in.  But I think to reference any prior ruling, which is

5     what it sounded like you were doing --

6          THE COURT:  No.

7          MS. McCLIMANS:  Okay.

8          THE COURT:  Miss McClimans, let me explain.  If the

9     plaintiffs -- as I understand it, the plaintiffs are simply

10    saying these videos are relevant because they are relevant

11    to the question of punitive damages.

12         MS. McCLIMANS:  I see that.

13         THE COURT:  They go to show malice.  I believe

14    that's all they're saying.

15         I agree that, based on what's represented that's on

16    the videos and my recollection, those are certainly relevant

17    and material to the question of whether there was any

18    malice, what have you, and it -- it's relevant for that

19    purpose.  And because of that, I believe they come in.

20         And what is probably appropriate is that the Court

21    will then give the jurors a limiting instruction that tells

22    them for what purposes they can consider this evidence.

23         Having -- so that's, that's where we are.  And I'm

24    -- I guess I'm not sure what your -- what the defendants'

25    stated position is.

1        MS. McCLIMANS:  No.  I just brought that up because

2   they referenced the denial of the Rule 50 motion, so I just

3   threw it out there.

4        THE COURT:  They were just refreshing my

5   recollection as to what videos they were referring to.

6   That's the way I understood it.

7        MS. McCLIMANS:  Right.

8        MR. SPIRA:  That's --

9        THE COURT:  The Court is not going to -- there will

10  be no reference to previous rulings other than the fact that

11  the Court has previously determined this -- "this."  There's

12  going to be no reference to a previous jury, previous

13  verdict, previous anything, so that's -- that's that.

14        MR. SPIRA:  Understood.

15        MS. McCLIMANS:  Your Honor, would that include the

16  ruling that the defendants are barred from putting on

17  evidence?

18        THE COURT:  Yeah.  The jury doesn't get to know any

19  of that.

20        MS. McCLIMANS:  Okay.

21        THE COURT:  Yeah, that would be -- that's not

22  something that comes in front of the jury.

23        MS. McCLIMANS:  Okay.

24        THE COURT:  And that won't come in front of the jury

25  from the Court.  The plaintiffs will be prohibited, and

1    certainly the defendants will be prohibited from, in any

2    way, stating or insinuating that they have been prohibited

3    from presenting evidence -- I mean, presenting witnesses.

4    That should not come up at all.  It is totally irrelevant.

5           Having said that, I base -- I looked at the jury

6    instruction situation, and I think there is not a whole lot

7    -- I mean, there's -- it shouldn't take us long to work out

8    what's the issues.  The issues are, basically have to do

9    with what the jury will be instructed in terms of the

10   damages.  I mean, that's really what's at stake.  Most of

11   the other ones are admitted to.

12          So, of course, given the short -- how long do you

13   guys anticipate the doctor's -- the testimony?  How long do

14   you think it will take to put on your case?

15          MR. SPIRA:  I think -- I think the plaintiff's

16   testimony will be roughly a half hour.  I think the doctor

17   will be --

18          MS. BECKER:  15 minutes.

19          MR. SPIRA:  -- 15, 20 minutes?

20          THE COURT:  So -- and then, of course,

21   cross-examination.

22          So, what I really think is that we will get the

23   evidence on.  At that point, I will probably give the jury,

24   depending on where you are, a fairly long or extended, to

25   some extent, lunch, so that we can work out these

1    instructions and get them ready.

2         There's no reason for us to take this case into

3    tomorrow.  We should get this case to the jury today.  But I

4    don't like to have them sitting around here.  So, what we'll

5    do is, we'll go ahead and get started.  We'll get the

6    evidence on and decide -- and see where we are and how long

7    we want to excuse them for.

8         And then I'll give everybody a little bit of time to

9    go grab something to eat and then we'll work on the jury

10   instruction conference and then get the instructions ready.

11        But, yeah, there's no way we shouldn't finish this

12   case today.  I think there's some weather approaching

13   tomorrow, too, so there's no reason to stretch this out.

14        Anything else we need to take up before voir dire?

15   I did incorporate some, most of the plaintiff's proposed

16   voir dire questions.  Some of them were duplicative of what

17   I was already asking.  I'm not going to ask the military

18   question.  I don't know what the relevance is.

19        MR. SPIRA:  That's -- okay.

20        THE COURT:  So, I mean, if we were doing a

21   full-blown voir dire where everybody got to ask and explore

22   all of that, I get that.  But in these cases, it's a little

23   bit more limited and narrow, so I don't -- we're not really

24   exploring attitudes in that way.

25        Okay.  Anything else?

1        MS. McCLIMANS:  I have something else.

2        THE COURT:  Yes.

3        MS. McCLIMANS:  Your Honor?  I would just like to

4   make a record pursuant to the Court's ruling at the final

5   pretrial conference.  The defendants were barred from

6   presenting witnesses at trial.

7        THE COURT:  I mean, are we going to beat this -- the

8   record -- it is so reflected in the record, Miss McClimans.

9   Let's not beat this horse.

10        MS. McCLIMANS:  All I want to do is request that we

11   be allowed to offer redacted transcripts of the defendants,

12   for the defendants' case.

13        THE COURT:  No.

14        MS. McCLIMANS:  Okay.

15        THE COURT:  Anything else?  (Pause.)  The defendants

16   are here, aren't they?

17        MS. McCLIMANS:  They are here, yes.

18        THE COURT:  Why wouldn't -- okay, then no is

19   sufficient.

20        Okay.  Anything else?  (Pause.) Okay.

21        (Court recessed from 9:35 a.m. to 9:45 a.m.)

22        (Proceedings continued in open court, plaintiff

23   present; venire panel present.)

24        THE CLERK:  The Court calls Case No. 13-CV-1260,

25   *Davis versus Department of Human Services, et al.*  This

1  matter is called for day one of jury trial.

2      Would the parties please state your presence for the

3  record?

4      THE PLAINTIFF:  Christopher Davis.

5      MR. SPIRA:  Daniel Spira on behalf of Christopher

6  Davis.

7      MS. BECKER:  Julie Becker on behalf of Christopher

8  Davis.

9      MR. BARNES:  Christopher Barnes on behalf of

10  Christopher Davis.

11      MS. McCLIMANS:  Kay McClimans on behalf of Lucas

12  Nanny, Tom Nordman, Josh Rackley, and Terry Stewart.

13      MR. SHULTZ:  Brandon Shultz on behalf of the

14  defendants.

15      DEFENDANT NANNY:  Lucas Nanny.

16      DEFENDANT STEWART:  Terry Stewart.

17      DEFENDANT RACKLEY:  Josh Rackley.

18      THE COURT:  Thank you.

19      Good morning, ladies and gentlemen.  My name is

20  Staci Yandle and I'm the District Judge who will be

21  presiding over this trial today.  I want to introduce you to

22  some other people in the courtroom who will be assisting me

23  throughout the course of trial.  Christine Dohack LaBuwi is

24  my court reporter, Stacie Hurst is my courtroom deputy, and

25  Sona Patel over there in the corner is my law clerk.

1          We also will have court services officers in and out

2    -- well, in the courtroom at all times, actually.

3          You have been called in the courtroom to be

4    questioned this morning concerning your qualifications to be

5    jurors in this case.  The name of the case is *Davis versus*

6    *the Department of Human Services*.

7          This is a civil case in which the plaintiff has

8    brought a lawsuit against the defendants claiming a

9    violation of a right or duty.  The plaintiff is seeking

10   monetary damages.  Parties in a civil matter have a right to

11   a fair trial, an accurate trial, and a timely trial in

12   accordance with the law.  And you are here today as a panel

13   of prospective jurors from which eight of you will be

14   selected to serve as jurors in this case.

15         Now, how many of you have served on a jury before?

16   (Pause.)  Not many of you.  All right.

17         So, I want to talk to all of you a minute about jury

18   service generally.  I know that many of you, if not all of

19   you, may be somewhat nervous about the process of jury

20   selection and the prospect of ultimately serving on a jury.

21   Some of you may also feel that jury service is inconvenient

22   and an unfair intrusion into your daily life.  I understand

23   those feelings.  But whatever your feelings may be at this

24   point, I hope you also understand that jury service is a

25   high responsibility of citizenship.  Many people, including

1    myself, believe that in terms of the responsibility of

2    citizenship, jury service is equated with military service

3    and the right to vote.  And that's because it's one of the

4    very few ways that average citizens such as yourself can

5    meaningfully participate in our form of democracy.

6              Some day, you or someone close to you may want to

7    bring a civil lawsuit or, unfortunately, you may be sued by

8    someone else.  Or someone close to you may be charged with a

9    crime, or you may be -- hopefully not -- but the victim of a

10   crime.  In other words, you may either voluntarily or

11   involuntarily find yourselves involved in the judicial

12   system and end up as a party in a jury trial.

13             Should this happen, I know you would expect the

14   jurors selected to decide your case to recognize and accept

15   the importance of their public service and to discharge

16   their responsibilities accordingly, and that's what the

17   parties in this case are asking from you today.

18             So, what are jurors' responsibilities?  They're the

19   same in every case, regardless of whether the case is a

20   civil case or a criminal case:  First, to listen and

21   consider all of the evidence with an open mind; second, to

22   apply the law which the judge says is applicable, whether or

23   not the juror personally agrees with the law; and third, to

24   decide the issues only on the evidence, the applicable law

25   and, of course, your common sense.

1          A person who can live up to these responsibilities

2     is thought to be a fair and impartial juror, that is, a

3     person who can give both sides a fair trial.

4          Those persons selected as jurors in effect become

5     the judges of the factual issues.  That is, the jurors judge

6     what evidence is most believable and persuasive based on the

7     testimony of witnesses and other evidence which is received

8     for the jury's consideration.

9          My job as the judge is different.  It is my

10    responsibility to determine what evidence is admissible, to

11    outline for the jurors the factual issues for decision, and

12    to instruct the jurors on the law that applies to the

13    particular case and how they are to apply that law to the

14    facts.

15         Obviously, not every person is right to be a juror

16    in every case.  And the only way to determine who will be

17    appropriate jurors for this case or any case is to learn

18    something about the people who have been called for jury

19    service.  We do this by questioning the jurors as a group on

20    various subjects.  I'm sure you will appreciate why this is

21    necessary and I won't dwell on it, except to say:  We will

22    and do depend on your truthful and candid answers to all of

23    the questions.

24         I want to tell you something about the trial of a

25    civil case.  The one who brought the lawsuit in a civil case

1    is known as the plaintiff.  And in this case, the plaintiff

2    is Christopher Novus Davis, who you met earlier.

3         The plaintiff in this case is being represented by

4    Daniel Spira, Julie Becker, and Christopher Barnes, who also

5    introduced themselves to you.

6         The one against whom the lawsuit is brought is known

7    as the defendants.  And in this case, we have multiple

8    defendants.  They are being -- in this case, they are Lucas

9    Nanny, Tom Nordman, Josh Rackley, and Terry Stewart.

10   They're all being represented by Christine McClimans and

11   Robert Brandon Shultz.

12        This is a civil rights action in which the Court has

13   previously determined that on December 26, 2011, the

14   defendants subjected the plaintiff to excessive force and

15   failed to intervene to prevent the use of excessive force on

16   the plaintiff, in violation of the Fourteenth Amendment to

17   the United States Constitution.  So, the issue to be decided

18   in this case now is the amount of money that will fairly

19   compensate plaintiff for any injury he sustained as a direct

20   result of the defendants' actions.

21        Now again, in order to determine your

22   qualifications, I will ask you all as a group, and I may ask

23   some individual follow up questions, again, to determine

24   your qualifications to sit as jurors in this case.  You

25   should not consider any questions that I ask as an attempt

to pry into your personal life.  None of the questions I

will ask you are intended to embarrass any of you in any

way.  All of the questions are designed to give the

attorneys an opportunity to know a little something about

each of you so that they can make a more considered judgment

in this case.  Questions are asked, for instance, to find

out whether any individual on the panel has any personal

interest in the case or knows of any reason why you could

not render an impartial verdict.

We also want to know whether any of you are related

to or personally acquainted with the plaintiff, the

defendants, their lawyers, or any witnesses who may testify

during trial.  Other questions will be asked to determine

whether any of you have any feelings that might influence

you in rendering a verdict and, in particular, might prevent

you from rendering a fair and impartial verdict.  Again, I

ask that you be absolutely candid and honest in your answers

and your responses to all of the questions.

If I ask a question that any of you would prefer not

to answer in open court, but it touches on something very

personal and private, let me know.  I will bring you up to

the side bench with the lawyers and deal with the question

there.

So, at this time I'm going to ask all of you to

please stand and raise your right hand to be sworn by Miss

1   Hurst.

2          (Subsequent to voir dire, proceedings continued in

3   open court, plaintiff present; jury present.)

4          THE COURT:  Okay, I'm going to ask that you remain

5   standing to be sworn in.

6          (Jury sworn by clerk.)

7          THE COURT:  You may be seated.

8          Okay.  We are about to begin the trial of the case

9   that you heard about during jury selection.  Before trial

10  begins, I'm going to give you a few instructions that will

11  help you to understand and that will be presented to you --

12  I'm sorry -- that will help you to understand the evidence

13  that will be presented to you and how you should conduct

14  yourselves during trial.  Soon, you will hear the lawyers'

15  opening statements in which they will explain to you the

16  issues in the case and summarize the facts that they expect

17  the evidence will show.  Then, witnesses will be called to

18  testify under oath and evidence will begin.  The witnesses

19  will be examined and cross-examined by the attorneys.  After

20  the evidence is in, the attorneys will have the opportunity

21  to make final arguments.

22          The opening and final statements made by the

23  attorneys are not to be considered as evidence in the case

24  or as your instructions on the law.  Nevertheless, these

25  statements and arguments are intended to help you properly

1   understand the issues, the evidence, and the applicable law,

2   so you should give them your close attention.  Before the

3   final arguments by the attorneys, I will give you the

4   instructions on the law.

5        You should give careful attention to the testimony

6   and the other evidence as it is received and presented for

7   your consideration, but you should not form or express any

8   opinion about the case until you have received all the

9   evidence, the arguments of the attorneys, and the

10  instructions on the law from me.  In other words, you should

11  not form or express any opinion about the case until you

12  retire to the jury room to consider your verdict.

13       From time to time, the lawyers and I may have

14  conferences off to the side and out of your presence.  You

15  should not let those conferences bother or annoy you in any

16  way, no matter how often they take place.  During these,

17  what we call sidebars, court remains in session, so I ask

18  that you not talk among yourselves during those times.

19       The lawyers are trained in the rules of evidence and

20  trial procedure.  It is their duty to make objections they

21  feel are proper.  When a lawyer makes an objection, I will

22  either overrule the objection or sustain the objection.  If

23  I overrule the objection to a question, the witness will

24  still answer the question.  If I sustain an objection, the

25  witness will not answer the question, and you must not

1    speculate on what might have happened or what the witness

2    might have said had I permitted them to answer the question.

3    You should not draw any inference from the question itself.

4         I also ask that you not have any contact with the

5    lawyers in this case or with any of the parties and

6    witnesses.  That includes any exchange of words or

7    pleasantries.  I have asked the lawyers not communicate with

8    you, so if you see them around the courthouse and they don't

9    acknowledge you and they don't speak, they are not rude.

10   They actually are fairly mannerable individuals, but they

11   are following my instructions.  And I'm sure you understand

12   why that's necessary; we want to make sure there is no

13   chance of improper influence of the jurors.

14        You, as jurors, must decide this case based solely

15   on the evidence presented within the four walls of this

16   courtroom.  This means that during the trial you must not

17   conduct any independent research about the case, the matters

18   in the case, the individuals or organizations involved in

19   the case.  In other words, you should not consult

20   dictionaries or reference materials, search the internet,

21   websites, blogs, or use any other electronic tools to obtain

22   information about this case or to help you decide the case.

23   Please do not try to find out any information from any

24   source outside the confines of this courtroom.

25        Until you retire to deliberate, you also may not

1    discuss this case with anyone, even your fellow jurors.

2    After you retire to deliberate, you may begin discussing the

3    case with your fellow jurors, but you cannot discuss the

4    case with anyone else until you have actually returned a

5    verdict and the case is at an end.

