1          UNITED STATES OF AMERICA
           SOUTHERN DISTRICT OF ILLINOIS
2

3    CHRISTOPHER NOVUS DAVIS,          )
                                       )
4                     Plaintiff,       )
     v.                                ) No. 3:13-cv-01260-SMY
5                                      )
     LUCAS NANNY, TOM NORDMAN, JOSH    )
6    RACKLEY, and TERRY STEWART,       ) Benton, Illinois
                                       )
7                     Defendants.      )

8

9

10            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                         DAY 2 OF 2
11
              BEFORE THE HONORABLE STACI M. YANDLE
12             UNITED STATES DISTRICT JUDGE

13                    December 10, 2019

14

15

16

17

18

19

20

21   REPORTED BY:        Christine Dohack LaBuwi, RDR, CRR
                         Official Court Reporter
22                       301 West Main Street
                         Benton, Illinois  62812
23                       (618) 439-7725
                         Christine_Dohack@ilsd.uscourts.gov
24
     Proceedings recorded by mechanical stenography, produced by
25   computer-aided transcription.

```
 1    APPEARANCES:

 2    FOR PLAINTIFF:      Julie Becker, Esq.
                          Christopher Batdorf-Barnes, Esq.
 3                        Daniel A. Spira, Esq.
                          SIDLEY AUSTIN LLP
 4                        One South Dearborn Street
                          Chicago, IL  60603
 5                        (312) 853-9203
                          julie.becker@sidley.com
 6                        cbarnes@sidley.com
                          dspira@sidley.com
 7
      FOR DEFENDANT:      Christine G. McClimans, Esq.
 8                        OFFICE OF THE ATTORNEY GENERAL
                          500 South Second Street
 9                        Springfield, IL  62706
                          (217) 782-1090
10                        cmcclimans@atg.state.il.us

11                        Robert Brandon Shultz, Esq.
                          OFFICE OF THE ATTORNEY GENERAL
12                        201 West Point Drive, Suite 7
                          Belleville, IL  62226
13                        (618) 236-8781
                          rshultz@atg.state.il.us
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2
                                              PAGE:
3

4      Court Instructions by the Court         130:3
       Closing Argument by Mr. Spira          139:6
5      Closing Argument by Ms. McClimans      149:11
       Closing Argument by Mr. Spira          156:15
6      Verdict                                 160:7

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings began in open court at 9:00 a.m,

2     plaintiff present; jury present.)

3          THE COURT:  Members of the jury, you have seen and

4     heard all the evidence.  Now I will instruct you on the law,

5     and then you will hear the arguments of the attorneys.

6          You have two duties as a jury.  Your first is to

7     decide the evidence from the evidence in the case.  This is

8     your job and yours alone.

9          Your second duty is to apply the law that I give you

10    to the facts.  You must follow these instructions, even if

11    you disagree with them.  Each of the instructions is

12    important, and you must follow all of them.

13          Perform these duties fairly and impartially.

14          Nothing I say now, and nothing I said during the

15    trial, is meant to indicate any opinion on my part about

16    what the facts are or about what your verdict should be.

17          During your deliberations, you must not communicate

18    with or provide any information to anyone by any means about

19    this case.  You may not use any electronic device or media,

20    such as a telephone, cell phone, smart phone, iPhone,

21    Blackberry or computer; the internet, any internet service,

22    or any text or instant messaging service; or any internet

23    chat room, blog, or website such as Facebook, MySpace,

24    LinkedIn, YouTube, or Twitter, to communicate to anyone any

25    information about this case or to conduct any research about

1    this case until I accept your verdict.

2         I do not accept that you will need to communicate

3    with me.  If you do need to communicate with me, the only

4    proper way is in writing.  The writing must be signed by the

5    presiding juror, or, if he or she is unwilling to do so, by

6    some other juror.  The writing should be given to the

7    marshal, who will give it to me.  I will respond either in

8    writing or by having you return to the courtroom so that I

9    can respond orally.

10        If you do communicate with me, you should not

11   indicate in your note what your numerical division is, if

12   any.

13        The evidence consists of the testimony of the

14   witnesses, the exhibits admitted in evidence and

15   stipulations.

16        A stipulation is an agreement between both sides

17   that certain facts are true.

18        Certain things are not to be considered as evidence.

19   I will list them for you:

20        First, if I told you to disregard any testimony or

21   exhibits or struck any testimony or exhibits from the

22   record, such testimony or exhibits are not evidence and must

23   not be considered.

24        Second, anything you may have seen or heard outside

25   the courtroom is not evidence and must be entirely

1    disregarded.

2         Third, questions and objections or comments by the

3    lawyers are not evidence.  Lawyers have a duty to object

4    when they believe a question is improper.  You should not be

5    influenced by any objection, and you should not infer from

6    my rulings that I have any view as to how you should decide

7    this case.

8         Fourth, the lawyers' opening statements and closing

9    arguments to you are not evidence.  Their purpose is to