6          In terms of your electronic devices, cell phones,

7    Blackberries, iPhones, the internet and other tools of

8    technology, you must not talk to anyone about this case or

9    use those tools to communicate electronically with anyone

10   about the case.  This includes your family and friends.  You

11   may not communicate with anyone about the case on your cell

12   phone, through e-mail, text messaging, or on Twitter,

13   through any blog or website, through any internet chat room,

14   or by way of any other social networking websites, including

15   Facebook, LinkedIn and YouTube.

16         You have a right to take notes during the course of

17   this trial if you choose to do so.  We have provided

18   notepads for your convenience.  No one else will be allowed

19   to look at your notes.  You do not have to take notes.  That

20   is entirely up to you.  I have no preference one way or the

21   other.  You may use your notes to refresh your memory at the

22   appropriate time.  Your notes are for your own use only, and

23   not for any other juror's use.  Do not show them to anyone

24   at any time; and that includes your fellow jurors, and it

25   includes at the time when you are deliberating for your

1    verdict.

2         You should rely on your own memory of the evidence.

3    If your notes conflict with what you remember or if someone

4    else's notes conflict with your memory, you are free to use

5    your own memory of the evidence.  Just because a juror has

6    taken notes does not mean that his or her memory of the

7    evidence has any more weight or impact than the memory of a

8    juror who has not taken notes.

9         At the end of the trial, when you are discharged

10   from further service in this case, the notes will be

11   collected by Miss Hurst and they will be destroyed.  No one

12   will be allowed to look at the notes before they are

13   destroyed.

14        And with that, we are prepared to proceed with

15   opening statements on behalf of the plaintiff, first.

16        MS. BECKER:  Good morning, members of the jury.  My

17   name is Julie Becker, and this is my team:  Dan Spira and

18   Chris Barnes.  And this is our client, Chris Davis.

19        In 2011, Chris was just 20 years old when he was a

20   patient at Chester Mental Health facility.  The four

21   defendants were Security Therapy Aides at Chester, or STAs.

22        Now, there has already been a finding of liability

23   in today's case.  There has already been a finding that the

24   defendants committed excessive force against my client and

25   failed to intervene while others committed excessive force.

1    Those constitutional violations have already been decided.

2        The only thing for you to do in today's trial is to

3    determine how much in damages Chris should be awarded for

4    the pain and emotional suffering that he was caused from the

5    defendants' attack.

6        The evidence will show that Chris is entitled to two

7    types of damages today:  The first is compensatory damages,

8    or the amount of money needed to compensate him for any

9    physical or emotional harm; the second type of damage is

10   punitive damages.  Punitive damages are meant to punish the

11   defendants for their actions.  To show punitive damages, we

12   will show you that the defendants acted maliciously and

13   recklessly.  We will show you that they did not care about

14   Chris's safety.  They simply wanted to injure him.

15       Let's walk through the events in 2011 that show just

16   how malicious the defendants' conduct was.

17       On December 22nd, 2011, Chris arrived as a patient

18   at Chester Mental Health.  Four days later, on December 26,

19   2011, he was in the dining hall for the first time.  And

20   when he sat down in the dining hall, he realized that he

21   forgot to get a glass of milk.  This was breakfast time.

22   So, he stood up.  As soon as he stood up, the staff member

23   started screaming at him to sit down.

24       Before I tell you exactly what they said, I want to

25   warn you, there is some difficult and offensive language in

1    today's trial.  I wish we could avoid it, but we have to

2    tell you what the evidence will show.  The evidence will

3    show that one staff member yelled, "I don't feel like

4    dealing with you stupid, retarded motherfuckers today.  Do

5    you want to be tied down?"

6            Chris was shocked.  He was caught off guard.  The

7    staff members then put his hands behind his back, handcuffed

8    him, and forced him out of the dining hall.

9            Two of these staff members were two of the

10   defendants sitting here today.  Now, the staff members took

11   him to an area of the facility called the stem.  The stem is

12   essentially a hallway.  You'll see the stem behind those two

13   open doors.  You can see in this video clip that it says

14   "stem door" from the camera.  It says "December 26,

15   2011," the date that Chris was attacked.  And it says

16   "7:49 a.m."  Chris will tell you that was soon after -- that

17   was during breakfast time at Chester.

18           I'm going to play a video for you.  And before I do,

19   I want to tell you what to look for.  At 7:50:35, in this

20   video, one of the defendants, Josh Rackley, will come out

21   from behind those doors; say something to an individual

22   vacuuming.  A few seconds later, the individual will shut

23   the right-hand door.

24           You will learn that by shutting that right-hand

25   door, it blocks our view into the stem, which is exactly

1    where Chris alleges the accident -- or the attack took

2    place.

3              (Video playing.)

4              You can see that there's an individual vacuuming and

5    you can see that Josh Rackley, sitting right there, says

6    something to the individual.

7              (Video playing.)

8              He then closes one of the doors, not both; locks it

9    at the bottom.

10             (Video playing.)

11             Chris will tell you that, if that door is closed,

12   those walking by it cannot see into the stem.  And more

13   importantly, the camera does not show what happened behind

14   those doors.

15             Let's walk through what Chris will tell you

16   happened, out of sight from any cameras.  He'll tell you

17   that once they were in the stem, Defendant Stewart put him

18   down in a chokehold, yanked him to the ground; the defendant

19   started punching and beating him.  Defendant Nanny then

20   started choking him and yelling, "I will kill you,

21   motherfucker."  Chris was then turned onto his stomach --

22   remember he is handcuffed -- and punched and kneed in the

23   face.

24             I'd like you to visualize this with me.  There are

25   four Security Therapy Aides around Chris.  He is face down

on the floor, handcuffed behind his back.  He cannot defend himself.

Eventually, after what felt like forever to Chris, he was yanked off the floor and forced into what's called a restraint room.  Now, in this restraint room, Chris was tied by both of his wrists and both of his ankles in leather straps to the bed.  He was left there for hours.  Chris will tell you that he was scared.  He was all alone.  His face hurt.  His body throbbed.  And he did what any 20-year-old would do.  He cried.

The next day, there were photographs taken of Chris. Here is one of those pictures.  You can tell that his eyes are bloodied.  That's called subconjunctival hemorrhaging. His eyes did not look like that before the attack.

In addition to Chris's testimony about what happened, you'll also hear from a Dr. Tariq.  Dr. Tariq will testify to the injury report that he wrote about Chris the day following the attack.

Dr. Tariq will walk you through his observations:

First, that Chris reports that he was hit by the staff members;

Second, that he observed conjunctival redness present bilaterally.  That means bleeding in both eyes;

He'll say that he observed periorbital tenderness, or tenderness around the eyes;

1        He also observed swelling in the left wrist and

2   swelling behind Chris's left ear.

3        Most importantly, he says that Chris alleged

4   physical abuse by the staff and that there was physical

5   evidence present, as above.  Physical evidence present of

6   the abuse that Chris alleged the staff members did.

7        And the defendants admit that Chris suffered

8   injuries after the attack.  They admit that plaintiff

9   suffered subconjunctival hemorrhaging following the

10  incident.

11       Chris will tell you that his injuries are not only

12  physical but emotional.  After this incident, he's had

13  nightmares.  He wakes up sweating with his palms -- his

14  palms sweating and he has flashbacks of the attack.

15  Whenever an authority figure approaches him, he gets

16  nervous; he's not sure what's going to happen.

17       This was not just a schoolyard brawl.  This was a

18  malicious abuse of power by Security Therapy Aides against a

19  mental health patient, whose job it was to keep him safe.

20       There has already been a finding that the defendants

21  violated my client's constitutional rights by using

22  excessive force against him and failing to intervene while

23  others used excessive force.  The only thing for you to

24  decide is how much Chris should be compensated for the

25  physical pain and mental suffering that he experienced.  How

1   much the defendants should be punished to ensure that they

2   are held accountable for their actions.

3          Last, I want to thank you for your service as

4   jurors.  I know it's not easy being kept away from your busy

5   lives to be here, but we appreciate you taking the time.

6          Thank you.

7          MR. SHULTZ:  Good morning, ladies and gentlemen of

8   the jury.  My name is Brandon Shultz.  And along with my

9   co-counsel, Miss Kay McClimans, we represent the defendants

10  Lucas Nanny, Josh Rackley, Terry Stewart and Tom Nordman.

11         On December 26, 2011, almost eight years ago now,

12  plaintiff was removed from the cafeteria at Chester Mental

13  Health hospital and brought to the patient restraint room

14  after he violated facility rules and cursed at the

15  employees.

16         As opposing counsel said, your purpose in this case

17  is limited to only determining what compensation, if any,

18  plaintiff should be awarded.  There have not been any

19  findings of what damages, if any, were caused by the

20  excessive force.  And also remember that the defendants'

21  admission said that the subconjunctival hemorrhaging

22  occurred following the incident, not during.

23         Plaintiff's version of events is that the defendants

24  brutally beat him after he was removed from the cafeteria.

25         THE COURT:  Counsel, please approach.

1          (Proceedings continued at the bench, outside the

2     hearing of the jury.)

3          THE COURT:  Mr. Shultz, I find it necessary to give

4     you a warning already.  Number one, you made a comment in

5     your opening statements about actions of -- alleged actions

6     of Mr. Davis before this incident.  I have already told you

7     that wasn't relevant.  There's going to be no evidence of

8     his actions because it's not relevant.  That's a problem.

9     We talked about this already.

10         We talked about this at the final pretrial, when you

11    said you wanted to present testimony on that very issue.  I

12    told you that was out of bounds.  So, since you couldn't

13    present a witness on it, you decide to just make a statement

14    to the jury?

15         MR. SHULTZ:  No.

16         THE COURT:  You did.  Now, number two, you're

17    talking about plaintiff's version of the events.  I'm going

18    to give you some leeway because there is a question.  I

19    mean, you get to talk about the version as it relates to how

20    he sustained injuries.

21         Mr. Shultz, I need to warn you:  I'm not giving you

22    any latitude to relitigate the liability in this case

23    through the front door or the backdoor, and I will impose

24    appropriate sanctions should you try to do it.

25         MR. SHULTZ:  I have no other mentions of the

1   defendants' conduct.

2        THE COURT:  Can I ask you a question?

3        MR. SHULTZ:  Yes, Your Honor.

4        THE COURT:  After the discussion we had at the final

5   pretrial, why would you stand up at that podium and talk

6   about allegedly what Mr. Davis's conduct was before this

7   incident that he cursed somebody?  We had this discussion,

8   did we not?

9        MR. SHULTZ:  I --

10       THE COURT:  I made a specific ruling.

11       MR. SHULTZ:  Yes, Your Honor.  You said that we

12  could not present any evidence about --

13       THE COURT:  So, you can't present evidence so you're

14  just going to blurt out a statement?  You think there's a

15  difference?

16       MR. SHULTZ:  No, Your Honor.

17       (Proceedings continued in open court, plaintiff

18  present; jury present.)

19       THE COURT:  The jury will disregard any statements

20  made by counsel as to any alleged conduct by Mr. Davis

21  before the excessive force incident, as it is irrelevant and

22  immaterial.

23       MR. SHULTZ:  Plaintiff's version of events is that

24  the defendants brutally beat him after he was removed from

25  the cafeteria and before he was brought to the patient

1    restraint room.

2         Plaintiff will claim that:  Lucas choked him

3    multiple times, making it hard for him to breathe; that Josh

4    repeatedly kneed him in the face; that Terry violently hit

5    him in the genitals, and twisted him in the ankles; and that

6    Tom beat him throughout his torso and head.

7         The plaintiff will claim that this incident caused

8    serious injury, but the evidence will not back up those

9    claims.  Dr. Ahmed Tariq examined plaintiff on December 27,

10   2011, the day after plaintiff was brought to the patient

11   restraint room.  During this examination, Dr. Tariq

12   completed a mental health injury report.

13        Dr. Tariq observed:  Redness in the eyes; slight

14   swelling behind plaintiff's left ear; swelling in his left

15   wrist; and tenderness was reported around plaintiff's eyes.

16        What Dr. Tariq's report will not show is any

17   indication of injuries to plaintiff's ankle, genitals, or

18   torso.

19        You'll also have the opportunity to view pictures of

20   plaintiff's neck, head, wrists, and eyes, that were taken

21   approximately 24 hours after the event.  In those pictures,

22   you will see that plaintiff does have redness in his eyes;

23   however, you will not be able to determine any markings on

24   plaintiff's neck or head.

25        The evidence will show the only injuries ever

1  reported or observed by a medical professional were redness

2  of the eyes, swelling in his left wrist, slight swelling

3  behind his left ear, and tenderness around his eyes, all

4  reported by Dr. Tariq.

5       Dr. Tariq only prescribed Tylenol after seeing these

6  injuries.  He did not prescribe ice, rest, or any further

7  emergency care.  You will hear that the redness resolved

8  itself within weeks, and that all other injuries resolved

9  themselves soon thereafter.  No long term injuries have been

10 reported due to this incident.

11      Now, after all the evidence is brought before you,

12 we will ask that you return a verdict of nominal

13 compensatory damages and no punitive damages.

14      The defendants ask you to make an inference that

15 that video showed malice towards the defendant.  We would

16 ask you to make an inference that that video showed trained

17 Chester Mental Health staff taking necessary safety

18 precautions when an incident is occurring.

19      Thank you.

20      THE COURT:  Okay.  So, ladies and gentlemen, we're

21 going to -- I'm going to let you go early for lunch so we

22 can do some work.  And when you come back, you will hear the

23 evidence and then we'll be able to go right into closing

24 arguments and get the case to you, as opposed to having a

25 break in the middle and having you sit here.  So, we're

1   going to be in recess until 1:30.

2          Please do not discuss the case amongst yourself or

3   with anyone during the recess, and I'll see you back here at

4   1:30.

5          (Proceedings continued in open court, plaintiff

6   present; jury not present.)

7          THE COURT:  Counsel, be seated for a second.  Before

8   we break -- let me say this and let's go over this one more

9   time.  I'm really trying to be patient this morning.  I

10  assured myself when I left my home that I was going to be

11  patient; I was not going to allow myself to be annoyed or

12  frustrated.

13         Mr. Shultz, you have pushed that in about five

14  minutes.

15         We are not going to be dealing with semantic sleight

16  of hand today.  Nominal damages are not appropriate in this

17  case.  They're not an issue in this case.  And whether you

18  choose to call them nominal compensatory damages or not,

19  that's an issue that's been decided by this Court.  Nominal

20  damages are only appropriate if the jury finds no monetary

21  value.

22         We already said that's out of this case, have we

23  not?

24         MR. SHULTZ:  Your Honor, you did say after the

25  evidence presented to the previous jury that nominal damages

1   was not appropriate.  But the evidence is not being

2   presented to this jury and they would still have -- should

3   still have the option to have nominal damages be an option

4   to award.  That's our -- that's our...

5           THE COURT:  Nominal damages, I believe the Court has

6   already ruled, are not appropriate in this case, but let me

7   check.  Because I want to keep this straight.

8           Because for some reason, I feel like you're trying

9   to play fast and loose, Mr. Shultz, and I have -- as you can

10  tell -- I have absolutely no patience for that.

11          MR. SHULTZ:  No.  No, Your Honor.  I apologize.  I

12  am not trying to pull one over on the Court at all.

13          THE COURT:  Okay.  So, hold on for one second here.

14          (Pause.)

15          What's the plaintiff's position on this?  I believe

16  -- and Mr. Shultz may be correct -- the jury still has to

17  make a determination absent -- I mean -- despite liability,

18  what's left to be determined are whether or not Mr. Davis is

19  entitled to compensatory -- first, compensatory damages for

20  any injuries that the jury finds are directly related or

21  directly caused by the conduct.  So, causation has not been

22  determined.

23          To that extent, why wouldn't the question of whether

24  or not plaintiff still has to prove compensatory damages?

25  And if the plaintiff does not prove compensatory damages,

1    then under the law the jury can still return a verdict for

2    one dollar.

3         Is that not the plaintiff's position?

4         MR. SPIRA:  That's not our position, Your Honor.

5    Our position is that, the entire reason we are here is that

6    a finding of nominal damages was inconsistent with the

7    finding of liability, which still stands.

8         THE COURT:  No, that's only part of it.  In fact,

9    had the jury come back with -- had the jury found one dollar

10   in compensatory damages but found no punitive damages, I'm

11   not sure we would be here.  The primary inconsistency was

12   created by a finding of nominal damages plus punitive

13   damages.