10   discuss the issues and the evidence.  If the evidence as you

11   remember it differs from what the lawyers say, your memory

12   is what counts.

13        Any notes you have taken during this trial are only

14   aids to your memory.  The notes are not evidence.  If you

15   have not taken notes, you should rely on your independent

16   recollection of the evidence and not be unduly influenced by

17   the notes of other jurors.  Notes are not entitled to any

18   greater weight than the recollections or impressions of each

19   juror about the testimony.

20        You should use common sense in weighing the evidence

21   and consider the evidence in light of your own observations

22   in life.

23        In our lives, we often look at one fact and conclude

24   from it that another fact exists.  In law, we call this

25   inference.  A jury is allowed to make reasonable inferences.

1     Any inference you make must be reasonable and must be based

2     on the evidence in the case.

3          You may have heard phrases like "direct evidence"

4     and "circumstantial evidence."  Direct evidence is proof

5     that does not require an inference, such as the testimony of

6     someone who claims to have personal knowledge of a fact.

7     Circumstantial evidence is proof of a fact, or a series of

8     facts, that tends to show that some other fact is true.

9          As an example, direct evidence that it is raining is

10    testimony from a witness who says, "I was outside a minute

11    ago and I saw it raining."  Circumstantial evidence that it

12    is raining is the observation of someone entering a room

13    carrying an umbrella.

14         The law makes no distinction between the weight to

15    be given to either direct or circumstantial evidence.  You

16    should decide how much weight to be given to any evidence.

17    In reaching your verdict, you should consider all of the

18    evidence in the case, including circumstantial evidence.

19         You must decide whether the testimony of each of the

20    witnesses is truthful and accurate, in part, in whole, or

21    not at all.  You must also decide what weight, if any, to

22    give to the testimony of each witness.

23         In evaluating the testimony of any witness,

24    including any party to the case, you may consider, among

25    other things:

1    The ability and opportunity the witness had to see,
2    hear, or know the things that the witness testified about;

3    The witness's memory;

4    Any interest, bias or prejudice the witness may
5    have;

6    The witness's intelligence;

7    The manner of the witness while testifying; and

8    The reasonableness of the witness's testimony in
9    light of all the evidence in the case.

10   The law does not require any party to call as a
11   witness every person who might have knowledge of the facts
12   related to this trial.  Similarly, the law does not require
13   any party to present as exhibits all papers and things
14   mentioned during this trial.

15   The defendants in this case, Lucas Nanny, Tom
16   Nordman, Joshua Rackley, and Terry Stewart, have been found
17   liable for the use of excessive force against the plaintiff,
18   Christopher Davis, and for failure to intervene to stop or
19   prevent the use of excessive force against the plaintiff,
20   Christopher Davis, so that is not an issue you will need to
21   decide.

22   When I say a particular party must prove something
23   by a preponderance of the evidence, or when I use the
24   expression "if you find," or "if you decide," this is what I
25   mean:  When you have considered all the evidence in the

1    case, you must be persuaded that it is more probably true

2    than not true.

3           In determining whether any fact has been proved, you

4    should consider all of the evidence bearing on the question

5    regardless of who introduced it.

6           The parties have stipulated or agreed to the

7    following facts:

8           1.  On December 26, 2011, plaintiff, Christopher

9    Davis, was a resident at Chester Mental Health Center,

10   operated by the Illinois Department of Human Services.

11          2.  On December 26, 2011, defendants were employed

12   by the Illinois Department of Human Services and assigned to

13   Chester Mental Health Center.

14          3.  On December 26, 2011, defendants were on duty as

15   Security Therapy Aides, or STAs, at Chester Mental Health

16   Center.

17          4.  The Court has previously determined that each of

18   the four defendants used excessive force towards Christopher

19   Davis and failed to intervene in the use of excessive force

20   towards Christopher Davis December 26, 2011.

21          5.  Christopher Davis experienced subconjunctival

22   hemorrhaging following the use of excessive force by the

23   defendants.

24          You must now treat these facts as having been proved

25   for the purposes of this case.

1    If you find that plaintiff sustained an injury or

2   injuries as a direct result of defendants' excessive force

3   and/or failure to intervene, then you must award

4   compensatory damages and determine what amount will fairly

5   compensate him for each injury.

6    Plaintiff must prove his damages by a preponderance

7   of the evidence.  Your award must be based on evidence, not

8   speculation or guesswork.  This does not mean, however, that

9   compensatory damages are restricted to the actual loss of

10   money; they include both the physical and mental aspects of

11   the injury, even if they are not easy to measure.

12    You should consider the following types of

13   compensatory damages, and no other:  The physical and

14   mental/emotional pain and suffering that plaintiff has

15   experienced.  No evidence of the dollar value of physical

16   and mental/emotional pain and suffering has been or needs to

17   be introduced.  There is no exact standard for setting the