14        MR. SPIRA:  Your Honor, I understand the distinction

15   but I still believe that that finding of nominal damages

16   plus punitives being inconsistent with a finding of

17   liability --

18        THE COURT:  Well, we can talk about this at the

19   instruction conference, but I'm not -- this is still an

20   issue, because clearly what I found in my motion for new

21   trial and -- was that liability is not an issue.  The jury

22   clearly found liability.  But to find liability, they didn't

23   necessarily find causation.  In other words, they found that

24   they committed the acts, but there's still a determination

25   that has to be whether or not, as a result of that conduct,

1   Mr. Davis suffered injuries.  And, if so, what the

2   appropriate compensatory damages would be.  And I'm not sure

3   that the jury will not be able to consider one-dollar

4   damages.

5          So, we'll take that up at the instruction

6   conference.  But for right now, I'd ask that counsel return

7   to chambers so that we can begin the instruction conference

8   at 12:15.

9          (Court recessed from 11:44 a.m. to 12:30 p.m.)

10          (Proceedings continued in chambers.)

11          THE COURT:  So, we are going to move through this

12   pretty quickly because I'm really concerned.  I don't want

13   to -- it always takes longer than -- there's no way to short

14   circuit getting these instructions done.  It always takes a

15   long time, but I really just don't want to have the jurors

16   sitting around.  I looked through all of this and, like I

17   said, most of the instructions are going to be just -- we'll

18   just make a record.

19          The ones that are at issue is because of the issue

20   in the case, and that is, what actually comes before the

21   jury in this case?  I have looked at this.  I have looked at

22   my previous Order.  I have looked at the law.  I have looked

23   at the proposed instructions.  And here, I think, is the

24   only accurate way to instruct the jurors in this case:

25          No. 1.  While liability has been determined, what

the Court has not previously determined is whether or not
the plaintiff sustained injuries as a direct result of the
excessive force and failure to intervene, and, if so, what
amount of money will fairly compensate him.  I think that's
what the jury gets to determine here.

The jury could also determine, as is set forth in
the case law that's in my Order under *Briggs versus
Marshall*, where the Seventh Circuit has noted that excessive
force and nominal damages make strange bedfellows, however,
nominal damages may be awarded on excessive force claims in
only three situations:

The first -- which I do not, which I know does not
apply in this case -- is during an altercation between a
police officer and an arrestee or detainee, the officer
might use both justifiable and excessive force.  That's
already been determined by the jury.  The jury has already
determined that the force was not justifiable.  So, Scenario
One does not apply.

However, Scenarios Two and/or Three may apply.

Two is:  Nominal damages may be appropriate where a
jury reasonably concludes that evidence concerning the
plaintiff's injuries was not credible.  That's a
determination this jury gets to make.

Or, Three, where the victim's injuries have no
monetary value or are insufficient to justify with

1    reasonable certainty.

2         I think those are both issues that are open to this

3    jury and so I think none of the pattern instructions work.

4    And what I believe the jury should be instructed, in a

5    combination of the damage instructions and on the verdict

6    form, is something along these lines.

7         I think the damage instruction should read -- and,

8    Sona, are you following me on this?

9         LAW CLERK:  Yes, Judge.

10        THE COURT:  I'll tell you what I think, first, and

11   then I'll let you make a record on your objections.  But I

12   think the only way to instruct this jury is that:

13        If you find that plaintiff sustained any injury as a

14   direct result of the excessive force used against him or

15   defendants' failure to intervene, then you must determine

16   the amount of money that will fairly compensate plaintiff

17   for that or those injuries and award compensatory damages.

18        That would be the second leg.

19        The first leg -- I'm sorry -- would read:

20        If you find that plaintiff suffered no injuries as a

21   direct result of the excessive force used against him or the

22   defendants' failure to intervene, or if you find that

23   plaintiff's injuries have no monetary value, then you will

24   award nominal damages of one dollar for the constitutional

25   violation.

1        That would be leg one.

2        Leg two would be:  If you find that plaintiff

3    suffered an injury or injuries as a direct result of

4    defendants' excessive force or failure to intervene, then

5    you must award compensatory damages and determine the amount

6    of money that will fairly compensate him for each injury.

7        So -- and then, of course, they will be instructed

8    on, they may award punitive damages.

9        I think what happened in my Order -- my Order, the

10   way it reads is not totally accurate.  They may award

11   nominal damages and punitive damages.  The problem in the

12   case was the combination of findings that the jury made on

13   factual findings and damages made it totally inconsistent.

14   It was not just that they found...

15       Because you may award nominal damages finding that

16   there was no injury, but there was a constitutional

17   violation.  And you still may find -- the jury may still

18   find the defendants' actions malice -- had malice and were

19   reckless and warranted punishment.  So, you could still do

20   that.  It was the combination of findings.  Because if you

21   find that they -- that the actions were malicious and

22   reckless and warrant punishment, the other inconsistency

23   was, a dollar ain't punishment.  So, it was the total

24   picture that was inconsistent and against the manifest

25   weight of the evidence.

1          So, what I think the jury has to be instructed here

2    is two parts.  That they may find that the plaintiff

3    suffered -- if they don't want -- if they don't believe the

4    plaintiff's evidence on his injuries and they find it not

5    credible, they can award nominal damages of one dollar for

6    the constitutional violation that's already been determined.

7    If, however, they find he suffered any injuries, then they

8    must award compensatory damages and determine how much those

9    damages are.

10          Given that, Mr. Shultz, I apologize for jumping on

11   you this morning, to some extent.  But I want to be clear

12   that because this is how the jury has to be instructed, it's

13   so easily -- easy to confuse them, please do not refer to

14   nominal compensatory damages because those are two separate

15   things.

16          MR. SHULTZ:  Yes, ma'am.

17          THE COURT:  Now, having said that, and I have

18   everybody's proposed instructions on the damage issues and

19   the forms, I'm going to let you make your record as to why

20   you think the Court is incorrect and make your record.  But

21   I, I think this is the only fair way and the only way that

22   reflects the law in this case to instruct this jury because

23   the jury still does get to determine whether he's -- they

24   can find that they don't believe Dr. Ahmed Tariq -- is it

25   Tariq?

1        MR. SPIRA:  Dr. Tariq.

2        THE COURT:  -- they don't believe Dr. Tariq and they

3   don't believe that whatever they saw came from the

4   situation.  We may not agree with them, but that's their

5   determination.  And it was not -- it's not a determination

6   that the Court made simply by, by determining that the

7   defendants were liable for excessive force.

8        So, I think the jury has to be given those two

9   choices and it has to be laid out that cleanly in that way.

10        Mr. Spira?

11        MR. SPIRA:  Thank you, Judge.

12        I would note, our position for the record is that a

13   finding of nominal damages was determined to be inconsistent

14   with the finding of liability in the first trial, and for

15   the same reasons, the finding of nominal damages would be

16   inconsistent with the -- would be inconsistent in this trial

17   with the previous finding of liability.

18        I would note that the Court's Order granting a new

19   trial stated, given -- quote, given the undisputed nature

20   and extent of plaintiff's injuries, no reasonable injury

21   could conclude that plaintiff's injuries had no monetary

22   value.

23        THE COURT:  But that was in the previous trial.  The

24   Court was commenting on the evidence that was presented in

25   the previous trial.  We haven't -- we don't know what the

1   nature of the evidence is here.  But I -- just to be fair

2   and to be clear, that -- you can't apply that to the

3   evidence that's been presented in this case.  Number one, we

4   haven't seen the evidence yet.  Okay?  As I indicated

5   before, my previous Order on the motion for new trial was

6   based on the specific evidence that was presented, and how

7   it was presented, and the fact that many of the things were

8   not -- actually, were not disputed in the previous trial,

9   combined with a one-dollar nominal damages, and punitive

10  damages in the amount of one dollar.  It's the total picture

11  that was against the manifest weight of the evidence.

12        So, I understand what you're saying.  I understand

13  you want to take the Court's order out of that context and

14  -- to support -- and I'm going to give you leeway to make

15  whatever record you want to make, but I think it's, it's my

16  obligation to, to clear up what the Court's -- what the

17  basis of that Order was, as I just indicated.  And I don't

18  think it's accurately reflected just by the text of this

19  Order.  As I read this Order, that's ambiguous or confusing,

20  but that's exactly what the basis of the Order was.

21        MR. SPIRA:  Okay.

22        THE COURT:  So, in other words, simply because the

23  jury found that they committed excessive force and failed to

24  intervene, that does not mean, and the Court did not find,

25  that the jury necessarily found or would -- in this case,

1    has to necessarily find, and find his evidence of the

2    injuries credible.  That's a -- that's a separate finding

3    for this jury.  This jury gets to make that determination.

4         MR. SPIRA:  And then I, I would just note for the

5    record that the evidence last time of injuries and the

6    evidence this time of injuries, some of which is stipulated

7    insofar as the conjunctival hemorrhaging is not in dispute

8    and that a -- it's our position that a finding of nominal

9    damages would be inconsistent with both the previous finding

10   of liability and with the evidence to be presented of the

11   injuries, some of which is undisputed at this trial.

12        And just for the record, I think for the same

13   reasons that plaintiff previously argued after the first

14   trial that none of the three situations in the *Briggs* case

15   applied, we maintain that those situations are still

16   inapplicable here.

17        THE COURT:  How can you make that argument right

18   this second, when there -- when there's been no evidence in

19   this case?

20        MR. SPIRA:  Your Honor, I am admittedly making the

21   argument based on the evidence that either is stipulated or

22   will be -- not evidence -- that the Stipulations of Facts

23   and the evidence that I anticipate to come in, which will be

24   consistent with the evidence that came in --

25        THE COURT:  Well, I think you're necessarily making

1    an argument.

2          In other words, and after the fact, it was clear

3    what the jury found, in that they found injuries.  They

4    found that the plaintiff was injured.

5          At this point in time, of course, we don't have the

6    evidence yet, so we're at a little bit of a disadvantage.

7    But I think the proper way to couch the plaintiff's argument

8    is, as I understand it, the plaintiff is arguing that based

9    on the anticipated evidence there is no way that the jury

10   can find that Mr. Davis did not suffer injuries as a direct

11   result of the constitutional violations.

12         The Court is saying, I don't think you can find

13   that.  The jury certainly is free to find that.  And that's

14   the reason why this Court intends to instruct the jury as I

15   intend to instruct the jury.

16         The jury does not have to believe your client's

17   evidence of injuries.  And if they choose not to believe

18   that, if they find that that evidence is not credible, they

19   absolutely could find that he suffered no injuries and, as a

20   result, because of the Court's previous finding that there

21   was a constitutional violation, and if the jury finds that,

22   yes, there was, but there were no injuries, a dollar nominal

23   damages is absolutely appropriate.

24         I want you to make your record but, Mr. Spira, could

25   you get to it?  Because I think --

1          MR. SPIRA:  Yes.

2          THE COURT:  Because what I don't want to do is

3     relitigate this whole case.

4          MR. SPIRA:  Yeah.  Understood.  I think the record

5     is clear, I just want to make one last statement.  And

6     understanding the caveats Your Honor gave with regard to the

7     prior Order, it does say that the evidence was undisputed;

8     that plaintiff suffered injuries as a direct result of

9     defendants' use of force.  I think that the evidence --

10         THE COURT:  We haven't heard any evidence.

11         MR. SPIRA:  I understand.  I understand.

12         THE COURT:  Ms. McClimans?

13         MS. McCLIMANS:  Your Honor, I think we're fine with

14    the instructions as you have set forth.  I think it's fair

15    to say that we don't have any idea what the evidence would

16    be yet.  It's up to the jury to determine whether or not

17    that they believe that the plaintiff is credible.

18         As far as the conjunctival hemorrhage?  The

19    condition is not in dispute, however, causation of the

20    conjunctival hemorrhage is in dispute.

21         THE COURT:  I don't know if it's in dispute or not.

22    We haven't heard any evidence.  What I will say is, we can

23    go forward with the instruction conference based on what we

24    know.  Obviously, once the evidence is in, if something is

25    very clear, in other words, if it's very clear, after the

1    evidence has been put on, that there is no way for the jury

2    to find that there were no injuries or whatever, then we can

3    -- then we can, you know, we can go another route.

4         But at this point in time, the Court is certainly

5    not in a position to -- which would amount to a directed

6    verdict, and issue a directed verdict on injuries in this

7    case, and I doubt that I will after the evidence is on.  The

8    jury has to be instructed that they can make these various

9    findings.

10        So, with that said, the proposed Court's

11   Instructions will be the same as they were previously.  And

12   I think you have been provided with the Court's Proposed

13   Instructions 1 through 16.

14        MR. SPIRA:  I'm sorry, I --

15        MS. McCLIMANS:  Do you have another copy?

16        MR. SPIRA:  I don't think we received those.

17        MR. SHULTZ:  We did not receive them.

18        THE COURT:  They're the Court's Instructions that

19   are on the website.  They're the standard, 1 through 16.

20   and we'll get those to you.  But they're the standard ones

21   that are on the website, the standard ones that were given

22   the last time.

23        As far as the Joint Proposed Instructions, those

24   that are the same as the Court Instructions, and that would

25   be:  Joint 1; Joint 2; Joint 3; Joint 5; Joint 7; Joint 8;

1    Joint 9 and Joint 10; Joint 13; Joint 15; Joint 16; Joint

2    23; and Joint 24, are the same as Court's Instructions 1

3    through 16, and will not be given.

4         Joint Instruction No. 4 seeks to add a phrase

5    "between the parties" at the end of paragraph one,

6    otherwise, it's the same as Court's 2.  There's no reason to

7    make that modification.  I'm going to give Court's 2.  That

8    includes reference to stipulations.

9         Joint 12.  I have no problems with giving it as

10   proposed and modified, if there is some impeachment.  If

11   there is no impeachment of a witness during the course of

12   trial, the Court will not give the prior inconsistent

13   statement instruction, which is Joint 12.

14        Joint 17, which is the instruction on stipulations.

15   That will be given with the stipulations added, that the

16   Court will give, and those are the ones that are in the

17   Final Pretrial Order.  And I'll give those right before we

18   begin the evidence in the case.  So, after you give --

19        MR. SPIRA:  I see.

20        THE COURT:  -- openings -- give your opening

21   statements -- right when we go out, I'm going to give the

22   stipulations and then you'll be able to call your first

23   witness.

24        Joint No. 18, which is that judicial notice one?

25   I'm assuming that's being withdrawn because we have handled

1    it by stipulation.  Is that correct?

2         MR. SPIRA:  That's my understanding, that that will

3    be part of Instruction No. 17?

4         THE COURT:  Yes.

5         Is that correct, Ms. McClimans?

6         MS. McCLIMANS:  I believe so.

7         THE COURT:  Yes.  Okay.  Joint 22 will be given.

8         Now, as to the disputed ones.  I think this is

9    Plaintiff's 19, which will be the Illinois Pattern 1.02.  I

10   will give that over defendants' objection.

11        Defendants believe it's repetitive.  It keeps it in

12   context, one -- in one way, we have told the jury that there

13   is no issue as to the liability, however, we need to put

14   that in the context of instructing the jury, who the

15   defendants are and that they have been found liable.  So, I

16   think that's -- is that Plaintiff's 19?

17        LAW CLERK:  Yes.

18        THE COURT:  You have it -- okay.

19        Illinois Pattern 1.02 will be given.

20        The Defendants' 20, which is in dispute based on

21   Pattern 1.25 -- Illinois Pattern Instruction 1.25, will not

22   be given.  That is a liability instruction and liability is

23   not an issue in this case.

24        The compensatory damages instructions, both will be

25   refused, as I have indicated.  And essentially, what I will

1    do is give a Court's Instruction over both parties'

2    objection that lays out the way I have indicated.  And so we

3    will -- Sona will be drafting that up and then we'll get

4    that to you.

5         But as I said, it will lay out the law on nominal

6    damages, first, if they find that there is no injury or no

7    monetary value, the nominal damages of one dollar -- they

8    can award nominal damages of one dollar for the

9    constitutional violation.  And then go into "if you find

10   that plaintiff suffered any injury, then you must assess a

11   reasonable compensation.  And then you may but you are not

12   required to find punitive damages."

13        So, we'll lay that out.  And it will be laid out

14   similarly in the verdict form.  We'll draft a verdict form

15   that spells that out.  And I'm -- again, I've given the

16   parties' record on their objections.  I'm happy to give it

17   as a Court Instruction.  Actually, without objection from

18   the defendants, but objection from the plaintiff.