18   damages to be awarded on account of pain and suffering.  You

19   are to determine an amount that will fairly compensate

20   plaintiff for the harm that he has sustained.

21    If you find that plaintiff sustained no injury as a

22   direct result of defendants' excessive force and/or failure

23   to intervene, or if you find that plaintiff's injuries have

24   no monetary value, then you must award nominal damages of

25   one dollar for the constitutional violation.

1     You may, but are not required to, assess punitive

2  damages against each defendant.  The purposes of punitive

3  damages are to punish a defendant for his or her conduct and

4  to serve as an example or warning to defendants and others

5  not to engage in similar conduct in the future.

6     Plaintiff must prove by a preponderance of the

7  evidence that punitive damages should be assessed against

8  one or more defendant.  You may assess punitive damages only

9  if you find that a defendant's conduct was malicious or in

10 reckless disregard of plaintiff's rights.  Conduct is

11 malicious if it is accompanied by ill will or spite, or is

12 done for the purpose of injuring plaintiff.  Conduct is

13 reckless -- I'm sorry.  Conduct is in reckless disregard of

14 plaintiff's rights if, under the circumstances, one or more

15 defendant simply did not care about plaintiff's safety.

16     If you find that punitive damages are appropriate,

17 then you must use sound reason in setting the amount of

18 those damages.  Punitive damages, if any, should be in an

19 amount sufficient to fulfill the purposes that I have

20 described to you, but should not reflect bias, prejudice, or

21 sympathy toward any party.  In determining the amount of any

22 punitive damages, you should consider the following factors:

23     The reprehensibility of defendants' conduct;

24     The impact of defendants' conduct on plaintiff;

25     The relationship between plaintiff and defendants;

1    The likelihood that defendants would repeat the

2    conduct if an award of punitive damages is not made; and

3    The relationship of any award of punitive damages to

4    the amount of actual harm the plaintiff suffered.

5    Upon retiring to the jury room, you must select a

6    presiding juror.  The presiding juror will preside over your

7    deliberations and will be your representative here in court.

8    Forms of verdict have been prepared for you.

9    Take these forms to the jury room, and when you have

10   reached unanimous agreement on the verdict, your presiding

11   juror will fill in the appropriate form, and all of you will

12   sign it.

13   The verdict must represent the considered judgment

14   of each juror.  Your verdict, whether for or against the

15   parties, must be unanimous.

16   You should make every reasonable effort to reach a

17   verdict.  In doing so, you should consult with one another,

18   express your own views, and listen to the opinions of your

19   fellow jurors.  Discuss your differences with an open mind.

20   Do not hesitate to reexamine your own views and change your

21   opinion if you come to believe it is wrong.  But you should

22   not surrender your honest beliefs about the weight or effect

23   of the evidence solely because of the opinions of other

24   jurors or for the purpose of returning a unanimous verdict.

25   All of you should give fair and equal consideration

1    to all the evidence and deliberate with the goal of reaching

2    an agreement that is consistent with the individual judgment

3    of each juror.  You are the impartial judges of the facts.

4          And with that, we will proceed with closing

5    arguments on behalf of the plaintiff.

6          MR. SPIRA:  "We're going to show how we do it down

7    here at Chester.  Sit down, you retarded motherfucker.  I'm

8    going to kill you."

9          Christopher Davis was a mental health patient with

10   his hands cuffed behind his back.  He was pulled to the

11   ground, punched, strangled, and kneed in the face.  That's

12   how a 20-year-old kid was welcomed to Chester.

13         Ladies and gentlemen, there has already been a

14   determination in this case that the four defendants used

15   excessive force towards Christopher Davis, and they failed

16   to intervene during the use of excessive force by others.

17         Now, shown here is one of the instructions that

18   Judge Yandle just gave you a moment ago, that you'll receive

19   when you go back to deliberate.  And you can see in the

20   highlighted portion that it says, "The Court has previously

21   determined that each of the four defendants used excessive

22   force towards Christopher Davis and failed to intervene in

23   the use of excessive force towards Christopher Davis on

24   December 26, 2011."  And that, "You must now treat these

25   facts as having been proved for the purpose of this case."

1        Now, what this means is that the only question for

2   you to decide here today is the amount of damages that

3   should be awarded to Chris.

4        You heard Chris take the stand yesterday and he

5   described the attack that happened on December 26, the

6   circumstances of how it happened, and what the defendants

7   said to him before and during the attack.

8        You heard that on December 26, a few days after

9   Chris had arrived at Chester, he stood up in the dining hall

10  because he had forgotten to get a carton of milk.  He was

11  yelled at to sit back down and he was called retarded.

12       Defendants told Chris to stand back up, put his

13  hands behind his back, and they put him in handcuffs.

14  Defendants Terry Stewart and Tom Nordman manhandled Chris,

15  jerking him back and forth, spewing racial slurs and

16  threats, telling him that they were going to show him how

17  they do it at Chester.

18       You heard the evidence that when they entered the