19        So, I think that's all we really need to cover.  And

20   so when we go out at 1:30, I'll do the stipulations.  You

21   can call your first witness.  It's my anticipation that when

22   the evidence is done, take up the Rule 50 real quick, I'm

23   assuming that still will leave us with a -- with jury

24   deliberations.  We'll take a short break to do that.  And by

25   then, we should have the instructions ready and everybody

1    should have had a chance to look at them.  And then we'll go

2    right into the jury instructions and then closings.

     Anything else?

3

4            Sona?

5            LAW CLERK:  The order of the last few instructions,

6    are you going to give those last few instructions, like

7    C-16?  Is that going to come after --

8            THE COURT:  I don't know -- the order of the

9    instructions -- once you put the instructions together on

10   what we are giving, then you need to give me marked copies

11   and I'll put it in the order, before you do a clean copy.

12           LAW CLERK:  Okay.

13           THE COURT:  Okay?  And actually, once I put it in

14   the order of the marked copies, you need to give that to the

15   parties so that they can look at it, before we do the clean

16   copies.

17           LAW CLERK:  Okay.

18           THE COURT:  And even if we're in the middle -- I

19   mean, if we're -- slide it on their table.  We'll just get

20   it to them.

21           LAW CLERK:  Okay.

22           THE COURT:  Okay?

23           LAW CLERK:  All right.

24           THE COURT:  All right.  Anything else comes up

25   between now and 1:30, like a settlement, let me know.

1    MS. McCLIMANS:  I do have a question?

2    THE COURT:  Yes.

3    MS. McCLIMANS:  To avoid any confusion when -- after

4  plaintiff puts on their case and it's our turn to cross, for

5  instance, plaintiff already brought up that the defendants

6  used different wording before the excessive force was

7  committed.

8    THE COURT:  I don't know what you mean, different

9  wording.

10    MS. McCLIMANS:  That they refer to him as mentally

11  retarded and motherfucker.

12    THE COURT:  Mm-hmm.

13    MS. McCLIMANS:  So --

14    THE COURT:  That goes to -- that is relevant, I

15  think, to show maliciousness.

16    MS. McCLIMANS:  Okay.

17    THE COURT:  So, they can put that on.  You can

18  cross-examine them.  I mean, what are you asking?  If you

19  can cross-examine --

20    MS. McCLIMANS:  That was it.  That was it.  It

21  seemed like when Brandon was giving his opening, that we

22  weren't allowed to go back to what happened in that room.

23    THE COURT:  No.  No.  No.

24    MS. McCLIMANS:  Okay.

25    THE COURT:  Miss McClimans, don't misrepresent what

1   happened here.  Mr. Shultz went back to what happened before

2   the ruling.  He talked about something that happened in the

3   cafeteria.

4        MS. McCLIMANS:  That's what I was talking about,

5   too, though.  When they had talked with him and called him

6   the MF and mentally retarded, that was -- I believe it was

7   in the cafeteria.

8        MR. SPIRA:  The first derogatory statements that,

9   that he would testify to, which I -- we agree goes towards

10  the maliciousness, were used in the cafeteria.

11       THE COURT:  So, what is it that you want to do?  You

12  want to bring in what plaintiff did?  Because plaintiff's

13  conduct is not in question here.

14       MS. McCLIMANS:  No.  No.  I just want to bring up

15  that he cursed at them, as well.  But that's what I don't

16  want to do, is if that's not in question, I don't want to go

17  there.

18       THE COURT:  Plaintiff's conduct is not in question.

19  Your client's conduct, to the extent it's relevant and

20  provides context, is.

21       So, no, you cannot talk about what plaintiff did.

22  Yes, they can talk about, to the extent -- because it

23  reflects on the, on the mental state and the maliciousness,

24  or lack thereof, of the defendants' conduct.  Whether or not

25  plaintiff -- you know, if you want to open the door to what

1    plaintiff did, then I think that that's -- I think that's a
2    whole other issue so, no, you cannot.
3           MS. McCLIMANS:  All right.  Okay.  Just wanted to
4    verify.
5           THE COURT:  Remind me of what the -- because there's
6    going to be evidence as to this statement that they made?
7           MR. SPIRA:  Correct.
8           THE COURT:  And what is it again?
9           MR. SPIRA:  What is the statement?
10          THE COURT:  Yeah.
11          MR. SPIRA:  I believe the statement in the dining
12   hall is --
13          MS. BECKER:  "I don't feel like dealing with you
14   retarded motherfuckers today.  Do you feel like being tied
15   down?"
16          "Stupid retarded motherfuckers."  Excuse me, Your
17   Honor.
18          THE COURT:  I think that is definitely relevant to
19   their mental state, and it is relevant to the question of
20   whether or not their conduct was malicious or reckless.
21          What the plaintiffs want to get into is that the
22   plaintiffs cursed him.
23          MR. SHULTZ:  His response to their --
24          THE COURT:  His response?
25          MR. SHULTZ:  The plaintiff's response to the alleged

1    defendants' statements included curse words.

2          THE COURT:  No.  No.  So, that is, that is out.

3          And that is in.

4          I think the plaintiff's response to their curse

5    words, again, that -- that's getting into plaintiff's

6    conduct that -- that's really, you know, getting confusing.

7    Confusing the issues here.  And I do not think that's

8    material or relevant.

9          MS. McCLIMANS:  Okay.  So, what about objections for

10   the record, hearsay?

11         THE COURT:  Huh?

12         MS. McCLIMANS:  He's saying what our defendants

13   said.

14         THE COURT:  That's admissions.

15         MS. McCLIMANS:  Okay.

16         THE COURT:  Those are statements made by parties.

17         MS. McCLIMANS:  All right.

18         THE COURT:  All right.  And I don't think there's

19   any argument that, whether or not they're being offered for

20   the truth of the matter asserted.  I don't think the

21   defendants are taking a position that that -- that statement

22   is being offered for the truth that plaintiff is a retarded

23   motherfucker.

24         MS. McCLIMANS:  No.

25         THE COURT:  Okay.

1          (Court recessed from 1:01 to 1:30 p.m.)

2          (Proceedings continued in open court, plaintiff

3    present; jury present.)

4          THE COURT:  Okay.  We are now ready to begin the

5    evidence in the case.  Before we call the first witness, I'm

6    going to read some stipulations to the jury.  These are

7    facts that the parties have stipulated to.  In other words,

8    these facts are not in dispute.

9          1.  On December 26, 2011, plaintiff, Christopher

10   Davis, was a resident at Chester Mental Health Center,

11   operated by the Illinois Department of Human Services.

12         2.  On December 26, 2011, defendants were employed

13   by the Illinois Department of Human Services and assigned to

14   Chester Mental Health Center.

15         3.  On December 26, 2011, defendants were on duty as

16   Security Therapy Aides, or STAs, at Chester Mental Health

17   Center.

18         4.  The Court has previously determined that each of

19   the four defendants used excessive force towards Christopher

20   Davis and failed to intervene in the use of excessive force

21   towards Christopher Davis on December 26, 2011.

22         5.  Christopher Davis experienced subconjunctival

23   hemorrhaging following the use of excessive force by the

24   defendants.

25         Those are the stipulated facts that are not in

1    dispute in this case.

2          And with that, plaintiff may call his first witness.

3          MR. SPIRA:  Thank you, Judge.

4          We'd like to call Christopher Davis.

5          THE COURT:  Mr. Davis, could you please come

6    forward?

7          (Witness sworn by clerk.)

8          THE WITNESS:  Christopher Davis.  D-A-V-I-S.

9                      CHRISTOPHER DAVIS,

10   having been first duly sworn, was examined and testified as

11   follows:

12                      DIRECT EXAMINATION

13   BY MR. SPIRA:

14   Q.    Good afternoon, Chris.

15   A.    Good afternoon.

16   Q.    Could you please tell the jury why you are here

17   today.

18   A.    I'm here today to be awarded on damages as to what

19   happened to me back in 2011, after proving that the

20   defendants used excessive force and attacked me.

21   Q.    Who are the defendants in this case?

22   A.    Todd Nordman, Josh Rackley, Lucas Nanny, and Terry

23   Stewart.

24   Q.    Chris, how old are you today?

25   A.    28.

```
1    Q.      So, in 2011, were you 20 years old?

2    A.      Yes, sir.

3    Q.      Chris, was there a period of time beginning in 2011

4    when you were a patient at Chester Mental Health Center?

5    A.      Yes, sir.

6    Q.      Do you remember about what date you became a

7    resident at Chester?

8    A.      I believe I arrived on December 22nd.

9    Q.      And when you first arrived at Chester, were you

10   examined by a doctor for any physical injuries?

11   A.      Yes, I was.

12   Q.      Do you know who that doctor was?

13   A.      Yes.  It was Dr. Tariq.

14   Q.      And did you have any physical injuries when you

15   arrived at Chester?

16   A.      No.

17   Q.      Now, I'd like you to tell the jury about the events

18   that occurred on December 26, 2011, the day after Christmas

19   and a few days after you arrived.

20           Do you know where you were that morning, December

21   26, 2011?

22   A.      Yes.  I was on my housing unit, Unit C.

23   Q.      And at some point did you go to get breakfast that

24   morning?

25   A.      Yes.
```

Q.      Where did you typically eat at Chester?  What was --
is it referred to the dining hall or cafeteria?

A.      Yes, it's the dining hall.

Q.      When you entered the dining hall on December 26,
where did you go first?

A.      It's like an assembly line.  All the patients get in
one line and go to the front, until the tray is handed out.
I was in the line, following the line, until I got my tray.

Q.      And after you got your tray, where did you go?

A.      I went and sat down in a designated area where the
people from my living unit was sitting at.

Q.      About how many other patients were in the dining
hall that morning?

A.      It's about 50 to 60.

Q.      About how many staff from Chester were in the dining
hall?

A.      At least eight.

Q.      Were the defendants in this case on duty at Chester
during December 26, 2011?

A.      Yes.

Q.      And do you know if the defendants were with you in
the dining hall on December 26th?

A.      I know for a fact that Tom Nordman was in the dining
room.  And if I'm not mistaken, Terry Stewart.

Q.      What happened after you sat down with your food?

1   A.      As soon as I sat down with my food, I looked down

2   and noticed that I had cereal and I looked for my milk.  And

3   looked back and noticed that the milk is the last thing that

4   you get, after you get your tray, which I missed, my first

5   time being in the dining room.  I stood up to go back and

6   get a milk and all a sudden, like chain reaction, all the

7   staff started yelling, "Hey, sit down, sit down, sit down."

8   So, I froze.

9   Q.      Is it your understanding that standing up from the

10  table is a violation of Chester rules?

11  A.      It is now.

12          THE COURT:  Counsel?  Where are we going with this?

13          MR. SPIRA:  Okay.

14          THE COURT:  Don't open doors you don't want to walk

15  through.

16  Q.      (BY MR. SPIRA)  What happened after the staff

17  ordered you to sit down?

18  A.      I sat back down.  And one of the defendants, Tom

19  Nordman, and another staff walked up to me and made a

20  comment and said, "Sit down, you retarded motherfuckers.  I

21  don't feel like dealing with you today."  Excuse my French.

22  Q.      And what did the defendants do next?

23  A.      One of the staff members was trying to slow 'em down

24  like, "Hey, that's the new guy, that's the new guy."  But I

25  guess it was too late.  By then, they started saying that

1    "he doesn't want to eat, he doesn't want to eat, take him

2    back, take him back."

3            And they told me to stand up and put my hands behind

4    my back.  And I stood up and I turned around, and they put

5    me in handcuffs.

6    Q.      After you were placed in handcuffs, what happened?

7    A.      I was grabbed by my arms, on each side of my arms,

8    and escorted out the dining room and back towards the unit

9    where I was housed.

10   Q.      Who, who was escorting you back to the unit?

11   A.      It was Tom Nordman and Terry Stewart.

12   Q.      Were Mr. Stewart and Nordman saying anything to you

13   while they were walking you back in that direction?

14   A.      Yes.  There were some racial slurs and some

15   antagonizing going on, as I was walking.  Tom Nordman was

16   saying stuff like, "Oh, we're going to show you how we do it

17   down here.  You're a tough guy.  You're from the city, huh?

18   You're from Chicago?  We're going to show you how we do it

19   down here in Chester.  We're going to show you, boy.  We're

20   going to show you, boy."

21           And all, during the meantime while he was saying

22   that stuff, Terry Stewart, they were manhandling me.

23   Q.      What do you mean by "manhandling" you?

24   A.      Well, both my hands was behind my back in handcuffs.

25   They were shoving me back and forth, side to side.  I had

1    no, no control over myself, for real, for real, and they

2    were just shoving me back and forth while they was -- you

3    know, both of them was on each side of me, tuggling me.

4    Q.      Now, when you exited -- when they exited the dining

5    hall with you, where did you go from there?

6    A.      To the living Unit C.

7    Q.      About how long is the walk from the dining hall to

8    Unit C?

9    A.      A minute or two.

10   Q.      And were you still in handcuffs at this point?

11   A.      Yes.

12   Q.      Is there -- do you refer to the entryway of Unit C

13   as the stem?

14   A.      Yes.

15   Q.      What happened when you got to the stem?

16   A.      When I got to the stem, we went inside.  We went

17   inside -- suddenly, I was yanked to the ground from behind,

18   choked from my neck and pulled to the ground.  And

19   immediately, I started being choked by Lucas Nanny.  And he

20   was saying, "I'll kill you, motherfucker.  I'll kill you,

21   motherfucker."

22   Q.      Okay.  I want to back up for a minute there.  So,

23   you said you were pulled to the ground.  Do you know who

24   pulled you to the ground?

25   A.      Yes.

1  Q.      Who pulled you to the ground?

2  A.      It was Terry Stewart.

3  Q.      And how did he pull you to the ground?

4  A.      He wrapped his arm around my neck and pulled me to

5  the ground, with him falling backwards, too.

6  Q.      So were you -- when you were pulled down, were you

7  on your stomach or on your back?

8  A.      I was on my back.

9  Q.      And what happened once you landed on your back?

10 A.      That's when Luke jumped on top of me and started

11 choking me.

12 Q.      How do you know that it was Luke that was choking

13 you?

14 A.      I was able to look him right in his face while he

15 was choking me.

16 Q.      At some point did the -- you have mentioned that --

17 you have mentioned, I believe, Mr. Stewart and one of the

18 other defendants were taking you into the stem, and that Mr.

19 Nanny arrived and choked you.  Do you know where the fourth

20 defendant was?

21 A.      At the time, no, I don't know where he was at, at

22 the time.  It wasn't until I was like rolled over onto my

23 side and to my stomach that I come in contact with Josh

24 Rackley, and knew exactly where he was at.

25 Q.      Okay.  So, about how long were you on your back

1    before you were rolled onto your side and stomach?

2    A.      I don't know exactly how long it lasted because I

3    was being choked, so I was clinging -- clinging to air.  You

4    know, my air passage was being shut off.  I don't know.

5    Q.      After you were rolled onto your stomach, what

6    happened then?

7    A.      After I was rolled to my stomach, that's when I saw

8    feet fly past my face.  And that's when I started being

9    kneed in my face, right here -- (indicating) -- while I was

10   on my chest and my stomach.

11   Q.      Do you know who kneed you in the face?

12   A.      That was Josh --

13           THE COURT:  Back up, counsel, and make a finding for

14   the record.  What he pointed to when he said "right

15   here" needs to be reflected in the record.

16           MR. SPIRA:  Thank you, Judge.

17           Let the record reflect that the plaintiff pointed to

18   the side of his face, next to his left eye.

19   Q.      (BY MR. SPIRA)  Chris, what happened after you were

20   -- or, excuse me, I think my question was:  How do you know

21   that it was -- or do you know who kneed you in the face?

22   A.      Yes.  It was Josh Rackley.

23   Q.      And how do you know that?

24   A.      Well, I saw the shoes when they ran past me.  And

25   eventually, as I was running from the blows from the knees,

I was able to look at him and see his face, for one.  For

two, the shoes that he had on, I was able to see them later

as I was tied to a restraint bed for hours.  And just the

constant blows from each side, I was able to look at faces

and see who was hitting me in each place.

Q.     Now, you said a second ago as you were "running from

the blows."  What do you mean by running?  Were you on the

ground at this point?

A.     Okay.  As I was on my chest and my stomach,

constantly being kneed in my face on my left side, of course

it hurted.  I couldn't block it.  I couldn't cover it up.  I

was handcuffed.  I kept trying to run with my face from the

blows.  Being on the ground, there's not much room, so I was

running this way with my head -- (demonstrating) -- this way

meaning to my right, only to be punched and hit from this

way, too.  So, it caused me only to run back this way --

(demonstrating) -- to be kneed more by Josh Rackley.