19  stem, Mr. Stewart put Chris in a chokehold and yanked him to

20  the floor.  Mr. Nanny began choking Chris, telling him he

21  was going to kill him.  Chris was turned over and Mr.

22  Rackley kneed him in the face.  Standing behind Chris, Mr.

23  Nordman continued punching him.

24       The four defendants continued beating Chris for what

25  he told you felt like a lifetime.  During this entire time,

1    Chris was handcuffed, unable to protect himself or block his

2    face or his throat.

3         When Chris was taken into the restraint room, he was

4    thrown on the bed, again choked by Mr. Nanny, before being

5    left there for hours, eyes bloodied, lying in pain and

6    crying in the bed.

7         That is how they do it at Chester.

8         Chris described the physical pain he was in during

9    this attack.  His face hurt.  His whole body hurt.  He felt

10   like he couldn't breathe.  But even beyond the physical pain

11   that Chris felt from this attack was the emotional pain.  He

12   has had trouble sleeping.  He gets scared around authority

13   figures.  He has sought mental health treatment and

14   described these same events to a treater.

15        You also heard the testimony from Dr. Tariq, a

16   medical doctor at Chester who examined Chris the day he got

17   to Chester and then again a few days later, after this

18   attack happened.  Chris had no injuries when he arrived;

19   that's what Dr. Tariq told.

20        Four days later, after the attack, Dr. Tariq

21   confirmed Chris's physical injuries.  He told you that he

22   had observed conjunctival redness in both of Chris's eyes.

23   He told you that there was tenderness and swelling around

24   Chris's eyes, swelling of the wrists and swelling behind the

25   left ear.  He observed physical evidence.  He stated that

1    physical evidence was present of abuse by the staff.

2          Dr. Tariq took the stand yesterday and he told you,

3    ladies and gentlemen, that his physical findings

4    substantiated Chris's reports of abuse.

5          You also heard a moment ago that the parties agreed

6    that Chris experienced subconjunctival hemorrhaging

7    following the use of excessive force by the defendants.

8    That's that same bleeding in the eyes that Dr. Tariq told us

9    about, and that you saw pictures of.  Again, this means that

10   you can accept that as a fact.  That's not in dispute.

11         Now, the defendants also had an opportunity to

12   question Chris and Dr. Tariq, but that, that questioning did

13   not refute Chris's and Dr. Tariq's testimony.  You did not

14   hear any explanation from defense counsel for defendants'

15   derogatory statements to Chris.  You didn't hear any

16   explanation why they pulled him to the floor, why they put

17   their hands around his neck, why they kneed and punched him,

18   or why he was tied in restraints for hours.

19         You didn't hear any explanation why Defendant

20   Rackley closed this door, blocking the camera into the stem

21   where Chris was attacked.

22         (Video playing.)

23         Ladies and gentlemen, why is one door suddenly

24   closed, blocking our view into the stem moments before this

25   attack happened?  What is it that defendants are trying to

1    hide?  As the jury, you can answer that question here today.

2         You also didn't hear an explanation why a dozen

3    staff followed Chris into a restraint room, after he had

4    been attacked and remained in handcuffs.

5         (Video playing.)

6         Think about what you just saw there.  Chris had his

7    hands cuffed behind his back and a dozen Chester staff,

8    including the four defendants in this case, took him into a

9    room where he was about to be tied down to a bed for hours.

10        Rather than refuting Chris's or Dr. Tariq's

11   testimony, defense counsel's primary argument seems to be

12   that the attack or the use of excessive force wasn't that

13   bad.  The bleeding, the swelling, the tenderness didn't last

14   that long.

15        When defendants called Chris a retarded motherfucker

16   and told him that they were going to kill him, those words

17   didn't cause any physical harm.

18        You heard defense counsel ask Chris whether Mr.

19   Rackley only *kneed you in the face.  He didn't do anything*

20   *else, right?*

21        Defense counsel asked Chris to confirm that when he

22   had his right hand, his left hand, his right ankle and his

23   left ankle tied down to a bed for hours in leather straps,

24   well, he could still move his head and his neck.  It can't

25   be that bad.

1          Ladies and gentlemen, this attack wasn't that bad?

2    Any amount of punching, choking, kneeing in the face or

3    cursing is unacceptable, particularly in a mental health

4    facility.  When Chris arrived at Chester in 2011, he did not

5    check his rights at the door.  He had been there for four

6    days.  They were the Security Therapy Aides.  Their job was

7    to protect him.  They were supposed to be the adults in the

8    room and they were supposed to keep him safe.

9          They want you to believe this wasn't that bad.  Any

10   physical or emotional abuse is bad enough.

11         Now, Judge Yandle has provided you with a set of

12   instructions to follow in deciding the outcome of this case.

13   And as we have discussed, one of those instructions will

14   remind you that the Court has previously determined that

15   each of the four defendants used excessive force towards

16   Chris Davis and they failed to intervene during that use of

17   force, and that you must accept those facts as having been

18   proved for the purpose of this case.  So again, the only

19   issue left for you to decide is the measure of damages to

20   give to Chris.

21         Now, there are two categories of damages that Chris