Q.     While Mr. Rackley was, was kneeing you in the face,

do you know where the other defendants were located?

A.     Tom Nordman and Terry Stewart were in the back of me

at the -- towards my feet.  My feet and ankles were being

twisted.  And I assume or highly believe that it was Tom

Nordman because, as my feet were being -- ankles were being

twisted and my genitals were being punched at, the same

slurs were coming out, "Tough guy, tough guy, you're a tough

1    guy.  We're going to show you.  We're going to show you."

2    Those comments were being made while I was being hit in my

3    genitals and my ankles were being twisted.

4    Q.     Was there anywhere else on your body that you were

5    punched or hit in some way?

6    A.     Yes.  I was really being hit everywhere on my body

7    like my sides, my sides of my stomach and my head, for

8    whoever was in the front, which I would assume on the other

9    side of Josh Rackley to be Lucas Nanny.  I was being kneed

10   by Josh Rackley on my left side.

11          When I was running from the blows from my left side,

12   I was being hit over here onto my right, which caused me to

13   run back this way -- (demonstrating) -- to my left.

14   Q.     When you say "hit over here," what part of your body

15   are you referring to?

16   A.     To the right side of my head.

17   Q.     About how long did this attack in the stem last?

18   A.     I could not tell you minute-wise, second-wise, how

19   long it lasted.  It felt like it lasted for a lifetime.  It

20   felt like it lasted forever, especially when I was being

21   choked.  You know, my airway passage being cut off.  I, I

22   felt like I was going to die, so I don't know how long it

23   was.

24   Q.     Were you handcuffed during the entire attack?

25   A.     Yes.

Q.      What happened after the attack stops?

A.      Well, it didn't really stop; it was only a pause.  I
was brought to my feet.  They all lifted me up.  At that
time, it was probably a dozen staff there, and I was being
snatched by many staff and grabbed and escorted into another
room which they call a restraint room, which is what I guess
is used for peoples out of control.  And I was taken in
there and slammed on a bed.  And immediately when I was
slammed on the bed, I started being choked more by Luke --
Lucas Nanny.

Q.      Okay.  And before -- I want to back up a little bit.
        Before you get to the restraint room and you are
brought to your feet in the stem, were you in pain at that
point?

A.      Yes.  Unbearable pain.

Q.      What was hurting?

A.      My whole body was hurting.  My soul was hurting,
most of all.  I was in shock.  Everything on my face was
aching.  I couldn't even take it in, at the time.  It, it
didn't really hit me until I laid in that restraint bed,
aching in pain.

Q.      When you were at -- when you were a patient at
Chester, did you pass through the stem on Unit C often?

A.      Yes.  Well, I -- the days -- the days prior to that,
I went in there -- here and there going to go meet with like

1   therapists.  And then thereafter, yes.

2   Q.     Are you familiar with the placement of any cameras

3   that look into the stem?

4   A.     Yes.

5   Q.     Are there any cameras that are aimed towards the

6   area where this attack happened?

7   A.     Yes.  There's a camera directly on C-2 that looks

8   directly into the stem that will see exactly where it

9   happened at.

10        MR. SPIRA:  Permission to approach the witness, Your

11   Honor?

12        THE COURT:  You may.

13   Q.     (BY MR. SPIRA)  Do you recognize what is shown --

14   excuse me -- do you recognize what is shown in this picture,

15   Chris?

16   A.     Yes, I do.

17   Q.     What is this?

18   A.     That is the entryway of C-2, the second wing of Unit

19   C.  And that's the camera that looks right into the stem.

20        MR. SPIRA:  Your Honor, I'd like to move to admit

21   Plaintiff's Exhibit 14 into evidence?

22        THE COURT:  Any objections?

23        MS. MCCLIMANS:  No objection, Your Honor.

24        THE COURT:  Okay.  It's not a video, it's just a

25   still, or --

1        MR. SPIRA:  It's a video, Your Honor.

2        THE COURT:  All right.  Plaintiff's Exhibit 14 is

3   admitted.  You may display it.

4        MR. SPIRA:  Thank you.

5   Q.     (BY MR. SPIRA)  Chris, can you point out for the

6   jury where the stem is located in this picture?

7   A.     This is the stem.  (Indicating.)

8   Q.     And is that where the attack occurred?

9   A.     Exactly right here.  (Indicating.)

10       THE COURT:  Hold on for one second, Mr. Davis.

11       Stacie, is there a way to change the color of the

12  ink?  Because it's very light.

13       (Off the record.)

14       MR. SPIRA:  Let the record reflect that the

15  plaintiff has drawn a yellow and blue X in the area where

16  the attack occurred in the stem.

17  Q.     (BY MR. SPIRA)  In the morning of December 26 when

18  these events were happening, would the doors -- would these

19  doors showing into the stem normally be open like they are

20  here?

21  A.     Yes.  When all the patients go to breakfast, they

22  open the doors so that everybody can enter back into the

23  living units.  So, when we come back, all our doors are open

24  to each unit, C-2, C-1.  C-1, C-2 and C-3, the doors are

25  open.

1          MR. SPIRA:   Okay.   I'd like to play a short clip

2     from this video.

3          (Video playing.)

4     Q.     (BY MR. SPIRA)   And who is that individual who comes

5     into the entryway?

6     A.     That right there is Josh Rackley.

7     Q.     Do you know who that is that Mr. Rackley is speaking

8     to?

9     A.     It's a housekeeper.

10    Q.     Okay.   Now, I'd like to play another short clip from

11    a little bit later in this same video.   And I just want you

12    to describe to the jury what you see occurring in this

13    video.

14         (Video playing.)

15    A.     The housekeeper went and closed the door that will

16    block the camera view that will see into the stem.

17    Q.     Once that door is closed, is the area where you were

18    attacked visible from this camera?

19    A.     It was not.

20    Q.     Do you see the time stamp on that video?

21    A.     Yes.

22    Q.     What's the time on that video?

23    A.     7:50.

24    Q.     Is that around the time that this attack would have

25    occurred?

1     A.      Yes.

2     Q.      Okay.  Now, you mentioned earlier that after you

3     were lifted to your feet, you were taken towards a restraint

4     room.  Where is the restraint room in relation to the stem?

5     A.      From this view?

6     Q.      Either from the view or if you are able to just

7     describe it.

8     A.      From this view, it's straight out and to the left,

9     which is Unit 3.  And then the restraint room would be to

10    the right, after that.

11    Q.      Do you know if there are any cameras that show the

12    hallway where you were taken to the restraint room?

13    A.      Yes, there is.

14    Q.      Chris, do you recognize the picture that I have just

15    handed you?

16    A.      Yes, I do.

17    Q.      And what is that?

18    A.      That's the hallway to C-3.

19           MR. SPIRA:  Your Honor, I'd like to move to admit

20    Plaintiff's Exhibit 15 into evidence and publish it to the

21    jury.

22           THE COURT:  Any objections?

23           MR. SHULTZ:  No objections, Your Honor.

24           THE COURT:  Plaintiff's Exhibit 15 is admitted.

25    Q.      (BY MR. SPIRA)  Chris, is this image showing a fair

1    and accurate representation of living unit C-3 on December

2    26, 2011?

3    A.       Yes, it is.

4    Q.       Now, where is the stem where the attack occurred in

5    relation to what we're seeing here?

6    A.       The stem is exactly back right here.  (Indicating.)

7    Q.       Okay.  So, the stem is sort of behind the camera

8    here?

9    A.       Yes.

10   Q.       And is this hallway where you were taken after you

11   were lifted on your feet from the stem?

12   A.       Yes.

13   Q.       What are the rooms around the left and right side of

14   the hallway?

15   A.       The first four rooms are restraint rooms.  They have

16   windows in the middle of the doors.

17   Q.       Were you taken into one of these rooms after the

18   attack in the stem?

19   A.       Yes.

20   Q.       Okay.  I'd like to play a short clip from this

21   video, and I'd like you to describe to the jury what you are

22   seeing here.

23            (Video playing.)

24   A.       That was all of them escorting me into the restraint

25   room after the attack.

1   Q.      Okay.

2           MR. SPIRA:  Can we back that up and actually play

3   that one more time?

4   Q.      (BY MR. SPIRA)  And I'd like you to just count out

5   loud for the jury how many people you see following you into

6   that restraint room.

7           (Video playing.)

8   A.      One, two, three, four, five, six, seven, eight,

9   nine, ten, eleven -- I got eleven.

10  Q.      Okay.  And can we actually -- and let's back that up

11  one more time and I'd like you to point out if you see the

12  defendants in this video.  And let's pause it when you, when

13  you see the defendants.

14          (Video playing.)

15  A.      Yep.

16          MR. SPIRA:  Stop it there.

17  Q.      (BY MR. SPIRA)  Where are the defendants here?

18  A.      It blurred up.  I need you to go back so I can...

19          (Video playing.)

20          This is Lucas Nanny.  (Indicating.)

21          This is Josh Rackley.  (Indicating.)

22          MR. SPIRA:  Okay.  Can you continue the video,

23  please?

24  A.      That's Tom Nordman.  (Indicating.)

25          And this is Terry Stewart.  (Indicating.)

Q.      (BY MR. SPIRA)  Do you know if, in 2011, Mr. Stewart
walked with a cane?

A.      No, not when he was at Chester.

Q.      Do you still have handcuffs on behind your back in
that video?

A.      Yes.

Q.      What happened after you were taken into the
restraint room?

A.      They slammed me on that bed with all those staff,
and held me.  And Lucas Nanny jumped on me and started
choking me.

Q.      Did Mr. Nanny say anything while he was choking you?

A.      "I'll kill you, motherfucker.  I'll kill you.  Shut
up.  Shut the fuck up.  I'll kill you, motherfucker."

Q.      About how long did Mr. Nanny strangle you for?

A.      I'm not sure exactly how long it was.

Q.      What happened after he stopped strangling you?

A.      The reason he stopped was because a nurse or
somebody yelled, in a female voice, "Hey, Luke.  Hey, Luke,
stop.  That camera's on in there."

        MS. McCLIMANS:  Objection, hearsay.

        THE COURT:  Overruled.

A.      Someone yelled, "Luke, Luke, stop.  Hey, Luke, that
camera's on in there.  That camera's on in there."

Q.      (BY MR. SPIRA)  And after -- and did Mr. Nanny stop

1    at that point?

2    A.      Yes, immediately stopped.

3    Q.      And what happened next?

4    A.      They started strapping my feet to the leather straps

5    that's on each side of the bed, at the bottom.  And then

6    they took one hand out of cuffs and put it on to one strap

7    and, likewise, did the other.

8    Q.      About how long were you held in those four

9    restraints?

10   A.      I don't know.  It was -- it was hours, multiple

11   hours.

12   Q.      Were you in pain during that time?

13   A.      Yes.

14   Q.      Were you doing anything else?

15   A.      Yes.  I was just laying there crying, hoping that

16   somebody came and got me out of that room.  I didn't know

17   how to get out of that room.

18   Q.      Was there something specific that was hurting you at

19   that point?

20   A.      My face was very sensitive and sore.  I was still

21   recuperating from the loss of breath mostly, though.  But my

22   face was sore and sensitive, which I would have expected

23   from being hit.

24   Q.      Do you know whether there was a video camera in the

25   restraint room while you were in there?

1   A.      Yes, there was.

2   Q.      How do you know that?

3   A.      Because I laid there for hours and looked at the

4   camera that was above in the room.

5   Q.      Have you ever received the video --

6          THE COURT:  Counsel?  Please approach.

7          (Proceedings continued at the bench, outside the

8   hearing of the jury.)

9          THE COURT:  Where are we going here?  There's no

10  spoliation claim here.

11         MR. SPIRA:  No, there's not.

12         THE COURT:  So, this is irrelevant.

13         MR. SPIRA:  Okay.

14         THE COURT:  You can go forward with the evidence

15  that you don't have -- you can't raise inferences from what

16  you don't have unless there's spoliation, and there is not.

17         MR. SPIRA:  Okay.

18         THE COURT:  Stick to the damages, counsel.

19         MR. SPIRA:  Okay.

20         (Proceedings continued in open court, plaintiff and

21  jury present.)

22         THE COURT:  The jury is instructed to disregard the

23  previous question and answer.

24  Q.      (BY MR. SPIRA)  Chris, where did you go after you

25  were released from the restraint room?

1    A.      Started walking down this hallway towards the

2    phones.

3    Q.      Did you look in the mirror at some point?

4    A.      Yes, I eventually did.  Yes.

5    Q.      What did you see?

6    A.      My face.  I looked like a blowfish.  It was bloated

7    up, swollen.  And my eyes were, were bleeded out.  They

8    weren't bloodshot, they were bloody eyes.

9    Q.      Chris, were any pictures taken of you following this

10   attack?

11   A.      Yes.

12   Q.      When were those pictures taken?

13   A.      I believe the next day.

14   Q.      You have been handed what's been marked as

15   Plaintiff's Exhibit 3, 4, 5, and 9.  Do you recognize those

16   images?

17   A.      Yes.

18   Q.      And do those pictures fairly and accurately depict

19   you from the day after the attack, December 27th?

20   A.      Yes, they do.

21           MR. SPIRA:  Your Honor, I'd like to move to enter

22   into evidence and publish for the jury Plaintiff's Exhibits

23   3, 4, 5, and 9.

24           THE COURT:  Any objections?

25           MS. McCLIMANS:  No objection, Your Honor.

1          THE COURT:  Plaintiff's Exhibits 3, 4, 5, and 9 are

2     admitted.

3          MR. SPIRA:  Mr. Barnes, could you please pull up

4     Plaintiff's Exhibit 3?  (Pause.)  Thank you.

5     Q.     (BY MR. SPIRA)  Chris, are there any injuries to

6     your face shown in this picture?

7     A.     Yes, there are.

8     Q.     Can you describe those?

9     A.     There's darkness under my eyes; my eyes were

10    darkening; busted blood vessels in both eyes; and swelling

11    on my cheekbone and swelling in lip.

12         MR. SPIRA:  Mr. Barnes, could you please pull up

13    Exhibit 4?

14    Q.     (BY MR. SPIRA)  Chris, are there any injuries shown

15    in this picture?

16    A.     Yes.

17    Q.     Can you describe those for the jury, please?

18    A.     There's a bruise above my eye; a bruise on the side

19    of my face, which I could probably circle; and my eyes.

20         MR. SPIRA:  Mr. Barnes, could you please pull up

21    Exhibit 5?

22    Q.     (BY MR. SPIRA)  Chris, are there any injuries shown

23    in this picture?

24    A.     Well, you see the slight swelling in my lip.  You

25    see both eyes with the busted blood vessels.  You could see

1    the slight swelling on this side of my face.  (Indicating.)

2          MR. SPIRA:  Mr. Barnes, could you please pull up

3    Exhibit 9?

4    Q.     (BY MR. SPIRA)  Are there any injuries shown in this

5    picture?

6    A.     It's probably not as visible, but I had a huge knot

7    in the back of my neck that was real sensitive and sore.

8    Q.     At any time that you were at Chester before the

9    attack, were your eyes ever bloody like that?

10   A.     No.

11   Q.     At any time that you were at Chester before that

12   attack, was your face swollen like that?

13   A.     No.

14   Q.     At any time that you were at Chester before the

15   attack, was your face tender or sensitive to the touch?

16   A.     No.

17   Q.     At any time that you were at Chester before the

18   attack, did you have any bruises or knots on your body?

19   A.     No.

20   Q.     At any time in your life other than following the

21   attack on December 26th, have your eyes ever been bloody

22   like that?

23   A.     Never in my life.

24   Q.     Do you have any other explanation besides the attack

25   for your bloody eyes, swelling, tenderness and bruising?

1    A.      No.

2    Q.      Were you seen by a doctor to evaluate your injuries

3    after the attack on December 26th?

4    A.      Yes.

5    Q.      And who is that doctor?

6    A.      Dr. Tariq.

7    Q.      Was that the same doctor who had examined you when

8    you came to Chester a few days earlier?

9    A.      Yes.

10   Q.      Do you recall what you told Dr. Tariq for the

11   purpose of his medical examination?

12   A.      I told him what happened to me, that I was attacked,

13   that I was beat up.

14   Q.      Did you tell him about any injuries that you had

15   suffered?