22   is asking you to award in this case, and I want to walk

23   through what each of those are.  The first category is

24   what's referred to as compensatory damages.  Again, this is

25   an instruction that Judge Yandle has given you and that you

1    will receive when you go back to deliberate.  Compensatory

2    are just what they sound like, they are meant to compensate

3    Chris both for the physical and the mental and emotional

4    pain that he endured.

5        Now, defense counsel may get up here and try to

6    argue that Chris's injuries don't have monetary value.  But

7    you have heard the undisputed evidence about the physical

8    pain that Chris was in from this attack.  After the attack,

9    his eyes were bloody, his face was swollen and tender, he

10   had bruises on his face.  Dr. Tariq told you he had

11   conjunctival redness, swelling and tenderness.  Defendants

12   agree that Chris had subconjunctival hemorrhaging.  Chris's

13   injuries, his physical injuries here, are undisputed.

14       But, ladies and gentlemen, compensatory damages are

15   not only about physical harm.  More impactful than the

16   physical injuries was the emotional harm that Chris talked

17   to you about.  He told you how he has had trouble sleeping.

18   He's had nightmares and flashbacks to the attack.  Anytime

19   an authority figure approaches him, he gets scared, his mind

20   goes back to this attack; he relives it all over again.

21   Chris has sought mental health treatment following this

22   attack, and described these same events and these same

23   symptoms to his therapist.  Chris has been suffering from

24   this attack for almost eight years.

25       Now, there is no exact standard for setting the

amount of money to be awarded on account of physical and
mental pain and suffering.  Judge Yandle has instructed you
on the same thing.  But when you are deliberating, keep in
mind the physical harm that Chris has endured, and keep in
mind the emotional injuries he suffered on his fourth day in
a mental health facility at the hands of the people who were
there to protect him.

     Now, Chris is asking you to you compensate him for
those physical and emotional injuries in the amount of
75,000 per defendant.  So, that's 300,000 in compensatory
that he is asking for today.  We believe that this amount
will fairly compensate Chris for the physical and the
emotional pain and suffering that he endured.

     Now, I mentioned a moment ago that there are two
categories of damages that you are going to need to consider
when you go back to deliberate.  The first one is the
compensatory damages to compensate Chris for the physical
and emotional pain and suffering.  The second category is
what's referred to as punitive damages.  And punitive
essentially means to punish.

     Judge Yandle has explained to you that "the purpose
of punitive damages are to punish a defendant for his or her
conduct and to serve as an example or warning to defendants
and others not to engage in similar conduct in the future."

     Now, in assessing punitive damages, you should

1    consider whether the defendants' actions were malicious or

2    in reckless disregard of Chris's rights.  In other words,

3    you should award punitive damages as is shown in this

4    instruction if defendants exhibited ill will or spite, acted

5    with the purpose of injuring Chris, or simply did not care

6    about his safety.

7            Now, in deciding punitive damages, all you have to

8    determine is that it is more likely true than not true that

9    this test has been met, that defendants acted maliciously or

10   with ill will or didn't care about Chris's safety.  This is

11   not a criminal trial with a beyond a reasonable doubt

12   standard.  It's more likely true than not true.  You can

13   imagine scales.  And all you have to find to award punitive

14   damages is that it tips ever so slightly in favor of this

15   being malicious, ill will or spite, and that they didn't

16   care of Chris's safety.  Just the slightest move and you

17   should award punitive damages.  That's the standard in this

18   case, in this civil case.

19           So, let's review the punitive damages evidence that

20   you have seen, the evidence that their conduct was malicious

21   and meets the standard, that they didn't care about Chris's

22   safety or acted with reckless disregard.

23           You heard about the derogatory statements the

24   defendants made to Chris before and during this attack, that

25   they were going to show him how they do it at Chester, that

they were going to kill him.  You heard that defendants
choked, kneed, and punched Chris for what he told you felt
like a lifetime.  You heard that they tied him down to a bed
in leather restraints.  And you heard that they closed our
view of the stem moments before this attack happened.

Ladies and gentlemen, there is nothing on the other
side of the scale.  None of this has been refuted.  You, as
the jury, can decide that each of those pieces of evidence
show that defendants acted maliciously and recklessly, that
their statements and their actions showed ill will and
spite, that they acted for the purpose of injuring Chris,
and that they simply did not care about Chris's safety.

As you consider the evidence and award punitive
damages today, remember what Chris told you he hopes to gain
from this case.  He does not want this kind of thing to
happen to anyone else, ever again.

No patient at Chester, no patient at any mental
health facility, should be subjected to this kind of abuse
of power from the security aides who are supposed to protect
the patients, not abuse them.

Now, you should award the amounts that you believe
will hold to serve these defendants accountable for their
disregard of Chris's safety and the amount that will serve
as an example.  By writing down a number for punitive
damages on your verdict form today --