16   A.      Yes.

17   Q.      What did you tell him?

18   A.      I don't think I told him about an injury that I

19   suffered, more so it was more visible.  And he addressed

20   what was there.

21   Q.      How long did it take for the redness in your eyes to

22   go away?

23   A.      About three weeks to a month.

24   Q.      How long did it take for the swelling to go away?

25   A.      A little bit over a month.  It was a little tender

1    still after a month, but it went down.

2    Q.     Chris, how else has the attack on December 26th

3    impacted you?

4    A.     This has impacted me more so mentally than

5    physically.  When it's talked about, when it was talked

6    about in opening statements, it sends a thrill through my

7    body, goosebumps, thinking about what happened, what they

8    did to me while I was in handcuffs.  It's a mental thing

9    more so than anything.  I can't explain how I'm shaky about

10   it still to this day, seeing those guys who did it to me,

11   and security figures and people who I think may do something

12   like that to me again.

13   Q.     Have you sought any mental health treatment since

14   the attack?

15   A.     Yes, still to this day.

16   Q.     Where did you seek that treatment?

17   A.     At Arden Shore and through a Nicasa program.

18   Q.     Did you meet with a therapist at those facilities?

19   A.     Yes.  At Arden Shore, I had a primary therapist.

20   And I have a primary therapist at Nicasa.

21   Q.     And were there symptoms, or the emotional harm that

22   you just described, did you describe anything like that to

23   your mental health treaters for the purposes of medical

24   treatment or diagnosis?

25   A.     Yes, I did.

Q.      What did you describe?

A.      I described about -- exactly how I just explained it

to you.  The thrills I get into goosebumps when I think

about it or when it's replayed in my mind.  How sometime at

night when I sleep, if I think about it or if it hits me or

if I can't sleep and I think about it, how I flinch or jump.

And it causes me to not be able to sleep because it's still

racing in my head.

Q.      Did you describe the attack itself to a mental

health treater for the purposes of medical treatment or

diagnosis?

A.      Yes, specifically my therapist from Arden Shore.

Q.      Chris, what are you looking to get from this

lawsuit?

A.      I want justice.  I want the people who did this to

me to be held accountable for what they did.  Because I

cannot force anybody to try them or prosecute them on a

criminal side, but nobody deserves to go through what I went

through.  What I went through is damaging.  It's bothering

me to this day.

        It scares me that I was in a mental institution to

get help, and the people I was trying to get help from, I

was begging for help from someone else to get away from

them.  The people who were supposed to help me were hurting

me.

1          And I, I believe, I want something to happen to be

2     enforced, to send a message so that this will stop happening

3     at the hospital, so that they will stop this practice of

4     thinking that somebody is mentally challenged or unable to

5     explain what's going on with them or what's happening, so

6     that this can't happen to nobody else.

7          Because anybody should feel that this could have

8     been their nephew, uncle, son, grandson, their own child,

9     that experienced the same thing I experienced.  So, I want

10    somebody to be held accountable, and, specifically, the four

11    guys who did what they did to me.  And not one of them, not

12    one person said "stop" or "that's enough."  Nobody said

13    nothing.

14         When Lucas was choking me, nobody stopped him until

15    someone screamed that there was a camera in there.  He

16    probably would have did it until I die.  Who's to determine

17    that?  They should be held accountable in a way that words

18    can't explain.

19         The pain that I felt, especially when I was clinging

20    on to breathe, when I was clinging for air, it should be a

21    way that's so damaging to them...

22         THE COURT:  I'm going to stop you.  I'm going to

23    stop you because you responded, and you need to be

24    responsive to the question and you have gone beyond the

25    question.

1          THE WITNESS:  Okay.

2          MR. SPIRA:  No further questions.  Thank you.

3          THE COURT:  Cross-examination.

4          MS. McCLIMANS:  Thank you, Your Honor.

5                      CROSS-EXAMINATION

6   BY MS. McCLIMANS:

7   Q.     Good morning, Chris -- or good afternoon.

8   A.     Good afternoon.

9   Q.     I just have a couple questions for you.  Now, you

10  spoke of some of the individuals making a reference to

11  calling you a name while you were in the dining hall.  Did

12  those individuals hurt you physically by calling you a name?

13  A.     Was I hurt physically --

14  Q.     Yes.

15  A.     -- by being called a name?

16  Q.     Yes.

17  A.     No.

18  Q.     Okay.  And then you proceeded into the stem.  And I

19  believe you testified then that Tom and Terry were escorting

20  you back to the unit.  And Terry said, "We want to show you

21  how we do it, and we want to" -- they were shoving you back

22  and forth.  Did the shoving actually cause you any physical

23  injury at that time?

24  A.     No.

25  Q.     Okay.  When they said, "We want to show you how we

1    do it," did that cause you any physical injury at that time?

2    A.      No.  Tom said it, not Terry.

3    Q.      Okay.  That's fine.  But you did say that Terry was

4    shoving you back and forth, so I just want to verify.  That

5    didn't cause you any physical injury at that time?

6    A.      No, ma'am.

7    Q.      Okay.  You were shown a video.  You saw the door

8    shutting.  You don't specifically know why that door was

9    shut, though, do you?

10   A.      Yes.

11   Q.      You believe you know.  But you don't specifically

12   know what was said between one of the defendants and the man

13   vacuuming, do you?

14   A.      I don't know what was said, no.

15   Q.      Okay.  You testified that you were suddenly yanked

16   to the ground from behind.  That Terry pulled you to the

17   ground; is that right?

18   A.      Correct.

19   Q.      Okay.  But when you went to the ground, you actually

20   landed on top of one of the defendants; right?

21   A.      Correct.

22   Q.      So, you landing on one of the defendants, did that

23   cause you harm?

24   A.      It initiated everything so, yes.

25   Q.      Okay.  You had to then roll off of the defendant.

1    Someone rolled you off the defendant; right?

2    A.     I don't know if you consider it rolled or turned me

3    off of him, pushed me over.  I was handcuffed.  I couldn't

4    control none of my movement or my body.

5    Q.     And that's when, that's when you believe that Lucas

6    Nordman said, "I'll kill you."

7    A.     Lucas Nanny?

8    Q.     Nanny.  I'm sorry.

9    A.     Yes.  He got on top of me and began chocking me,

10   saying that, yes.

11   Q.     Now that choking, he had his hands on you?

12   A.     Yes.

13   Q.     Up to this point in time, before Mr. Nanny has

14   actually got his hands on your neck, tell me specifically

15   what injury you had sustained up to now?

16   A.     I wouldn't know that.

17   Q.     Okay.  So, you are rolled over onto your stomach,

18   and you testified that the feet are flying past you; right?

19   A.     Yes.

20   Q.     You testified that you are kneed in the face.

21   A.     Yes.

22   Q.     Explain to me how that actually happened, the

23   kneeing in the face.

24   A.     I was laying on my stomach and my chest, handcuffed

25   behind my back, with my face face-forward like this --

1  (demonstrating) -- chin to the ground, and I begin being

2  kneed on the left cheek of my -- right here where I'm

3  winking.  (Indicating.)  Hard blows, knees, to my face.

4  Q.    Was the defendant actually kneeling down when that

5  was happening?

6  A.    Yes.  He was jump kneeing me.  He was lifting up and

7  coming down, striking me with his knee.

8  Q.    And which defendant was that?

9  A.    Josh Rackley.

10       MS. McCLIMANS:  Mr. Rackley, can you raise your

11  hand?

12       DEFENDANT RACKLEY:  (Complies.)

13  Q.    (BY MS. McCLIMANS)  Is that the defendant?

14  A.    Yes, ma'am.

15  Q.    Okay.  So, you said he was jump kneeing.

16  A.    Jump kneeing me, yes.

17  Q.    Right.  So, he is jumping and he is kneeing you in

18  the entire face?

19  A.    No.  When I say jump kneeing me, he was taking his

20  knee back and bringing it back in.  He wasn't just on his

21  knee and striking me.

22  Q.    Okay.

23  A.    He was taking his knee back, and bringing it back

24  in.

25  Q.    Okay.  And during that time -- and correct me if I'm

1    wrong -- you are moving your face back and forth on the

2    ground?

3    A.      No, I'm not moving my face until I start being

4    kneed.

5    Q.      Okay.  And then once you start being kneed, what are

6    you doing?

7    A.      Trying to run from the blows.

8    Q.      How are you doing that?

9    A.      By moving my face.

10   Q.      Back and forth on the ground, right?

11   A.      I couldn't move it back and forth because Lucas was

12   on the other side.  I was trying to run from the blows with

13   my face.  There wasn't much room to run.

14   Q.      Were you able to turn to the other side?

15   A.      Slightly.  But I was being hit over there, too.

16   Q.      All right.  Now, eventually you are lifted up;

17   right?

18   A.      Yes.

19   Q.      And that's where we see you in the video.  You are

20   actually being taken, after you are lifted up, into the

21   restraint room; right?

22   A.      Yes.

23   Q.      Okay.  And there are, you counted, eleven people;

24   right?

25   A.      Yes.

1    Q.      And you are taken into the restraint room.  And you

2    are actually -- the handcuffs are removed; right?

3    A.      Yes.  Eventually, yes.

4    Q.      And you are actually restrained into the bed?

5    A.      Yes.

6    Q.      Okay.  And you are telling us that Mr. Nanny is then

7    on top of you, strangling you or choking you?

8    A.      Prior -- prior to that, he was on top of me choking

9    me.  As soon as I was slammed on the bed, when I got in the

10   room, he started choking me again.

11   Q.      Was he on the bed on top of you?

12   A.      Yes.

13   Q.      Okay.  So, all of those individuals are in that

14   room, and you are -- you have your handcuffs removed; right?

15   A.      I don't understand your timeline.

16   Q.      Okay.  All of those eleven individuals go in the

17   restraint room with you; right?

18   A.      Yes.

19   Q.      You are laid onto the bed.

20   A.      Slammed onto the bed, yes.

21   Q.      Okay.  And then you are eventually placed into the

22   restraints; right?

23   A.      Yes.

24   Q.      And the handcuffs were removed before that or after

25   that?

1    A.      Before I was placed into the restraints?

2    Q.      Yes.

3    A.      Well, in order to be placed into the restraints with

4    my hands, the handcuffs had to be removed.

5    Q.      Okay.  Now, once you are actually restrained onto

6    the bed, does everyone leave?

7    A.      Yes, they eventually depart.  Yes.

8    Q.      All right.  How many minutes or seconds did it take

9    to actually get you restrained onto the bed?

10   A.      A minute -- a minute or so.

11   Q.      Okay.

12   A.      There was so many staff in there, that they all were

13   putting my limbs in restraints.

14   Q.      All right.  So, once that happened did they all

15   leave?

16   A.      I don't -- eventually?

17   Q.      Yes.

18   A.      A lot of them left.  But not all of them.

19   Q.      Okay.  You saw a nurse while you were in the

20   restraints on that bed, didn't you?

21   A.      What do you mean by "see a nurse"?

22   Q.      Did a nurse come it and look at you and take your

23   vital signs?

24   A.      I don't know about look at me.  She came in there

25   and took my blood pressure and my vitals, yes.

1    Q.      Was she able to see your face?

2    A.      I don't know that she looked at my face.

3    Q.      Were you able to see her?

4    A.      Yes.

5    Q.      You know that a nurse was in your room?

6    A.      Yes.

7    Q.      She did take your vital signs; right?

8    A.      Yes.

9    Q.      And did you tell her about any of your injuries?

10   A.      I tried to talk to her.

11   Q.      All right.  She looked you in the face, though.  Did

12   you actually have a conversation with her?

13   A.      She ignored me.

14   Q.      She ignored you?

15   A.      Yes.

16   Q.      Okay.  You said you were in there for four hours.

17   A.      I don't know, it was hours.  I don't know exactly

18   how many.  I don't recall.

19   Q.      What did you do you while you were in that room?

20   A.      As in?  I don't understand what you mean, what did I

21   do?

22   Q.      Did you --

23           THE COURT:  I'm sorry, Mr. Davis.  You need to speak

24   up because your voice is trailing off.

25           THE WITNESS:  I'm sorry.  I can't hear how loud I am

```
 1   because this ear has been clogged for five days, so I can't
 2   hear.
 3          THE COURT:  Well, we can't hear.
 4   A.     I don't understand, what did I do?
 5   Q.     (BY MS. McCLIMANS)  Let me ask you this:  After the
 6   nurse left, what did you do?  Did you make any noises?
 7   A.     I laid in the bed and cried.
 8   Q.     Did you, did you scream at all?
 9   A.     No.
10   Q.     Did you seek any help from anybody to come back in
11   the room?
12   A.     No.  I tried to talk to a nurse, and a nurse ignored
13   me when I tried to tell her what happened to me.  I got
14   discouraged.  All of those people just beat me up.  I don't
15   know who to trust.  I was new to this facility.  They made
16   racial slurs.  I was just quiet, and quiet, until somebody
17   came in there and told me, *That's how you're going to get
18   out of this room, you have to just be quiet.*
19   Q.     And it took you four hours to be quiet?
20   A.     No, that's not what I said.
21   Q.     Okay.
22   A.     I said that I was quiet the entire time, crying,
23   until a staff member finally came and told me, *That's how
24   you're going to get out of this room, just keep doing what
25   you are doing, be quiet.  Don't make any threats, don't make*
```

1    *any noise, just be quiet.*

2    Q.      Okay.  What time or how long after you had been in

3    that room did that staff member come into the room?

4    A.      I don't recall.  But I was there for hours before

5    someone even came and said that to me.

6    Q.      Okay.  Were you yelling out though, at all, when you

7    were in that room?

8    A.      No.

9    Q.      Were you struggling in the restraints while you were

10   in that room?

11   A.      No.

12   Q.      Now, as I understand it, your hands were -- your

13   arms were restrained down, and your legs were restrained

14   down; right?

15   A.      Yes.

16   Q.      You were able to move your head?

17   A.      Yes.

18   Q.      You were able to move your neck up and down?

19   A.      Yes.

20   Q.      Okay.  Were you able to scream, if you wanted to

21   scream?

22   A.      Yes.

23   Q.      Okay.  You were shown some of the pictures of your

24   injuries.  Was that the extent of the injuries that were

25   visible?

1    A.      What was that?

2    Q.      You were shown some pictures by your attorney of

3    your injuries.

4    A.      Yes.

5    Q.      Was that the extent of the injuries that were

6    visible?

7    A.      Was that the extent of the injuries?

8    Q.      That were visible.

9    A.      I don't understand your question.

10   Q.      Okay.  You testified that those were your visible

11   injuries, that your attorney showed you in Exhibits --

12   Plaintiff's Exhibit 3, 4, 5, and 9.

13           Do you remember testifying that those were your

14   visible injuries?

15   A.      Yes.

16   Q.      Okay.  Now, you saw Dr. Tariq the next day; right?

17   A.      Yes, I believe so, it was the next day.

18   Q.      You didn't see a doctor the day of this incident,

19   did you?

20   A.      No.

21   Q.      It was just a nurse; right?

22   A.      I didn't even see a nurse.

23   Q.      The nurse that was in the restraint room that took

24   your vitals?

25   A.      I did not see her.  She just came and did what she

1    wanted and left.

2    Q.      Okay.  Now, you didn't see any doctor that day

3    though; right?

4    A.      No.

5    Q.      You had no bleeding from anywhere on your face that,

6    that you needed a Band-Aid for or to be wiped off; right?

7    A.      Correct.

8    Q.      Okay.  And no one needed to bring you ice for any

9    swelling; right?

10   A.      I probably needed ice.

11   Q.      But you didn't get any ice from anyone?

12   A.      No, because I didn't see anybody.

13   Q.      You didn't ask for any ice either, though, did you?

14   A.      No.  I, I went and got on the phone, called my mom,

15   told her what happened.

16   Q.      Okay.

17   A.      And went in my room.

18   Q.      Let me just ask you a little bit more.  When you

19   left the restraint room, they finally let you out, you were

20   able to go to the dayroom; right?

21   A.      Yes.

22   Q.      And you didn't know that anything was wrong with

23   your eyes until someone brought that to your attention;

24   right?

25   A.      Correct.

1    Q.      And you didn't notice anything was wrong with your

2    eyes until you went in and looked in the mirror, which was

3    four hours after the incident with the defendants; right?

4    A.      I don't know how many hours it was.  It was hours

5    later.  And it was after I got released from the restraints,

6    that someone pointed it out to me and said, "Damn, go look

7    at your face.  They did that to you?  They beat you up."