```
 1          THE CLERK:  Three.

 2          MR. SPIRA:  -- you can stop the way they do it at

 3  Chester.

 4          Ladies and gentlemen, I want to thank you again on

 5  behalf of myself and my team and on behalf of Chris, for

 6  considering his case and for being here the past couple

 7  days.  In a few moments, when defense counsel stands up here

 8  and argues to you that this attack wasn't that bad, I want

 9  you to just remember, any abuse is bad enough.

10          Thank you.

11          MS. McCLIMANS:  Thank you.

12          Good morning.  Plaintiff wants you to believe that

13  an attack happened at Chester Mental Health Center.  We

14  don't believe that happened.  It's up to you to decide what

15  actually happened and whether or not any injuries are

16  attributable to the excessive use of force.

17          Now, in looking at the plaintiff's testimony, let's

18  take it step by step.  Plaintiff was in the dining hall.

19  Plaintiff testified that the defendants made derogatory

20  comments to him.  Plaintiff admitted to you that those

21  derogatory comments did not cause him any pain.  Plaintiff

22  then was taken and he was handcuffed.  Up to this point,

23  plaintiff was not injured at all.

24          Plaintiff goes into the stem.  He has Terry Stewart

25  and Tom Nordman both by his sides.  He is taken into the
```

stem area.  Plaintiff testified about this video.  He
admitted to you, he doesn't know why that door was shut.  He
has no idea what was said to the guy vacuuming.  There is no
evidence whatsoever that the door was shut to prevent or --
to prevent anyone from seeing anything.  That is an
inference on plaintiff's part.  Please do not infer that
that was there.  There is no idea, there is no reason to
believe that.

So, we get into the stem area.  There is Terry
Stewart on one side, Tom Nordman on the other side.
Plaintiff testified that one of the men pulled him down.
Plaintiff admitted to you that he actually then landed on
Terry Stewart, sitting at the table there.

After he landed on Terry Stewart, then supposedly
Luke Nanny then jumped on top of all of them and started
strangling or choking plaintiff.  And this is important to
point out.  It was plaintiff's testimony that he was -- that
Lucas Nanny was choking him while he was on top of Mr.
Stewart.  So, we have Mr. Stewart, we have plaintiff, and
then we have Lucas Nanny supposedly choking plaintiff.  It
was the plaintiff's counsel that said strangling.  Plaintiff
never said strangling.  He said choking.

Eventually, you hear about Josh Rackley.  Up to now,
plaintiff admitted that, before that fall, there were no
major injuries.  There were no injuries whatsoever.  So, we

1    have Terry Stewart involved.  We have Tom Nordman involved.

2    And then Lucas Nanny gets involved.  And Lucas Nanny is

3    supposedly on top of the two, choking plaintiff.

4         After that happens, we hear about Josh Rackley

5    coming up, running.  He has not even been on the scene yet.

6    He didn't take part in any derogatory language whatsoever.

7    There's no evidence that, that he said anything or even knew

8    about what was going on.  He came up to help.  He came up

9    because plaintiff had to be brought to his knees so that he

10   could get taken into the next room.

11        Before this happened, before plaintiff was brought

12   to the floor, plaintiff was going to go back to his housing

13   unit.  But after this happened, now we know and plaintiff

14   testified, he's going to the restraint room.

15        So, Josh Rackley comes up, runs up.  Plaintiff

16   testified that Josh Rackley jump kneed him in the face.

17   Three hundred pounds, jump kneeing him in the face.  It

18   doesn't make sense.  Because it didn't happen.  It's up to

19   you to assess credibility here.  It didn't happen.

20        Plaintiff is brought up to his feet.  Plaintiff is

21   walked to the area where he is put into the restraint room.

22   All these other people go into that room because plaintiff

23   has to have his handcuffs taken off; plaintiff has to be

24   restrained onto the bed.

25        Plaintiff also testified that someone eventually

1    came into the room and told you, *You can get out of these*
2    *restraints as soon as you calm down.*

3        So, it's your job here today to tell us what
4    injuries actually were caused by the excessive use of force.
5    It's your job to determine the credibility of the plaintiff
6    here today.

7        Out of all the injuries that plaintiff talked about,
8    the choking, the inference of the strangling, the kicking,
9    the punching, these are the injuries to the plaintiff that
10   were seen four hours after he was released from that --
11   after the incident occurred, after he was placed in the
12   restraints.  These are the injuries.

13        And they talk about Dr. Tariq, telling you about
14   what those injuries are?  Well, Dr. Tariq also told you, he
15   doesn't know what caused those injuries.  It was positive
16   for abuse based upon what the plaintiff told him.  Dr. Tariq
17   didn't receive any indication from the plaintiff that his
18   neck hurt, that there was any choking to his neck.  There is
19   no evidence whatsoever that anything happened to his neck.
20   There is no evidence whatsoever that he was punched anywhere
21   in the stomach or the back, that his ankles were twisted, or
22   that his torso was hurt in any way.

23        Dr. Tariq told you about periorbital tenderness.  He
24   told you about the subconjunctival hemorrhage to the eyes.
25   That was noticed, according to the plaintiff, after he

1    walked back to his housing unit, after someone told him

2    that, *Oh, you should go look at your eyes.*  Four hours after

3    the incident occurred is when anyone noticed that anything

4    was wrong with the eyes.

5         Now, let's talk about what happened in the actual

6    room, when he was strapped down.  He said he cried.  He was

7    able to move his head.  He was strapped down.  He was told

8    that, *As soon as you are quiet, you can get up and go.*  He

9    admitted to you that a nurse came in that room.  A nurse

10   took his vitals.  A nurse was able to look at his face.

11   That nurse isn't here to testify for the plaintiff that

12   there were any injuries present when he was still in that

13   room.  Again, no one notices any injuries at all to the

14   plaintiff until he walks out of that room.

15        I want you to take a good look at that picture, then

16   look at plaintiff.  They look very similar.  Any swelling,

17   as far as plaintiff even admitted, it was minor swelling.

18   The doctor said he received a complaint of minor swelling to

19   the wrist.  That could have been from the handcuffs, a

20   normal use of force.  Nothing else is really shown on the