8    Q.      There were no resident witnesses to the incident

9    though; right?

10   A.      Yes, there were.

11   Q.      But no one can actually tell us who harmed your eyes

12   though; right?  Nobody witnessed that part of it; right?

13   A.      As in people-wise?

14   Q.      Yes.

15   A.      No, not besides myself.

16   Q.      Okay.  So, going through the defendants, you've got

17   -- you've got Tom Nordman punching your body and maybe

18   punching the genitals?

19   A.      Yes, ma'am.

20   Q.      Okay.  And Josh punched -- and he only kneed you in

21   the face, he didn't do anything else; right?

22   A.      I don't know for a fact -- I know for a fact that he

23   was kneeing me.

24   Q.      And you think that Lucas Nanny was someone that was

25   choking you?

1  A.    I know for a fact Lucas Nanny was the one that was

2  choking me.

3  Q.    Okay.  And Terry Stewart, what do you think Terry

4  Stewart did to you?

5  A.    I know for fact that he pulled me down to the

6  ground, and he probably was -- when I was feeling the blows

7  about the body, he was probably hitting me about the body

8  while I was on my stomach.

9  Q.    And Terry Stewart is the one that pulled you

10 backwards?

11 A.    Yes.

12 Q.    And you actually landed on top of Terry?

13 A.    Yes.

14 Q.    Now, you testified that you have some mental health

15 issues, and you talked to a mental health provider because

16 of this?

17 A.    Yes.

18 Q.    But you were already in Chester Mental Health;

19 right?

20 A.    Yes.

21 Q.    And as far as the Arden Shore Behavioral Health

22 Center, you didn't go there until just recently; right?

23 A.    Yes.

24 Q.    March of 2019; right?

25 A.    Yes, that sounds about accurate.

1    Q.      Okay.  And this incident took place in December of

2    2011; right?

3    A.      Yes.

4            MS. McCLIMANS:  May I have one moment, Your Honor?

5            THE COURT:  You may.

6            (Off the record.)

7            MS. McCLIMANS:  That's all we have, Your Honor.

8            THE COURT:  Any redirect?

9            MR. SPIRA:  Just one or two questions, Your Honor.

10                      REDIRECT EXAMINATION

11   BY MR. SPIRA:

12   Q.      Chris, did you have any control over the amount of

13   time between the attack and when you finally saw a doctor?

14   A.      No.  I was seeing doctors inpatient.

15           MR. SPIRA:  Thank you.  Nothing further.

16           THE COURT:  Anything else?

17           MS. McCLIMANS:  No, Your Honor.

18           THE COURT:  Mr. Davis, you can step down.

19           THE WITNESS:  Thank you.

20           THE COURT:  Would you call your next witness, Mr.

21   Spira?

22           MR. SPIRA:  Your Honor, we'd like to call Dr. Tariq.

23   I believe he's out in the hall at the moment.

24           THE COURT:  Okay.  Somebody can go grab him.

25           (Pause.)

1          Dr. Tariq, would you please step forward, sir?

2          THE WITNESS:  Sure.

3          (Witness sworn by clerk.)

4          THE WITNESS:  My last name is T-A-R-I-Q.

5          THE COURT:  You may proceed.

6                    AHMED TARIQ,

7     having been first duly sworn, was examined and testified as

8     follows:

9                    DIRECT EXAMINATION

10    BY MS. BECKER:

11    Q.     Good afternoon, Dr. Tariq.

12    A.     Good afternoon.

13    Q.     Can you please tell the jury what your occupation

14    is?

15    A.     I'm a Medical Doctor.  I work emergency medicine and

16    I work as a house physician in Chester Mental Health.

17    Q.     How long have you worked at Chester?

18    A.     In total, I have worked 15 years.

19    Q.     When you worked at Chester for 15 years, did you

20    provide medical services to the patients at Chester?

21    A.     Yes, ma'am.

22    Q.     Do you recognize my client sitting over there,

23    Christopher Davis?

24    A.     Yeah.  Yeah.  Very well.

25    Q.     Okay.

1        MS. BECKER:  Your Honor, permission to approach the

2    bench?

3        THE COURT:  You may.

4    Q.      (BY MS. BECKER)  Mr. Tariq, I'm handing you what's

5    previously been marked as Plaintiff's Exhibit 2.  Do you

6    recognize this document?

7    A.      Yes.

8    Q.      What is it?

9    A.      This is an admission history physical which is

10   performed when any other -- any new patient comes to Chester

11   Mental Health.  That's the first thing happens to him, that

12   he is evaluated by medicine and by psych people.

13   Q.      Is it fair to say you fill those forms out

14   frequently?

15   A.      Yes, almost every -- everyday basis.

16   Q.      Okay.  Can you turn to the bottom of the second page

17   of that document?

18   A.      Yes, ma'am.

19   Q.      Do you see your signature --

20   A.      Yes.

21   Q.      -- on the document?

22   A.      Yes.

23   Q.      And what is the patient's name in this record?

24   A.      Christopher Davis.

25        MS. BECKER:  Your Honor, at this time I'd move to

1    admit Plaintiff's Exhibit 2 and publish it to the jury.

2           THE COURT:  Any objections?

3           MR. SHULTZ:  No objection.

4           THE COURT:  Plaintiff's Exhibit 2 is admitted.

5    Q.     (BY MS. BECKER)  Dr. Tariq, can you read the date at

6    the top of this document?

7    A.     12/22/11.

8    Q.     And can you read what you wrote under the first

9    section, Chief Complaint or Presenting Problem?

10   A.     Yeah, admission -- this evaluation was for admission

11   history and physical.  Patient did not offer any complaint

12   upon admission to the Chester Mental Health.  His history of

13   birth and development seems to be normal.

14   Q.     So, when it says that the patient did not offer any

15   complaints during this intake form, does that mean he didn't

16   complain of any injuries?

17   A.     Yeah, he -- at that point, he did not mention any

18   injuries.

19   Q.     Okay.

20   A.     Or any medical complaint.

21   Q.     Dr. Tariq, I am now handing you what's been

22   previously marked as Plaintiff's Exhibit No. 1.  Do you

23   recognize this document?

24   A.     Yes, ma'am.

25   Q.     Can you explain for the jury what this document is?

1    A.      Well, when there is any injury to any patient,

2    either patient to patient or patient to a staff, this injury

3    report is filled out.  And whatever physical finding or

4    patient complaints, those are mentioned in this.  And an

5    evaluation and a management plan is devised based on

6    physical findings and the patient complaint.

7    Q.      Do you see your signature anywhere on this document?

8    A.      Yes, ma'am.  I see it on the bottom.

9    Q.      Okay.  And what is the patient's name on this

10   document?

11   A.      Christopher Davis.

12   Q.      And is it common for you to fill out injury reports

13   like this during your time at Chester?

14   A.      Say it again, please?

15   Q.      Is it common for you to fill out injury reports --

16   A.      Yeah, quite a bit.

17   Q.      -- like this?

18   A.      Quite a bit.

19        MS. BECKER:  Your Honor, at this time I'd like to

20   admit Plaintiff's Exhibit 1 and publish it to the jury.

21        THE COURT:  Any objections?

22        MR. SHULTZ:  No objections.

23        THE COURT:  Plaintiff's Exhibit 1 is admitted.

24        MS. BECKER:  Thank you, Your Honor.

25   Q.      (BY MS. BECKER)  Dr. Tariq, do you see your

1    handwriting in the box titled Physician's Examination,

2    Comments, and Disposition --

3    A.      Yes, ma'am.

4    Q.      -- towards the bottom right-hand side of the page?

5    A.      Yes.

6            THE COURT:  Counsel, do you have an extra hard copy

7    of this record?

8            MS. BECKER:  Yes, Your Honor.

9    Q.      (BY MS. BECKER)  Dr. Tariq, before we get into more

10   detail on those particular comments --

11   A.      Sure.

12   Q.      -- what is the date of this injury report?

13   A.      I'm seeing here 12/22/11.

14   Q.      The date at the upper left-hand corner of the injury

15   report, what is it again?

16   A.      Sorry.  Sorry.  Sorry.  It says 12/27/11.

17   Q.      So, does this mean that you would have filled out

18   this report and examined the patient on that date?

19   A.      Yes, ma'am.

20   Q.      Okay.  Now, can you please read word for word what

21   you have written in the first part of that comment box?

22   A.      Yeah.  So, basically, I am saying patient reports

23   that he was hit by staff and this injury occurred while he

24   was held in physical hold and in restraint process.  Like

25   when there is an injury, you know, they try to contain by --

1    that's called physical hold.

2         And then -- what you call -- and then he was placed

3    into the physical restraints, the leather thing you were

4    talking this morning, so -- and this is, to be honest to

5    this court, this is a dangerous time for both patients and

6    the staff.  Because when the patient goes in physical hold,

7    he has his emotions -- staff try to contain it and sometime

8    injury happens both ways.

9    Q.    Mr. Tariq, what is -- or Dr. Tariq, excuse me --

10   what does the "S" mean up above before --

11   A.    "S" means subjective, what the patient said.  "O" is

12   objective, what I saw.  "A" and "P" is Assessment, that --

13   what I think of this injury.  And the Plan, what I'm going

14   to do about it.

15   Q.    Okay.  So, can you go to the next line and read what

16   that says, please?

17   A.    It says -- can I ask you one question before I --

18         THE COURT:  Hold on.  Hold on.

19         THE WITNESS:  No?

20         THE COURT:  You may not -- you probably should not

21   ask the question.

22         THE WITNESS:  Okay.

23         THE COURT:  Is there a problem --

24         THE WITNESS:  No.  No.  I was just asking the date

25   when -- date.  Only thing I -- asking this date and -- okay.

1          THE COURT:  You got the date at the top of the
2    record, Doc.
3          THE WITNESS:  Okay, go ahead.
4          THE COURT:  Could you just respond to the questions,
5    please?
6          THE WITNESS:  Sure.
7    Q.     (BY MS. BECKER)  I'll repeat the question.  Could
8    you read the second line there that's boxed in red, please?
9    A.     Yeah.  Periorbital tenderness and swelling, and
10   there is some swelling behind the left ear; pupil are equal,
11   reacting to light and accommodation; and extraocular muscles
12   are intact.
13   Q.     Before getting into that part of the comment, can
14   you read what's in the red text right there?
15   A.     Yes.  Conjunctival redness present bilateralized,
16   yes.
17   Q.     What does bilateral mean, or "BL"?
18   A.     "BL" means both eyes.
19   Q.     Okay.  And you mentioned earlier for the jury what
20   "O" means.  Can you explain --
21   A.     Yeah, "O" is objective findings.  What physician
22   finds on physical exam, that's objective.
23   Q.     So, subjective finding is what the patient tells
24   you --
25   A.     Patient tells you.

1  Q.      Objective finding is what you observed on the

2  patient?

3  A.      You got it.  Yeah.

4          THE COURT:  Okay.  Doctor, could you let her finish

5  her question before you answer?

6          And do the same thing, counsel.

7          Only because the court reporter can only take down

8  one person talking at a time.

9          THE WITNESS:  Okay.

10  Q.      (BY MS. BECKER)  Dr. Tariq, can you read the next

11  line down to the side of conjunctival redness, that's in the

12  red box right there?

13  A.      Yeah.  Slight swelling behind left ear.

14  Q.      Does that you mean that you observed swelling on Mr.

15  Davis?

16  A.      Yes, ma'am.

17  Q.      Okay.  Can you also read the next --

18          MR. BARNES:  Excuse me.

19          THE CLERK:  It might be your cable.

20          MR. BARNES:  Okay.

21          (Off the record.)

22          THE COURT:  Counsel, would you be able to use the

23  Elmo?

24          MS. BECKER:  Yeah, I can use the Elmo.

25  Q.      (BY MS. BECKER)  Dr. Tariq, apologize for the

1    technical difficulties here.

2    A.      Not a problem.

3    Q.      Would you mind reading the sentence under

4    conjunctival redness, that I am highlighting in this

5    document?

6    A.      Periorbital tenderness, and then PERLA/EOMI.

7            PERLA is abbreviation for Pupil Equal Reacting to

8    Light and Accommodation.  And Extraocular Muscles Intact.

9    Q.      Before getting to that second sentence, can you

10   explain to the jury what periorbital tenderness means?

11   A.      Yeah.  Periorbital tender means swelling and redness

12   in response to an injury or a physical trauma.

13   Q.      And does periorbital mean around the eyes?

14   A.      Yeah, around -- around the eyes.

15   Q.      Okay.  And can you explain one more time a little

16   more slowly for us nonmedical personnel, what you said

17   P-E-K-L-A [sic] means?

18   A.      Yeah, Pupil Equal and Reacting to Light and

19   Accommodation.  What it means is, there is injury

20   periorbital, around the eye, but eye in itself seems to be

21   reacting and moving well.

22   Q.      Okay.  And what about the next letters that you have

23   here?  EOMI?

24   A.      Yeah, Extraocular Muscles Intact.

25   Q.      Can you translate that for us, as well, please?

A.      Yeah, like, these are the muscles of the eye which move the eye to the right or the left, or up or down.  So those -- he was able to perform those functions.

What I am trying to say is, this injury which has happened or patient is alleging has happened to the periorbital region, but not involving the muscles which move the eye right and left or up and down, so that operatus is intact.

Q.     Okay.  And can you read what I am highlighting under that, please?

A.      Yeah.  This assessment is basically to summarize my assessment of the subjective, what patient told me; on objective, what I found on clinical exam; and I am saying that this patient is alleging physical abuse.

And what I'm saying in the second line, that my physical findings substantiate that.

Q.     Okay.  So, can you read for the jury exactly what you wrote in that second line?

A.      Yeah, the same thing, basically, I try to explain.  Physical evidence present.

Q.     Okay.  So, you said that --

A.      He is alleging and I'm finding some physical finding, which are suggestive of some injury or trauma.

Q.     Okay.  So, you are substantiating in your examination what he told you?

1    A.      Yes.

2    Q.      Okay.  Dr. Tariq, did you exam Chris on December 26,

3    2011, immediately following the attack that he alleged?

4    A.      No.  I, I think this is 27th is, is the next day.

5    It's not immediate I'm seeing, not right away.

6            MS. BECKER:  Okay.  Thank you, Doctor.  We have no

7    further questions at this time.

8            THE WITNESS:  Thank you.

9                          CROSS-EXAMINATION

10   BY MR. SHULTZ:

11   Q.      Hello, Dr. Tariq.

12   A.      Hi.

13   Q.      I just have a few questions for you.

14   A.      Sure.

15           MR. SHULTZ:  Your Honor, I'd like to show the jury

16   again what's been previously submitted as Plaintiff

17   Exhibit 1.

18           THE COURT:  Okay.

19           MR. SHULTZ:  Thank you.

20           THE COURT:  It's been admitted.  You can just plop

21   it right on up there.

22           MR. SHULTZ:  Okay.  I'll just leave -- I'll leave

23   it --

24           THE COURT:  That's different Plaintiff's Exhibit 1?

25   Are you going to rehighlight?

1          MR. SHULTZ:  Yes.  Actually, I probably won't

2   highlight it, Your Honor.

3   Q.     (BY MR. SHULTZ)  Dr. Tariq, you were just looking at

4   Exhibit -- I just want to put it up there because I will be

5   referencing it multiple times.

6   A.     Sure.

7   Q.     So, your comment that the patient reported he was

8   hit by staff, that is a subjective comment.  That's what the

9   patient reported to you.  You are not concluding that in the

10  beginning of your comments; correct?

11  A.     Yes.  I am just mentioning there what patient said.

12  That's a subjective.

13  Q.     And then in the -- you talked about the O-slash.

14  That's -- you said that was the objective part of your

15  statement.  You are not concluding how or when those

16  injuries occurred, but you're just, you're just showing

17  which injuries you found present?

18  A.     Yeah, at that moment that I'm examining him.

19  Q.     And you listed the patient had conjunctival redness

20  and that, obviously, you observed the redness in the

21  patient's eyes?

22  A.     Yes.

23  Q.     And you, you used those acronyms, the PERLA and

24  EOMI?

25  A.     Yeah.

1   Q.      You referenced that PERLA means Pupil Equal,

2   Reacting to Light and Accommodation; is that correct?

3   A.      Yes, sir.

4   Q.      And then EOMI stands for Extraocular Muscles are

5   Intact?

6   A.      Yes, sir.

7   Q.      Did you perform some type of eye exam in order to

8   come to those conclusions?