21   picture.

22        Dr. Tariq testified that there was some swelling

23   behind the ear.  Plaintiff didn't even testify that he was

24   hit behind the ear.

25        Plaintiff also wants you to believe that he's had

1  emotional injuries from this attack.  Plaintiff wants you to

2  believe that he has nightmares, that he can't sleep at

3  night.  Plaintiff admitted to you that he didn't even see a

4  mental health provider about this until 2019, almost eight

5  years after this happened.  Again, it's up to you to judge

6  the credibility of the plaintiff here.

7        Now, I want to go back to Dr. Tariq.  Dr. Tariq

8  recommended Tylenol.  Dr. Tariq recommended X-rays.  No one

9  was here to tell you that the X-rays were positive because

10 they weren't.  The X-rays were normal.  Dr. Tariq also told

11 the plaintiff, *Come back and see me, if you need to.*

12 There's no evidence that he came back to see him.  This was

13 something that happened.  This was a minor incident.

14       It's up to you, again, to judge the credibility of

15 the plaintiff.  He told you about this vicious attack.  It

16 just doesn't add up.  It's not present.  The injuries are

17 not there.

18       Let's talk about each of the defendants just

19 briefly.  Again, Terry Stewart, Tom Nordman, were both in

20 the dining hall.  They said some derogatory comments.

21 Plaintiff admitted it didn't cause him harm at all.

22       He was cuffed.  Terry Stewart, Tom Nordman took him

23 out of the dining hall.  Again, he admitted, comments were

24 made.  Up to that point, he was being moved back and forth,

25 side to side.  He admitted, no injuries were -- occurred

because of that.  None whatsoever.

Then he wants you to believe that someone pulled him down on top of somebody else.  A 300-pound man landed on a smaller man.  And then Lucas Nanny came up and started strangling him or choking him.  Again, he didn't complain about any injuries to his neck.  Didn't complain that he suffered any injuries in that area whatsoever.

Again, someone's running up, and that becomes Josh Rackley, who wasn't a part of any of this before, had no idea what was going on.  He picks up -- or helps pick up the plaintiff.  I want you to infer that he did help pick up the plaintiff because plaintiff was handcuffed.  Plaintiff had to be brought back to his feet.  Plaintiff had to be walked to the next place, which was then the restraint room.

All those people went in the room.  Plaintiff could have had them come testify for him, too, but he did not. Plaintiff said there were witnesses to this attack, but he has nobody else to testify here except for Dr. Tariq.

Dr. Tariq was not a witness to the attack, and told you that the only reason he substantiated the attack was based upon what the plaintiff told him.

You were shown the stipulations several times. Again, in looking at No. 5, I just want to point out to you, Christopher Davis experienced subconjunctival hemorrhaging following the use of excessive force by the defendants.  It

1    doesn't say the defendants caused it.  It doesn't say that

2    at all.  Plaintiffs would like you to infer it, but it

3    doesn't say it.

4         Again, if you look at what he's alleging, what he's

5    saying happened, and what the evidence actually shows, if

6    someone kneed -- if a 250-plus pound man kneed you in the

7    face, it's going to show more than slight swelling.  It

8    didn't happen.

9         We're going to ask that you find in favor of the

10   defendants.  It's up to you to find the amount of, of an

11   award.  Plaintiff has no compensable damages.  We're going

12   to ask that you award one dollar and no punitive damages,

13   because punitive damages are not evident here.

14        Thank you.

15        MR. SPIRA:  Ladies and gentlemen, you just heard

16   defense counsel get up here and say this didn't happen.

17   It's already been decided.  The defendants used excessive

18   force against Chris Davis and failed to intervene.  That is

19   not an issue for you to decide.  That has been decided

20   already.

21        They want to suggest, oh, well, that he had injuries

22   after the incident but not from the incident?  He didn't

23   have any injuries before.  Dr. Tariq testified to that.  He

24   had no injuries when he arrived.  Chris testified to that.

25   Dr. Tariq testified to that.  Then he was attacked.  There

1    was a finding of excessive force and failure to intervene.

2    That's a fact.   Afterwards, he had injuries.

3          A doctor, a medical doctor has testified that he had

4    redness -- he had conjunctival hemorrhaging; he had

5    swelling; he had tenderness; he had a big knot behind his

6    left ear.   It doesn't take a rocket scientist to figure out

7    that this happened from the attack.   There's no other

8    explanation.   They've never offered you any other

9    explanation for any of the injuries.   It didn't happen?

10   It's not even in dispute.   Of course it happened.

11         Defense counsel got up here again and repeated that,

12   *Oh, well, those derogatory statements that you heard?*  She

13   didn't refute that they were said.   She said they didn't

14   cause physical harm.   But ask yourself, *Is it appropriate*

15   *for the Security Therapy Aides to be making those kind of*

16   *statements to a mental health patient, let alone a*

17   *20-year-old on his fourth day there?*   We believe that goes

18   directly to the issue of malice, their ill will, their

19   intent.   The fact that they didn't care about his safety.

20         Defense counsel also said, *Oh, it was four hours*

21   *until someone noticed his injuries.*   That's because he was

22   lying in a restraint room, tied down to a bed.   He wasn't --

23   he wasn't like walking around in a community, going about

24   his day.   He was tied down and told to be quiet until they'd

25   let him out.   Again, not in dispute.   No one disputes that

1    he was in that restraint room, that the defendants tied him

2    down to a bed for hours.

3         Defense counsel asks you to award one dollar in this

4    case.  The constitutional violations have been decided.

5    They used excessive force.  They failed to intervene.  That

6    is not in dispute.  They are asking you to let that slide

7    and to find that constitutional violations by Security

8    Therapy Aides towards a mental health patient have no value.

9    That's what they're asking you to do today.

10        Now, I have to correct something.  I don't know how

11   long defense counsel has known Mr. Stewart, but he was not a

12   smaller man than Chris Davis at the time of this attack.

13        If we could pull up that video one more time?

14        We're going to pause it on what Terry Stewart looked