9   A.      Yes.

10   Q.      What, what did the eye exam consist of?

11   A.      Physical exam.  You move -- ask patient to look into

12   your eyes, and then ask the patient not to move his head or

13   neck and just follow the finger.  I show my finger in

14   different directions, goes back and forth, right and left,

15   up and down, and sideways.  And if the patient is, you know,

16   making all those movements symmetrical and equal on both

17   sides, most likely clinically the muscles are intact.

18   Q.      And you found that the pupils were --

19   A.      Yes.

20   Q.      -- round and reactive?

21   A.      Yes.

22   Q.      And the -- that's normal; correct?

23   A.      Yes.

24   Q.      And the, the muscles were working normally?

25   A.      Yes, sir.

1    Q.      There was no -- they were not injured in any way

2    that you found?

3    A.      Not to my clinical exam.

4    Q.      Now, the tenderness you reported, was the tenderness

5    first reported by the patient or did you observe the

6    tenderness?

7    A.      You don't observe the tenderness.  You touch the

8    patient, and it's an objective finding from the patient.

9    When I touch your -- any bone or some -- any -- like if you

10   feel painful when I touch, or not, that's how you find out,

11   elicit tenderness.

12   Q.      So, you touched him in the periorbital --

13   A.      Yes.

14   Q.      -- region --

15   A.      Yes.

16   Q.      -- and you saw that, you know, he was --

17   A.      Yes.

18   Q.      -- sore --

19   A.      Yes.

20   Q.      -- and he reacted?  Did you -- what were the -- do

21   you recall what signs he showed of the tenderness?

22   A.      Well, at this point, I think redness, swelling,

23   pain, tenderness, those are the four typical features of any

24   tenderness.

25   Q.      And is there any other measurement of tenderness

1   besides that, that test?

2   A.      Well, deeper down, I suppose if there is any

3   fracture of the bone or something, for that I order an X-ray

4   to make sure this tenderness the patient is eliciting, you

5   know, is a result of simple bone contusion or a result of a

6   fracture or something.  So, that's why I ordered an X-ray on

7   that patient.

8   Q.      And you don't know the results of those X-rays?

9   A.      Not at this point.

10  Q.      I'd like to show you Plaintiff's Exhibit 3.

11  A.      Sure.

12  Q.      Dr. Tariq, is this -- have you seen this picture

13  before?

14  A.      No.

15  Q.      Do you recall, is this what plaintiff looked like

16  when you examined him on December 27 --

17  A.      I cannot recall at this time, this is six or seven

18  -- how many years ago.  I'm just, I mean, you know, going by

19  what I have documented here.

20  Q.      Does it appear in this picture that the plaintiff

21  has conjunctival redness?

22  A.      Yes.  I mean, I can still see conjunctival -- I mean

23  -- conjunctival redness on both eyes.

24  Q.      Now, Dr. Tariq, when you, when you saw plaintiff on

25  December 27, you didn't note that there were any swelling

1    around plaintiff's eyes specifically.

2    A.      Say it again, please.

3    Q.      When you saw plaintiff on December 27, in your note

4    you didn't mention any swelling around the eyes.

5    A.      Well, I have mentioned -- okay.  I -- we go by

6    positive find -- you look at the space, you know, how much

7    the space is to write any situation.  So what I -- you write

8    the positive pertinent findings.  That's how I write, you

9    know, my note.  So, those are my pertinent findings.

10          When there is a tenderness, there is swelling,

11   everything is entered on this, yes, they all go hand in hand

12   with each other.

13   Q.      Okay.  And I have just a few more questions.

14   A.      Sure.

15   Q.      There is no indication that patient either

16   subjectively reported to you or you objectively observed any

17   injuries to plaintiff's ankle; correct?

18   A.      No.

19   Q.      And plaintiff didn't report and you didn't observe

20   any injuries to plaintiff's genitals?

21   A.      No.

22   Q.      And plaintiff didn't report and you didn't observe

23   any injuries to plaintiff's torso?

24   A.      No.

25   Q.      Plaintiff didn't report and you didn't observe any

1    injuries to plaintiff's neck?

2    A.      Behind ear -- I saw left ear.

3    Q.      The slight swelling behind the left ear?

4    A.      Yes.

5    Q.      And that was the only injury you indicated to his

6    neck?

7    A.      And I think a wrist, I also mentioned here.

8    Q.      The left wrist, as well, yes.  And did you indicate

9    or did the plaintiff report to you any swelling in his

10   cheeks?

11   A.      I, I don't mention here.

12   Q.      Did the plaintiff report to you or did you observe

13   any swelling in his lips?

14   A.      I don't think so.

15   Q.      And did the plaintiff report to you or did you

16   observe any injuries consistent with choking or

17   strangulation?

18   A.      No, not on the neck.

19   Q.      The treatment that you mentioned in the -- at the

20   conclusion of your note includes an X-ray, Tylenol, and a

21   follow-up with the eye doctor; correct?

22   A.      Yes.

23   Q.      And is Tylenol the only medication that you

24   prescribed?

25   A.      Yes.  I just keep one thing in mind.  I'm seeing

1    this patient next day.  This ice pack, what you were talking

2    this morning, if you -- if I got hit now, this is the time

3    to apply me, because that's the time the swelling process

4    and all that initiates after a trauma or injury.  So that's

5    the time, in first half an hour, 30 minutes, you know, and

6    that limits the swelling and fluid accumulation.

7         A day later, it's, it's -- after 24 hours, the

8    healing process doesn't start.  Body starts its own healing

9    process after 16 to 18 hours.  And then at that point, you

10   do not want to cut down -- what you call -- blood flow to

11   the area, so that's why applying ice pack or anything a day

12   later doesn't -- it is contra-productive rather than any

13   advantage of that, at that point.

14   Q.    It -- I'm sorry.  Is it for those same reasons you

15   didn't prescribe the typical RICE treatment?  The Rest, Ice,

16   Compression, Elevation?

17   A.    Yeah, exactly.  That explains that.

18   Q.    And did -- you didn't see the plaintiff again after

19   this; correct?

20   A.    I cannot tell you unless I'm looking the whole

21   chart.  But I have written him follow up PRN that, you know,

22   after this visit if he need some -- if he develops more

23   complaints or something, he can be seen back again.

24   Q.    So, you are not sure when or if the swelling and the

25   redness subsided or went away?

1    A.      Yes.

2    Q.      And did, did you -- that's all.

3            MR. SHULTZ:  That's all the questions I have, Your

4    Honor.

5            THE COURT:  Any redirect direct?

6            MS. BECKER:  Briefly, Your Honor.

7                         REDIRECT EXAMINATION

8    BY MS. BECKER:

9    Q.      Dr. Tariq, in the intake form that we looked at

10   earlier, did it say anything about Chris experiencing

11   subconjunctival hemorrhaging or bleeding in his eyes?

12   A.      None whatsoever.

13   Q.      Did the intake form from a few days earlier say

14   anything about swelling, tenderness, et cetera?

15   A.      No.

16   Q.      The defense counsel asked you about ordering an

17   X-ray for Chris.  Do you remember that?

18   A.      Yes.

19   Q.      Do you order an X-ray for a patient every time you

20   see them in your office?

21   A.      No.  X-ray -- which X-ray are you talking about?

22   Q.      The X-ray that you ordered for the swelling around

23   the eyes.

24   A.      Okay.  No, this was after the injury.  When I'm

25   doing the second -- this one.  At that time, I ordered

1    X-ray.  Not the initial intake exam, no.

2    Q.      Right, Dr. Tariq.  And every time a patient comes in

3    alleging some sort of injury, do you always require an

4    X-ray?

5    A.      No.  It depends on clinical evaluation, what you

6    think of that.

7    Q.      Thank you, Dr. Tariq.

8            MS. BECKER:  Nothing further, Your Honor.

9            THE COURT:  Anything else, counsel?

10           MR. SHULTZ:  No, Your Honor.

11           THE COURT:  Thank you, Dr. Tariq.  You may step

12   down.

13           THE WITNESS:  Thank you.

14           THE COURT:  Does the plaintiff have any additional

15   witnesses?

16           MR. SPIRA:  No, Your Honor.  At this time, we close

17   our case.

18           THE COURT:  The plaintiff rests?

19           MR. SPIRA:  Plaintiff rests.  Thank you.

20           THE COURT:  Okay.  Can counsel approach sidebar,

21   please?

22           (Proceedings continued at the bench, outside the

23   hearing of the jury.)

24           THE COURT:  Okay.  So, I think I was overly

25   ambitious.  I really do not see a way.  We need to take up

motions.  We are -- we have still a little bit more work to do on the instructions.  In other words, I have to put them in the order that I would read them in, in the marked format, and have you guys take a look at them.  And then we'll have to finalize them and clean them up.

You know, you always look at things like that and say, *I can get that done in a short period of time*.  But, truthfully, you know, we wouldn't get this case to the jury and start reading instructions before 4:00.  We're not going to give this case to the jury at 4:30, number one, because it's -- you know, the courthouse shuts down.

So, I'm going to fall on the sword and tell the jury I lied to them, not purposely, but my expectations are -- were ambitious.  But what I think I'm going to do is go ahead and send them home, and then we'll take up the motions at the end of the case.  Then we'll finish up with the instructions and get them to the point where all that's left to be done -- actually, we can get the instructions to you before you leave this evening, and then let you go home.

And bring the jurors back to start with reading instructions, closing arguments, and give the case to them in the morning.  Unless anybody has any opposition to that?  We can't get it to them.  (Pause.)  It won't serve anybody to give this jury a case at 4:00, and then they shut off the air circulation in this building.  We don't know which way

1    that's going to go cut.  I don't know if anybody's willing

2    to take a 50/50 risk that it cuts against them.  Okay.  So,

3    that's what we're going to do.

4           (Proceedings continued in open court, plaintiff and

5    jury present.)

6           THE COURT:  Okay.  Ladies and gentlemen, that

7    completes the evidence.  I'm going to have to fall on the

8    sword and say I was quite ambitious this morning.  We still

9    -- there are certain things we can't do until the evidence

10   is completed.  And now that it's completed, we probably

11   would be an hour away from being able to give you

12   instructions.  We are not going to instruct you on the law

13   at 4:00.  You know, the end of the day is 4:30 and, frankly,

14   the Federal Government cuts off air circulation at 4:30, and

15   you will have no doubt about it by 4:35.

16          So, I'm going to keep these people here.  We're

17   going to continue to work and get it done.  I'm going to

18   recess.  Have you come back in at 9:00 in the morning.  When

19   you come back, you're going to get my instructions, you're

20   going to hear closing arguments, and then you'll be doing

21   your job.  Okay?

22          So, have a good evening.  Please remember my

23   admonitions not to discuss the case or do any research on

24   the case.  Be careful out there and I'll see you in the

25   morning.  And thank you.

1            (Proceedings continued in open court, plaintiff

2    present; jury not present.)

3            THE COURT:  Okay.  So, we're going to recess for the

4    day.  The parties can go home.

5            And, counsel, if you want to hang around out here,

6    I'm going to -- first thing I'm going to do is put in order

7    the marked copies of the instructions that we have.  Once I

8    put them in order, Sona's going to bring you copies to look

9    over.  You can look over them for order.  You can also

10   review them and let me know if you see any issues with them

11   based on the instruction conference and the rulings that I

12   made.

13           Once we get that cleared up, then she's going to do

14   clean copies in the order that they will be read and we'll

15   give you guys a set before you leave here tonight so you can

16   use them in your closing arguments, so you can know what the

17   jury will be instructed of.

18           Then we'll be done, and we'll start up 9:00 in the

19   morning.  I'll read the instructions to the jury.  Closing

20   -- you can do your closing arguments and we'll get the jury

21   the case.

22           Mr. Spira, do you have any estimate as to how long

23   of a closing argument you anticipate?

24           MR. SPIRA:  I would anticipate no more than 20

25   minutes, perhaps with an additional five minutes for

1    rebuttal.

2         THE COURT:  Okay.  Is that sufficient time for the

3    defendant, as well?

4         MS. McCLIMANS:  Yes, Your Honor.

5         THE COURT:  So, you can let -- you can let Stacie

6    know in the morning how you want your time split up.  But

7    we'll talk about a total of 25 minutes and then, once you

8    figure it out, you can decide how you want to split it up

9    and what warnings you want in the morning.

10        All right.  Anything else we need to take up on the

11   record?  (Pause.)  All right.  Thank you.

12        (Court recessed from 3:02 p.m. to 3:25 p.m.)

13        (Proceedings continued in open court, plaintiff

14   present; jury not present.)

15        THE COURT:  Okay.  We're on the record.  I have

16   already discussed this with the attorneys but I wanted to

17   put it on the record.  We received -- I received information

18   from the Court Services Officer that, as the jurors were

19   leaving for the day, Juror No. 6, Miss Shafer, informed him

20   that she had received a phone call that her mother,

21   unfortunately, was dying.  And she's in New Mexico.  And I

22   think she indicated to the CSO that she hadn't decided what

23   she was going to do.

24        Under the circumstances, I discussed with the

25   attorneys that we have eight jurors, we only need six for a

1    verdict, so Miss Shafer's absence would not jeopardize

2    deliberations or a verdict.  And that I thought, under the

3    circumstances, it would be best for me to communicate with

4    Miss Shafer this evening, to let her know she would not

5    jeopardize the case or the verdict if she were excused, and

6    that I was happy to excuse her so that she could just make

7    whatever decision and do whatever she needs to do.  She does

8    not need that hanging over her head or need to be here with

9    that hanging over her head.

10            So, all of the attorneys are in agreement with that

11   approach and that's what we intend to do.  Okay.  Thank you.

12            (Pause.)

13            All right.  We have one more issue to take up on the

14   instructions.  The parties have submitted Joint Instruction

15   No. 11, which is based on Seventh Circuit Pattern

16   Instruction 1.15, which informs the jury that the plaintiff

17   has been convicted of a crime and tells them that they can

18   consider that as it relates to plaintiff's credibility.

19            However, during the course of trial there was no

20   evidence that plaintiff has in fact been convicted of a

21   crime.  As a result, plaintiff now objects to giving this

22   instruction.

23            Miss McClimans, what's the defendants' response?

24            MS. McCLIMANS:  I have no objection, Your Honor.  I

25   did not bring it into evidence.

1       THE COURT:  Okay.  So, without objection, the Joint
2  Instruction No. 11 is withdrawn and it will not be given.
3       Any other issues with respect to the instructions
4  before we shut down?
5       MR. SPIRA:  I do have one --
6       THE COURT:  Mr. Spira?  Really?
7       MR. SPIRA:  Sorry, Judge.  We're almost there.
8       On the Jury Verdict Form, I understand Your Honor's
9  prior ruling with regard to nominal damages.  It's
10 nevertheless our position that, having it as a separate line
11 with its own check box, is prejudicial, to have the first
12 line on the verdict form say, "we assess nominal damages in
13 the amount of one dollar" with a check box, as opposed to
14 not having that instruction or having it as a subpart of
15 compensatory damages.
16      THE COURT:  It's consistent with how this Court
17 believes the jury needs to be instructed and I think it's
18 clear, particularly when you consider it in light of the
19 language of the instruction that tells them that if they
20 find an injury, they need to consider compensatory damages.
21 If they don't find an injury, then they need to assess
22 nominal damages.
23      So, I really don't know what the objection is,
24 beyond the fact that I understand the plaintiff's position
25 remains that there should be no consideration of nominal

1   damages.  But beyond that, I do not see why this verdict

2   form is objectionable.

3          Miss McClimans?

4          MS. McCLIMANS:  I agree with the Court because it

5   does follow the plaintiff's contested instruction, No. 21.

6   Check box or not, it would still be in there.

7          THE COURT:  Okay.  Overruled.  It will be given.

8          (Court adjourned at 3:55 p.m.)

9

10

11

12

13                    REPORTER'S CERTIFICATE

14          I, Christine Dohack LaBuwi, RDR, CRR, Official Court

15   Reporter for the U.S. District Court, Southern District of

16   Illinois, do hereby certify that I reported with mechanical

17   stenography the proceedings contained in pages 1-126; and

18   that the same is a full, true, correct and complete

19   transcript from the record of proceedings in the

20   above-entitled matter.

21

22          DATED this 13th day of January, 2020,

23

24                  s/Christine Dohack LaBuwi, RDR, CRR
                    ---------------------------------------
25                  Christine Dohack LaBuwi, RDR, CRR