15   like in 2011.

16        (Video playing.)

17        Pause it there.

18        That's Terry Stewart at the bottom of the screen.

19   That's a smaller man?  Again, I don't know if defense

20   counsel knew that or not, but it's just -- it's just not

21   true.  That's Terry Stewart.

22        Ladies and gentlemen, there has been no other

23   explanation for any of Chris's injuries.  Chris testified to

24   them.  Dr. Tariq testified to them.  Dr. Tariq noted

25   physical evidence of abuse by the staff.  He sat there and

1    he told you that Chris's injuries were substantiated by his

2    findings.

3          Counsel didn't touch on Chris's emotional harm.

4    Chris didn't say that he never sought mental health

5    treatment until nine years later.  He said he sought mental

6    health treatment at two facilities, and defense counsel

7    asked him about one of them.  He did not say that he never

8    received mental health treatment following this incident for

9    nine years.

10          And it is not in evidence -- there is no evidence

11    that X-rays don't exist or that there were negative

12    findings.  Defense counsel telling you that is not evidence.

13    That -- there is no evidence of what those X-rays showed.

14          Ladies and gentlemen, this attack happened.  That is

15    not in dispute.  There was excessive force.  There was a

16    failure to intervene.  Each of the four defendants are

17    liable for that.

18          This should not -- this happened and it should not

19    have happened.  Any abuse is bad enough.

20          Thank you.

21          THE COURT:  All right.  Ladies and gentlemen, you

22    have now heard the evidence and the closing arguments from

23    the parties.  You will now be retiring to the jury room to

24    begin your deliberations.

25          Once the marshal is sworn in, he will lead you back

1    into the jury room.  Miss Hurst will then come back and

2    instruct you on how to use the equipment back there, and

3    then it's all in your ballpark.

4           (CSO sworn by clerk.)

5           (Jury out to deliberate at 9:49 a.m.)

6           (Court recessed from 9:49 a.m. to 10:36 a.m.)

7           (Notification of verdict from jury at 10:36 a.m.)

8           (Proceedings continued in open court, plaintiff

9    present; jury not present.)

10          THE COURT:  While they're bringing in the jurors,

11   let me just remind and ask everyone in the courtroom, there

12   should be no outburst or any demonstrative reactions to the

13   jury's verdict, whichever it is.

14          (Proceedings continued in open court, plaintiff

15   present; jury present.)

16          THE COURT:  Okay.  Who is the presiding juror?

17          FOREPERSON:  (Indicating.)

18          THE COURT:  Okay.  ~~Mr. Kucera~~, has the jury reached

19   a unanimous verdict?

20          FOREPERSON:  We have, Your Honor.

21          THE COURT:  And do you have the form?

22          FOREPERSON:  I do.

23          THE COURT:  And could you hand it to the marshal,

24   please.

25          (Pause.)

1      Okay.  I will now publish the jury's verdict.

2      The jury has reached a verdict and they checked Box

3  No. 2:  We assess compensatory damages in the following

4  amount:  $150,000.

5      The jurors also checked Box No. 3:  We assess

6  punitive damages, if any, against the following defendants:

7      Defendant Lucas Nanny in the amount of $75,000;

8  Defendant Tom Nordman in the amount of $75,000;

9      Defendant Josh Rackley in the amount of $75,000;

10     Defendant Terry Stewart in the amount of $75,000.

11     The total, with compensatory and punitive damages,

12  is $300,000 dollars.

13     I will now poll the jurors.

14     (Whereupon, the jury was polled and the verdict

15  rendered unanimous.)

16     THE COURT:  All right.  Ladies and gentlemen of the

17  jury, you have now completed your service and, on behalf of

18  the parties and the Court, we thank you for your service.

19  We do know that jury service is not easy and, as I explained

20  to you yesterday, it's an inconvenient and may, in some

21  ways, be an intrusion.  But it is extremely important and we

22  appreciate the fact that you have been and were committed to

23  your service and you carried it out.

24     The marshal will lead you back to the jury room.

25  Miss Hurst needs to come back and process you out, and then

1    we'll get you on your way.

2         Thank you for your service.

3         THE CLERK:  All rise for the jury.

4         (Proceedings continued in open court, plaintiff

5    present; jury not present.)

6         THE COURT:  Again, on behalf of the Court, I want to

7    thank the parties and the attorneys for conducting yourself

8    in a civil and professional manner, which you all did.  And,

9    obviously, there are two sides to every case.  But the one

10   common side is that everybody in the courtroom receives a

11   fair trial, and is entitled to so, and I hope -- I feel that

12   this jury was certainly dedicated to that, to that duty.

13        So, Miss -- we can get -- Miss Hurst is going to go

14   process the jurors.

15        Sona, would you -- if anybody wants a copy of the

16   Verdict Form, we'll have Miss Patel make you a copy.

17        And again, thanks and good luck to everyone.

18        Yes, sir, Mr. Spira?

19        MR. SPIRA:  Judge, I think you may have misspoke on

20   the overall total.  I just wanted to clarify that for the

21   record.

22        THE COURT:  Yeah, I did.  That's $450,000.  Is that

23   right -- yeah, $75,000 has been assessed in punitive damages

24   against each defendant.

25        Mr. Spira, I appreciate you outing my largest

1    shortcoming -- well, one of them, anyway -- in front of

2    everybody which is, I cannot add and subtract.  But that is

3    450,000.

4         But the verdict form and, more importantly, the

5    judgment will bear out the correct amount.  And I apologize

6    for that.

7         Thank you.

8         MR. SPIRA:  Thank you, Judge.

9         THE CLERK:  All rise.  Court is adjourned.

10        (Court adjourned at 11:18 a.m.)

11

12

13                    REPORTER'S CERTIFICATE

14        I, Christine Dohack LaBuwi, RDR, CRR, Official Court

15   Reporter for the U.S. District Court, Southern District of

16   Illinois, do hereby certify that I reported with mechanical

17   stenography the proceedings contained in pages 127-163; and

18   that the same is a full, true, correct and complete

19   transcript from the record of proceedings in the

20   above-entitled matter.

21

22        DATED this 13th day of January, 2020,

23

24             s/Christine Dohack LaBuwi, RDR, CRR
               ---------------------------------------
25             Christine Dohack LaBuwi, RDR, CRR